1  Scott D. Baker (SBN 84923)
   *Email: sbaker@reedsmith.com*
2  James A. Daire (SBN 239637)
   *Email: jdaire@reedsmith.com*
3  REED SMITH LLP
   Two Embarcadero Center, Suite 2000
4  San Francisco, CA 94111-3922

5  **Mailing Address:**
   P.O. Box 7936
6  San Francisco, CA 94120-7936

7  Telephone:     +1 415 543 8700
   Facsimile:     +1 415 391 8269
8
   Attorneys for Plaintiff
9  Clear Channel Outdoor, Inc.

10              UNITED STATES DISTRICT COURT

11            NORTHERN DISTRICT OF CALIFORNIA

12                  OAKLAND DIVISION

13  CLEAR CHANNEL OUTDOOR, INC., a          Case No.:  C 07-06138 SBA (JL)
    Delaware Corporation,
14                                          **DECLARATION OF JAMES A. DAIRE IN**
                      Plaintiff,            **SUPPORT OF CLEAR CHANNEL**
15                                          **OUTDOOR, INC'S MOTION FOR**
          vs.                               **PARTIAL SUMMARY JUDGMENT**
16
    LINDA ERKELENS, an individual,          **[Fed.R.Civ.P. 56]**
17
                      Defendant.            Date:       September 23rd, 2008
18                                          Time:       1 p.m.
                                            Place:      Courtroom 3, 3rd Floor
19
                                            Compl. Filed:  December 4, 2007
20                                          Trial Date:  November 10, 2008

21                                          Hon. Saundra Brown Armstrong

22          <u>**RE-SUBMITTED FOR FILING IN THE PUBLIC RECORD**</u>

23

24

25

26

27

28

DECLARATION OF JAMES A. DAIRE IN SUPPORT OF CLEAR CHANNEL OUTDOOR, INC.'S MOTION FOR
PARTIAL SUMMARY JUDGMENT

1    I, James A. Daire, declare:

2

3        1.      I am an attorney at law licensed to practice before the courts of the State of California

4    and the Northern District of California and an associate at Reed Smith LLP, attorneys for Plaintiff

5    Clear Channel Outdoor, Inc. ("Clear Channel").  I have personal knowledge of the matters set forth

6    herein, and if called as a witness, could and would completely testify to them.

7

8        2.      Attached hereto as Exhibit A are true and correct certified excerpts from the

9    deposition of Linda Erkelens, taken in connection with this matter on July 14 and July 17, 2008 in

10   San Francisco, California. The excerpts show the deponent's name and includes the court reporter's

11   certification that the transcript is a true and correct record.

12

13       I declare under penalty of perjury of the laws of the United States that the following is true

14   and correct.

15

16       DATED:  August 6, 2008.

17                                          _____/s/  James. A. Daire_____

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF JAMES A. DAIRE IN SUPPORT OF CLEAR CHANNEL OUTDOOR, INC.'S MOTION FOR
PARTIAL SUMMARY JUDGMENT

## **Certificate of Service**

The undersigned hereby certifies that all counsel of record who are deemed to have consented to electronic service are being served this 11th day of August 2008, with this document via the Court's CM/ECF system.  I certify that all parties in this case are represented by counsel who are CM/ECF participants.

_____/s/_____
James A. Daire

DECLARATION OF JAMES A. DAIRE IN SUPPORT OF CLEAR CHANNEL OUTDOOR, INC.'S MOTION FOR
PARTIAL SUMMARY JUDGMENT

# EXHIBIT A

Page 1

1                    UNITED STATES DISTRICT COURT

2                   NORTHERN DISTRICT OF CALIFORNIA

3                       SAN FRANCISCO DIVISION

4

5      CLEAR CHANNEL OUTDOOR, INC., a
       Delaware corporation,
6
                        Plaintiff,
7
           vs.                          CASE NO. C 07-06138 JCS
8
       LINDA ERKELENS, an individual,
9
                        Defendant.
10     ~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

11

12

13                        DEPOSITION OF

14                    LINDA KALEY ERKELENS

15

16                       July 14, 2008

17                        1:21 p.m.

18

19           Two Embarcadero Center, Suite 2000

20               San Francisco, California

21

22

23           QUYEN N. DO, RPR, CSR No. 12447

24

25

```
 1                    APPEARANCES OF COUNSEL

 2

 3        For Plaintiff:

 4             REED SMITH LLP

 5             JAMES A. DAIRE, ESQ.

 6             Two Embarcadero Center, Suite 2000

 7             San Francisco, California 94111

 8             415.659.5922

 9             415.391.8269 Fax

10             jdaire@reedsmith.com

11

12        For Defendant:

13             LUCE, FORWARD, HAMILTON & SCRIPPS LLP

14             GERALD M. MURPHY, ESQ.

15             Rincon Center II

16             121 Spear Street, Suite 200

17             San Francisco, California 94105-1582

18             415.356.4600

19             415.356.4610 Fax

20             gmurphy@luce.com

21

22

23

24

25
```

```
 1                    SAN FRANCISCO, CALIFORNIA

 2              MONDAY, JULY 14, 2008; 1:21 P.M.

 3                    LINDA KALEY ERKELENS,

 4    having been first duly sworn, testifies as follows:

 5

 6                         EXAMINATION

 7    BY MR. DAIRE:

 8         Q    Could you please state your name and spell it

 9    for the record.

10         A    Linda Kaley Erkelens, L-i-n-d-a K-a-l-e-y

11    E-r-k-e-l-e-n-s.

12         Q    Ms. Erkelens, have you ever been deposed

13    before?

14         A    Yes.

15         Q    When was that?

16         A    1970.

17         Q    And was that the only time you've been

18    deposed?

19         A    Yes.

20         Q    And can you tell me briefly about the case you

21    were deposed in?

22         A    It was a divorce case.

23         Q    Okay.  So you're a little bit familiar with

24    this process here, and I'm just going to go through a

25    few things to kind of refresh your memory of the
```

1     in as a real estate broker; is that right?

2          A     A college degree.

3          Q     A college degree.  And you made a distinction

4     between the training that's required then and now.  Do

5     you have to do any sort of continuing education in order

6     to keep your license up to date?

7          A     Yes, I do.

8          Q     And can you describe the continuing education

9     that's required?

10         A     Every four years I have to take 45 hours of

11    continuing education.  But that wasn't what I was

12    referring to.

13         Q     What were you referring to?

14         A     You can no longer be grandfathered in to get

15    your broker's license.  You have to have two years of

16    experience.

17         Q     And you've now had approximately 30 years of

18    experience as a real estate broker; is that more or less

19    accurate?

20         A     More or less.

21         Q     And what about the continuing education

22    component?  Let's just take the last time you had to be

23    certified for an example.  Could you describe the

24    continuing education that was required?

25         A     I buy books from First Tuesday that cover the

Linda Kaley Erkelens                                                              July 14, 2008

Page 17

```
 1                    (Record read as follows:

 2                     "QUESTION:  Would you categorize

 3                     yourself as self-employed?

 4                     "ANSER:  And retired.")

 5   BY MR. DAIRE:

 6        Q    Okay.  I said you were self-employed, and you

 7   agreed.  Could you describe the nature of that

 8   self-employment?

 9        A    Managing rental property.

10        Q    And what property do you manage?

11        A    Apartment buildings that I own.

12        Q    How many buildings would that be?

13        A    Four.

14        Q    One of those buildings 1801 Turk Street?

15        A    Yes.

16        Q    Where are the other buildings located?  Are

17   they in San Francisco, or are they outside of

18   San Francisco?

19        A    San Francisco.

20        Q    Are you the sole owner of those properties?

21        A    No.

22        Q    Who else owns those properties?

23        A    My husband owns two of them with me.

24        Q    And the other two are owned 100 percent by

25   you?
```

Linda Kaley Erkelens                                        July 14, 2008

Page 21

```
 1       A    As far as I know.  My computer crashed, and I
 2   had to go back to a backup, and I think I got them all.
 3       Q    What did you talk to your assistant about with
 4   respect to this deposition?
 5       A    What a pain it is.  How I'm being blackmailed.
 6   How ... that when I bought the building, I didn't
 7   envision that terminating the billboard and getting a
 8   different vendor would be so brutal, that I was being
 9   extorted.
10       Q    Okay, what is McIntosh Property Services?
11       A    It's a fictitious name I assigned to my rental
12   property years ago.  It's just me.
13       Q    Is it a corporation?
14       A    No.  It's nothing, because I didn't renew the
15   fictitious-name filing.
16       Q    Do you still use it in connection with your
17   property management services?
18       A    To a certain extent.
19       Q    What do you mean by a certain extent?
20       A    It's on letterhead and envelopes.
21       Q    When checks come in for rent and that sort of
22   thing, are they made out to Linda Erkelens or McIntosh
23   Property Services?
24       A    Most of the time they're made out to Linda
25   Erkelens.
```

Linda Kaley Erkelens                                      July 14, 2008

Page 26

1      Q    You've identified four properties that you

2   own, each of which are real estate properties that have

3   apartment buildings on them.  Are there any billboards

4   on properties other than 1801 Turk Street?

5      A    Of any of the residential buildings?

6      Q    Of any of the buildings that you own other

7   than 1801 Turk Street.

8      A    No.

9      Q    So currently there are no billboards on any

10  property besides 1801 Turk; is that right?

11     A    Any of my residential properties.

12     Q    You made a distinction between residential and

13  commercial.  Do you own commercial property as well?

14     A    We own a business.  We are part owners in a

15  business.

16     Q    What's the name of that business?

17     A    California Mini Storage.

18     Q    And is there a billboard at that location?

19     A    Yes, there is.

20     Q    And who is the lessee of the real estate for

21  the billboard at that location?

22     A    I think it's CBS.

23     Q    Not Clear Channel?

24     A    No, I don't think -- no.

25     Q    And not ADS?

Linda Kaley Erkelens                                              July 14, 2008

Page 29

```
 1    are located at the 1801 Turk Street property.  You

 2    understand that?

 3         A    Yes.

 4         Q    Who currently owns the real property at 1801

 5    Turk Street?  Is it Linda Erkelens or McIntosh Property?

 6         A    McIntosh does not own anything.  It's a

 7    nonentity.  Linda Erkelens and Ronald Dion own it in

 8    their revocable trust.

 9         Q    Okay.  And when was it acquired?

10         A    To the best of my recollection, August 17th,

11    2004.

12         Q    It's a good recollection.

13         A    Well, last week I said August 22nd, so I'm

14    being careful.

15         Q    And from whom was it purchased?

16         A    A bunch of people, including Craig Lipton,

17    Marion Lipton and several other people, and I can't

18    remember if it had a business name.

19         Q    Do you recall what the purchase price was?

20         A    Yes.

21         Q    What was it?

22         A    3,970,000, to the best of my recollection.

23         Q    So that's $3,970,000, right?

24         A    Yes.

25         Q    How did you come up with the purchase price?
```

Page 30

1     A     Craig Lipton said, "If you want to buy the

2  building, that's what I want."

3     Q     And how did you determine that you and your

4  husband were willing to offer that amount?

5     A     The price was in line with other property on

6  the market at that time.  It was built at a period that

7  we liked.  The location was acceptable.

8     Q     Okay, you said it was in line with other

9  property.  How did you determine that?

10    A     Properties, at that point, were selling at

11 about 13.8 times gross rents.

12    Q     How did you know that?

13    A     Various pub -- analysis that was put forth on

14 sales by various agents.

15    Q     So you consulted with real estate agents in

16 connection with the 1801 Turk purchase.

17    A     No.  I read e-mail that comes across my desk.

18 I read Board of Realtors or, you know -- there's a whole

19 bunch of people that put out monthly and quarterly

20 analysis of sales, which includes gross rent multiplier.

21    Q     And you said, in your estimation, the market

22 GRM, which is what I'll refer to the acronym for gross

23 rent multiplier, was about 3.8?

24    A     13.8.

25    Q     13.8.  I'm glad I asked again.

Page 31

1          Do you still have any of the e-mails you

2     reviewed to reach that conclusion?

3          A    No idea.

4          Q    You haven't looked?

5          A    I have not looked.

6          Q    You also said that it was the period that you

7     were looking for.  Can you elaborate on that a little

8     bit?

9          A    I like 19 -- mid-1920s buildings in the Marina

10    style.

11         Q    Are the other buildings that you own the same

12    period?

13         A    Yes.

14         Q    So you've got a style?

15         A    I have style.

16         Q    And you also said the location appealed to

17    you.  The location is Turk Street and Divisadero; is

18    that right?

19         A    That's correct.

20         Q    What about that location appealed to you?

21         A    It would attract the kind of tenants that I

22    like to attract to the kind of building that I like to

23    own.

24         Q    By attract tenants, do you just mean tenants

25    that had a certain level of income that you could rely

Linda Kaley Erkelens                                        July 14, 2008

Page 43

```
 1        A    I believe the inspections were done, and then
 2   they were all waived, and the price was lowered.
 3        Q    I see.  You said a review of financial
 4   documents.  Was one of the conditions to the sale -- do
 5   you remember what documents you looked at?
 6        A    All the tenants' files, the leases, the
 7   rent-raise letters.  Tenant applications, if they
 8   existed.
 9        Q    Did you also review the lease in place between
10   Clear Channel and Maven Investments?
11        A    Yes, I did.
12        Q    And this was prior to the close of escrow,
13   correct?
14        A    Yes.
15        Q    Was this prior to signing the contract for
16   sale?
17        A    I don't know.  Or I don't remember.
18             MR. DAIRE:  Let's take a look at that now.
19                     (Exhibit 2 marked)
20   BY MR. DAIRE:
21        Q    Take a quick look through, Miss Erkelens, and
22   let me know when you're finished.
23        A    What -- is there a question on the table?
24        Q    Just waiting for you to finish reviewing.
25   Just let me know when you're done.
```

Page 44

 1      A    Okay.

 2      Q    I just want to make sure that we have the

 3   timeline right.

 4           What is this document that I've just handed

 5   you?  Can you describe it?

 6      A    It's a contract for sale and purchase of real

 7   property at 1801 Turk Street.

 8      Q    Who are the parties to the agreement?

 9      A    Linda Erkelens and Ron Dion as buyers and

10   Craig Lipton, representing the sellers.

11      Q    Okay.  Did you fill out this contract?

12      A    No.  He rewrote my initial offer, and this is

13   his contract.

14      Q    Okay.  So the handwriting at the top of the

15   page is his?

16      A    Yes.  He is actually my agent in this.  I am

17   not operating as a real estate broker in this deal.

18      Q    Okay, I just want to make sure that we have

19   the timeline right here.  So the inspections and

20   conditions that you mentioned just prior to this, to the

21   best of your recollection, were those done just prior to

22   or after May 19th, 2004?

23      A    I don't remember.

24      Q    With respect to the financial document review,

25   did you undertake that yourself, or did someone else

Page 45

1    help you?

2         A    I did it.

3         Q    Did Mr. Dion look at any documents, financial

4    documents?

5         A    Don't remember.

6         Q    So it's possible that he, too, was doing the

7    financial document review?

8         A    Not at a detail level.

9         Q    You were in charge?

10        A    I was in charge.

11        Q    Did you have any lawyers look over any of the

12   financial documents?

13        A    No, I did not.

14        Q    Did you feel confident you could render the

15   right conclusion with respect to the financial

16   documents?

17        A    Yes, I did.

18        Q    And why did you feel that way?

19        A    Why did I feel ...

20        Q    That you could render a conclusion about the

21   financial documents?

22        A    Because I dealt with other rental property.

23        Q    Okay.  Drawing on your years as a real estate

24   broker?

25        A    No.  Drawing on my years of rental property.

Page 46

```
 1        Q     Ownership of real estate property?

 2        A     Yes.

 3        Q     The other category you mentioned were the

 4   tenant files, and I think we've covered any letters or

 5   applications as well the documents -- as well as the

 6   agreement between Clear Channel and Maven Investments.

 7   Were there anything else in the tenant files that you

 8   can recall?

 9        A     Yeah.  One of the tenants had his security

10   deposit rebated for some reason such that he had no

11   security.  There were an occasional late notice.  There

12   were applications, most of which were done by e-mail.

13   Some of the older tenants had written applications.

14   There were not credit checks.  Rent-raise letters.

15        Q     So the files were pretty thorough, then?

16        A     I wouldn't call them thorough.  They were ...

17   I mean, they lack credit reports, for instance.

18        Q     In comparison to the other files you've dealt

19   with in your 30-odd years of property ownership, would

20   you consider these files more complete? less complete?

21   about the same?

22        A     A little less complete.

23        Q     And anything else besides the credit reports

24   that comes to mind in terms of stuff that would be

25   missing?
```

Page 47

1    A    If there were any written notices to tenants

2    on noise, you know, condition or anything, they didn't

3    exist.

4    Q    Did you ask Maven Investments about the

5    missing documents?

6    A    No, I didn't.

7    Q    And these credit reports and notices, they

8    would have been documents relating to tenants of the

9    apartment building, right?

10   A    Correct.

11   Q    Did you consider whether anything was missing

12   from the Clear Channel file?

13   A    No, I didn't.

14   Q    You didn't consider?

15   A    I didn't -- I didn't say that.  Did I ... the

16   Clear Channel files seemed to have the appropriate

17   paperwork in it.

18   Q    So you reviewed the file, and you determined

19   that the file was complete so far as you knew?

20   A    Yes.  And I read the lease.

21   Q    And again so we're clear on the timeline, this

22   would have been roughly spring of 2004?

23   A    Yes.

24   Q    Prior to close of escrow?

25   A    Definitely, yes.

Page 48

1      Q    Did you talk to anybody at Maven Investments

2   about the Clear Channel lease?

3      A    No, I didn't.

4      Q    Did you talk to your husband, Mr. Dion, about

5   the Clear Channel lease at this time?

6      A    I told him when it was up and that it had very

7   specific rules for giving notice to terminate it.

8      Q    And this is all --

9      A    And that we would have to be careful.

10     Q    And this is prior to the close of escrow?

11     A    Yes.

12     Q    Did you have any conversations with any other

13  third parties, prior to the close of escrow, regarding

14  the Clear Channel lease?

15     A    Not that I remember.

16     Q    And again sticking with the prior to the close

17  of escrow time period, did you talk to anyone at Clear

18  Channel about the lease?

19     A    No, I didn't.

20     Q    Did you ask anyone at Maven Investments about

21  contact information for people at Clear Channel so you

22  would have that information in the future, again

23  confining the time period to before the closing?

24     A    I assumed it was in the file.

25     Q    Did you look for that information when you

1    looked through the file?

2        A    We did a letter when we bought the building,

3    stating the change of ownership.

4        Q    And this is prior -- I'm still talking prior

5    to the close of escrow here.  Was one of the things that

6    you looked for, in the Clear Channel file, contact

7    information and the like so that you could continue the

8    relationship after the sale of the building went

9    through?

10        A    No.

11        Q    At this time, did you have any plans for the

12    real estate where the sign structure was located prior

13    to the close of escrow?

14        A    At this point, did I have any what?

15        Q    Any plans for the real estate used for the

16    billboard structure.

17        A    No.

18        Q    Did you do or have someone else do any

19    inspections related to the sign structure before the

20    close of escrow?

21        A    Only if it was part of the contractor's

22    inspection.

23        Q    So you're not sure --

24        A    No, I'm not sure.

25        Q    -- whether it was a part of the contractor's

| | | |
|---|---|---|
| 1 | A | Craig Mallory. |
| 2 | Q | Sorry.  Craig Mallory or Craig Lipton? |
| 3 | A | Craig Mallory. |
| 4 | Q | Craig Mallory.  Who is Craig Lipton? |
| 5 | A | Craig Lipton is the main owner of the |

6    property.  Craig Mallory is a real estate broker that

7    works for Craig Lipton.

| | | |
|---|---|---|
| 8 | Q | Two Craigs.  That's why I was confused. |
| 9 | A | Mm-hm.  You didn't get it wrong. |
| 10 | Q | So Mr. Lipton was the prior owner of 1801 |

11    Turk.  One of --

| | | |
|---|---|---|
| 12 | A | One of -- one of the prior owners. |
| 13 | Q | I know you said you can't remember when you |

14    got this, but it looks like -- would you agree with me

15    that it covers up through April 2004?

| | | |
|---|---|---|
| 16 | A | That's what I was just checking.  Yes.  Where |

17    is this?

| | | |
|---|---|---|
| 18 | Q | So would you say you got this sometime between |

19    May 2004 and the close of escrow?

| | | |
|---|---|---|
| 20 | A | Yes. |
| 21 | Q | You wouldn't have been given this after close |

22    of escrow?

| | | |
|---|---|---|
| 23 | A | No, I would not. |
| 24 | Q | And I want to confirm that I'm reading this |

25    right for the gross numbers.  If we look at the 2003

```
 1    column, the gross income from all of 1801 Turk Street

 2    was $286,339; is that right?

 3          A    639.

 4          Q    639, thank you.

 5          A    Yes.

 6          Q    So it was 286639; is that right?

 7          A    Yes.

 8          Q    And are there any numbers on this sheet or

 9    that are not on this sheet, I should say, that should

10    have also contributed to gross income?

11          A    Not that I know of.

12          Q    So the six categories here (apartment income,

13    parking, billboard, storage, laundry, bad-check

14    fees/late fees) would have been the entire universe of

15    gross income.  Is that right?

16          A    According to this statement, yes.

17          Q    And you can't think of anything else that

18    would belong on this sheet?

19          A    No.

20          Q    Of the gross income in the year 2003, $1,974

21    of it was attributable to the billboard; is that right?

22          A    According to this sheet.

23          Q    Was there a source document that was used to

24    generate these numbers, if you know?

25          A    You'll have to ask Craig Lipton.
```

1        Q     So you don't know?

2        A     I don't know.

3        Q     Did you ask him, when you received this

4     document, whether there were source documents?

5        A     No.

6        Q     You took his word that these were accurate

7     numbers?

8        A     No.  I verified it against the rental files

9     and leases.

10       Q     So there is a document that substantiates this

11    number that you've seen?

12       A     I went through the apartment rents.  I went

13    through all the project -- all the current rent, and

14    they added up.  I multiplied them by 12, and it was

15    within the ballpark of that.

16       Q     So you did an analysis of this document?

17       A     I did what?

18       Q     You did an analysis of this document?

19       A     Well, I would have done an analysis of these

20    figures, whether -- since I don't remember when we got

21    the document.

22       Q     Okay, fair enough.  You did an analysis of

23    these figure; is that right?

24       A     Yes.

25       Q     And you concluded that, maybe give or take a

Page 59

1    a five-minute break.  I don't know if you'd appreciate

2    one as well.

3        A    Oh, I would.

4              (Break taken at 2:51 p.m. to

5              2:59 p.m.)

6              MR. DAIRE:  Ready to resume.

7        Q    (By Mr. Daire)  You had testified that the

8    final contract price of the deal to purchase 1801 Turk

9    Street was 3.97 million.  How did you internally value

10   that deal for Linda Erkelens and Ron Dion?

11             MR. MURPHY:  Objection.  Vague.

12   BY MR. DAIRE:

13       Q    Do you understand the question?

14       A    Yeah.  I -- I do find it vague, and I ...

15       Q    So you don't understand the question?

16       A    I value any deal based on rents and price and

17   current interest rate, expenses.

18       Q    How did you reach the conclusion that it made

19   sense to buy for 3.79 million?

20       A    I analyzed the finances.

21       Q    And, when you say finances, what

22   specifically --

23       A    Income --

24       Q    -- are you referring to?

25       A    Income, expense, loan cost.

1        Q     And the categories income and expense are

2    covered on the Exhibit 3 that we just looked at; is that

3    right?

4        A     That's right.

5        Q     And you said you also look at loan cost,

6    which, I assume, is something that you would negotiate

7    with Washington Mutual bank, right?

8        A     I don't know you negotiate.  You look at what

9    they're offering or what they're willing to loan, what

10   the payments would be, before they start going up and up

11   and up.

12       Q     Okay, so we've got income and expense as

13   stated on the Exhibit 3, and we've got loan costs.  Are

14   there any other variables that you would have accounted

15   for in figuring out that you make the deal of 3.97

16   million?

17       A     Well, you have to look at what work has to be

18   done, what's been neglected.

19       Q     Was there anything that stuck out in that

20   regard?

21       A     Yeah.  The whole -- the paint on the rear was

22   peeling.  The paint on the other three sides was ugly

23   and sloppy.  The cold-water plumbing was shot, but we

24   didn't know that.  There was dry rot and pest control

25   work based on the pest control work from R and S Pest

Linda Kaley Erkelens                                                July 14, 2008

Page 73

```
 1        Q     And that's -- ·

 2        A     So it says.

 3        Q     Do you have any reason to doubt that?

 4        A     No, I don't.

 5        Q     And did you write this letter?

 6        A     Yes.

 7        Q     Did anyone write it with you?

 8        A     No.  Mindy might have typed it, but I told her

 9   what I wanted if she did, or I typed -- did it.

10        Q     So you either typed it yourself or dictated

11   it?

12        A     Correct.

13        Q     Did you give it to anyone to review before you

14   sent it to Clear Channel?

15        A     No.  There was a lot of controversy about

16   illegal billboards, and mine didn't have a sign -- a

17   number on it.  I wanted to make sure that we weren't

18   illegal.  There were newspaper articles on illegal

19   billboards.

20        Q     So you were aware of some controversy

21   surrounding illegal billboards in San Francisco?

22        A     Yes.

23        Q     And you initiated this letter because you were

24   concerned that the billboard at 1801 Turk might be

25   illegal?
```

Linda Kaley Erkelens                                                July 14, 2008

Page 74

1        A    It didn't have a permit number or size on it,

2    and I had read in the newspaper that it had -- all

3    billboards had to have a permit number and size on it.

4        Q    So you were concerned that it might be

5    illegal; is that right?

6        A    It crossed my mind.

7        Q    Is there a reason you wrote this letter to

8    Clear Channel as opposed to just putting up the permit

9    number and size yourself?

10            MR. MURPHY:  Objection.  Argumentative.

11            THE WITNESS:  It's what?

12            MR. MURPHY:  It's argumentative.

13   BY MR. DAIRE:

14       Q    I'll withdraw the question and ask it this

15   way:  Why did you write this letter to Clear Channel?

16       A    I wasn't going to crawl up in the structure

17   and do it myself.

18       Q    Okay, was there a reason why you didn't hire

19   someone to do it?

20       A    Never occurred to me.  You're putting the copy

21   on the billboard.  Clear Channel was putting the copy on

22   the billboard.  They could put the size and number on

23   it.

24       Q    So it never occurred to you to take care of

25   putting the permit number and size up yourself?

Page 75

1        A     No.

2        Q     Other than newspapers, did you draw on any

3    other sources for your understanding that all

4    San Francisco billboards must have number and size?

5        A     I don't remember.

6        Q     Did you have any conversations with anybody,

7    prior to sending this letter, about that law?

8        A     No.   I mean, I read the Apartment Association

9    magazine.  I read the Board of Realtors magazine,

10   anything that is in there in addition to newspapers.

11   But, no, I did not have a conversation.

12       Q     Did you talk to your husband about it?

13       A     I might have.

14       Q     I asked because the letter is from you and

15   your husband, so I was curious whether you had discussed

16   with him prior to sending.

17       A     I don't remember.

18       Q     You wrote this letter on or about November

19   2nd, 2005, right?

20       A     Right.

21       Q     Did you have any conversations with Clear

22   Channel between the time you told them that you assumed

23   the lease and this letter?

24       A     I don't remember any.

25       Q     So it may have happened; you just don't

1    A    No.

2    Q    What about any other third parties; did any

3    other third parties tell you, "We saw Clear Channel do

4    this"?

5    A    No.

6    Q    So you just assumed that Clear Channel had

7    done it?

8    A    That's correct.

9    Q    And, at any point during this time period, did

10   you tell Clear Channel they needed specific permission

11   to come onto your property to put the number and size on

12   the sign?

13   A    No.

14   Q    To your knowledge, did Mr. Dion tell Clear

15   Channel they needed specific property [sic] to put the

16   permit number and size on the property?

17   A    To my knowledge, he did not.

18   Q    Anybody else representing you or on your

19   behalf?

20   A    I can't think of anyone.

21   Q    Had you placed any general restrictions on

22   Clear Channel's access to the property during this time?

23   A    I recall telling them not to leave ladders

24   going up the front while they were working on it.

25   Q    But with respect to access to your property,

Page 79

1    do you recall putting any general restrictions on their

2    access to your property?

3         A     No, I do not.

4         Q     Do you know why they would have needed access

5    to your property during this time?

6         A     To change the billboard signs.  Change the

7    advertising copy is what I mean.

8         Q     Did they do any general maintenance of the

9    sign at this time, to your knowledge?

10         A     What do you mean by general maintenance?

11         Q     Cleaning, for example.  Start with cleaning.

12         A     I don't know.

13         Q     What about safety, checking to make sure it

14    was still affixed that sort of thing; do you know?

15         A     I don't know.

16         Q     At any time between when you told Clear

17    Channel that you had assumed the lease and this letter,

18    the November 2nd, 2005, letter, did you restrict or

19    otherwise ban Clear Channel from your property?

20         A     No.

21         Q     And other than Clear Channel's response to

22    your letter, if they did respond, did you have any

23    conversations with Clear Channel at this time period

24    about the possible renewal of the lease?

25         A     No.

1        Q     Did you have any conversations with any other

2    sign company about a new lease at this time?

3        A     This time being?

4        Q     November 2005.

5        A     No, I did not.

6        Q     Okay, before the removal permit that you

7    appealed, are you aware of any other removal permits

8    obtained for the sign structure?

9        A     Yes.

10       Q     Can you tell me about those removal permits?

11       A     There was a removal permit to paint the side

12   of the building.

13       Q     So the permit was to remove the sign, right?

14       A     Correct.

15       Q     And the reason why there was a permit to

16   remove the sign was so that you could paint the

17   building?

18       A     Correct.

19       Q     Who obtained that permit?

20       A     Clear Channel with the help of Schoepp

21   Construction.

22       Q     Who is Schoepp Construction?

23       A     Schoepp Construction painted the building.

24       Q     What help did they provide?

25       A     I was told that they told him how to go about

Page 81

1    it, whoever the Clear Channel representative was.

2        Q    What do you mean by how to go about it?

3        A    I took it to mean how to fill out the permit.

4        Q    And how do you know Schoepp Construction

5    provided this help?

6        A    Verbal from Greg Schoepp.  Plus I was billed

7    for time for them working with Clear Channel.

8        Q    Mr. Schoepp was your contractor --

9        A    That's correct.

10       Q    -- for the painting?

11            Do you recall when Clear Channel obtained this

12   removal permit?

13       A    I think it was 2005.

14       Q    Do you remember before or after that

15   November 2nd letter?

16       A    It would have been before.

17       Q    Okay.

18       A    If it was 2005, it would -- it would have been

19   summer 2005 or summer 2006.

20       Q    Okay.  So it is possible, then, that you had

21   some other interactions with Clear Channel, at least

22   your agents did?

23       A    Mm-hm.

24       Q    During that time period?

25       A    Yes, it is.

Page 82

1     Q    And it's either 2005 or 2006; you're not sure

2     as you sit here today what year --

3     A    I'm trying to remember when we painted and did

4     windows.  I think it's 2005, but it could be 2006.

5     Q    Okay.  Did you pay for the removal permit?

6     A    I don't remember.  I don't recall paying for

7     it.

8              MR. DAIRE:  This guy as 5.

9                  (Exhibit 5 marked)

10    BY MR. DAIRE:

11    Q    Let me know when you've had a chance to take a

12    look at this.

13    A    Okay.

14    Q    So it looks like this is an e-mail with a

15    couple of different dates on it.  There's an e-mail from

16    Kevin Hicks to you dated July 24 and an initial e-mail

17    from you to Kevin Hicks dated July 23rd, 2007.

18              Have you seen this document before?

19    A    Have I?

20    Q    Yes.

21    A    Yes.

22    Q    And did you write the original message

23    starting about midway down the first page?

24    A    Yes, I did.

25    Q    And does this help refresh your memory at all

Page 83

1    as to whether --

2        A    It looks like it happened in 2005.

3             THE REPORTER:  I'm sorry, what was the last

4    part of your question?

5    BY MR. DAIRE:

6        Q    Does this refresh your memory at all as to who

7    paid for the permit?

8        A    It -- I could not find the Clear Channel -- I

9    mean, that I had paid for the permit, so I assumed Clear

10   Channel had paid for the permit.

11       Q    And, when you went through your file in

12   preparation for this deposition, did you see a permit

13   related to this removal?

14       A    I didn't look for it this time.  All I saw was

15   the bill from Schoepp Construction for the time they

16   spent on helping someone from Clear Channel to get the

17   permit.

18       Q    Okay.  Do you have the permit for this

19   removal?

20       A    Actually, I think I do.

21       Q    You do?

22       A    [Nodding.]  Because I pull all the permits for

23   the property -- for all my properties.

24       Q    This was recent?

25       A    No.  A year or two ago.

Page 84

```
 1        Q     Looking at the last line of your original

 2   e-mail and the sentence starting, "I ordered a copy of

 3   all permits for the building before this date, so I

 4   don't have a copy of the permit."

 5        A     That's true.

 6        Q     So, at the time you wrote this, you didn't

 7   have the permit; is that right?

 8        A     That's right.

 9        Q     Do you remember filling out any paperwork in

10   connection with the application for the permit?

11        A     No.  Schoepp Construction, I think -- I don't

12   know.

13        Q     Do you know if Mr. Dion filled out any

14   paperwork in connection --

15        A     No, we did not.

16        Q     Did you object or raise any issue with Clear

17   Channel about application for this removal permit?

18        A     No.

19        Q     Did you talk to Clear Channel about it at all?

20        A     No.

21        Q     Did you restrict Clear Channel's access to

22   your property in connection with removing the sign for

23   the painting of the building?

24        A     No.

25        Q     How did Clear Channel know that you needed to
```

Page 88

1    and you want the Schoepp Construction bill, which has

2    the 6.5 [sic] hours.

3        Q    So those are all notes that you've written

4    during the deposition this afternoon?

5        A    Well, not the top page.

6        Q    Those are unrelated?

7        A    They're totally unrelated, and then this one

8    got too cluttered, so I recopied it.

9                        (Exhibit 6 marked)

10   BY MR. DAIRE:

11       Q    Let me know when you've had a chance to take a

12   look at this, Miss Erkelens.

13       A    Okay.

14       Q    This is an untitled document that looks, in

15   substance, to be a lease between the lessor and lessee

16   of 1801 Turk Street and two subsequent amendments to the

17   lease.  Have you seen these documents before?

18       A    Yes, I have.

19       Q    When is the first time that you saw these

20   documents?

21       A    When I was purchasing the property.

22       Q    Prior to entering the agreement to purchase

23   the property?

24       A    Prior to closing escrow.

25       Q    So, before August 2004?

Page 89

```
 1      A    Correct.

 2      Q    And is this the substance of the Clear Channel

 3    file that you referred to in your review of financial

 4    documents?

 5      A    No.   There's other stuff.

 6      Q    So there were other stuff, but these documents

 7    were in the file?

 8      A    These were in the file, yes.

 9      Q    And you had a chance to take a look to each of

10    these documents prior to the close of escrow?

11      A    Yes.

12      Q    Looking at these documents now, do you recall

13    talking to anyone at Clear Channel about them prior to

14    the close of escrow?

15      A    No.

16      Q    And do you recall talking to anybody at Maven

17    Investments about the documents?

18      A    No.

19      Q    Let's set aside the documents for a minute and

20    just talk about the terms.   Did you talk about the terms

21    of the agreement with Maven Investments before the close

22    of escrow?

23      A    No.   The file covered it.

24      Q    Did you talk to Clear Channel about the terms

25    of the deal before the close of escrow?
```

1     renewing lease.

2          Q     Gotcha.

3                              (Exhibit 8 marked)

4     BY MR. DAIRE:

5          Q     So this looks to be a letter on McIntosh

6     Property Services letterhead dated May 31st, 2007, from

7     you to Patrick Powers at Clear Channel Outdoors.  Do you

8     recognize this document?

9          A     I do.

10         Q     And that's your signature at the bottom there?

11         A     Yes, it is.

12         Q     And do you have any reason to doubt that it

13    was written on or around May 31st, 2007?

14         A     No.

15         Q     Okay, if I call this the second termination

16    letter as opposed to the first in February, you'll

17    understand what I'm referring to?

18         A     Okay.

19         Q     So, in the second termination letter, did

20    you -- well, let me ask it this way:  In the second

21    termination letter, did you state that you were willing

22    to renegotiate the lease?

23         A     No, I did not.

24         Q     Why not?

25         A     Because I no longer was willing to negotiate

Linda Kaley Erkelens                                                    July 14, 2008

Page 101

1    letterhead.  It is ...

2        Q    And do you still have the billing records with

3    those phone calls?

4        A    If they existed.

5        Q    Have you looked to see if there were phone

6    calls?

7        A    No, I haven't.  There -- if it were my home

8    phone, there wouldn't be any call -- bills.  I mean, you

9    don't get a detail on a land line.

10       Q    For a local call?

11       A    For a local call.  If it's my -- my cell

12   phone, I have not looked.  If it was incoming ... I

13   haven't looked.

14            MR. DAIRE:  Those would also be responsive to

15   the Court's order, Gerry.

16            MR. MURPHY:  I'll take a look.

17            MR. DAIRE:  So I'd like to see if any of the

18   documents exist.

19       Q    (By Mr. Daire)  So what I'll call the May 31st

20   letter, did you discuss the substance of that letter

21   with anyone before sending it to Clear Channel?

22       A    I might have discussed it with Mindy.  She

23   might have typed it.  I don't remember.

24       Q    You didn't discuss it with Kevin Hicks?

25       A    No.

Page 102

```
 1      Q     And you didn't discuss it with anybody else

 2   associated with ADS?

 3      A     No.

 4      Q     Okay.  The second sentence in the first full

 5   paragraph of that letter says, "Please make arrangements

 6   to remove the billboard and your lock box from our gate

 7   by that time."  "That time" referring to July 31, 2007?

 8      A     Correct.

 9      Q     And those were your words?

10      A     Yes.

11      Q     Why did you ask Clear Channel to make

12   arrangements to remove the billboard and lockbox?

13      A     Because ... because I didn't understand the

14   new law, and I assumed we will be putting up our own

15   billboard.

16      Q     When you say new law --

17      A     Or the Peskin ordinance.

18      Q     So, when you say new law, you're referring to

19   the Peskin ordinance?

20      A     Right.

21      Q     To your knowledge, what is the Peskin

22   ordinance?

23      A     A restriction on billboards, supposed -- it

24   was supposed to be all -- there couldn't be any new

25   billboards, but somewhere along the line it got twisted
```

Linda Kaley Erkelens                                                    July 14, 2008

Page 104

```
 1      A    Sure.

 2      Q    When we left off, you said that you had

 3  expected Clear Channel to remove the billboard and the

 4  lockbox; is that right?

 5      A    That's right.

 6      Q    What was the basis for that expectation?

 7      A    The lease was up.

 8      Q    Was there something in the lease that led to

 9  your expectation that Clear Channel would remove the

10  billboard?

11      A    No.

12      Q    So why did you expect Clear Channel to remove

13  the billboard?

14      A    I just expected them to remove it.  They put

15  the lockbox up.

16      Q    So you're not sure why you expected them to

17  remove the billboard?

18      A    No.

19      Q    You said they put up the lockbox.  Do you know

20  when they put up the lockbox on the gate?

21      A    After I put up the gate.  After I got mad that

22  they were using their ladder to go up the front and

23  leaving it there so anybody could break in.

24      Q    Did they contact you or did you contact them

25  about the gate when you put it up?
```

1        A      Might not have.  Might have been my error.

2    Don't know.

3        Q      So you don't remember any communications about

4    the gate?

5        A      Though I remember that I met with them a

6    couple of times to give them keys to the gate because --

7    because they didn't like getting a "do not duplicate"

8    key, like on your key ring.  They wanted multiple keys

9    for multiple drivers, and I think that's, maybe, how the

10   lockbox came into existence.

11       Q      And so just so I'm not confused, you did have

12   communications with Clear Channel about the lease other

13   than the written correspondence that we have here; is

14   that right?

15       A      Yes.

16       Q      When did those conversations take place?

17       A      Whenever I put the gate up, which would

18   probably have been 2006.

19       Q      So this would have been sometime between your

20   November letter in which you asked them to put up the

21   permit size and number and these more recent letters; is

22   that right?

23       A      Right.

24       Q      And were those conversations over the phone,

25   in person or both?

```
 1    termination of the lease with this gentleman at that

 2    time?

 3         A    No.  He was the installation person.

 4         Q    Did you have any other discussions with this

 5    person at that time other than the -- related to key?

 6         A    Other than the keys?  No.  Keys and security.

 7         Q    Was this the only time, other than the

 8    correspondence that we've talked about thus far, that

 9    you had interaction with Clear Channel?

10         A    That building makes me dizzy.

11              As far as I can remember.  There -- I mean --

12    you're probably come up with something else that I -- I

13    don't remember.

14         Q    I'm just asking.

15         A    Yeah, I don't remember any other conversation

16    with Clear Channel.  If the plumbing runs, I deal with

17    it; I forget about it, you know.

18         Q    The plumbing runs?

19         A    A toilet drips.  I get -- I get it fixed.  I

20    forget about it.  I don't keep a log or a memory of the

21    minutia that's required in running rental property.

22         Q    So dealing with the sign was just something

23    you dealt with on a minor basis?

24         A    Exactly.

25         Q    And you didn't really have any interactions
```

Page 110

1      Q      I said phone logs.  Have you checked phone

2    bills?

3      A      I have not checked phone bills.  I don't have

4    phone logs.

5      Q      Did you receive a response from Clear Channel

6    to your May 31st, 2007, letter?

7      A      I know I got a letter that was sort of

8    threatening that said -- it was like extortion -- that

9    said, if we take it down, it's going to be gone forever;

10   you'll never get to get another billboard.  I also

11   got -- I don't remember the time frame.  I got a faxed

12   copy of the permit to take it down, which was not

13   readable.

14     Q      So you don't remember whether you got a letter

15   in response to your May 31st letter?

16     A      I don't remember the timing of all the -- of

17   the letter.

18     Q      And you don't recall a letter that was

19   specifically in response to your May 31st letter?

20     A      No.  I know there's a letter.  I don't know

21   whether it crossed in the mail or it was in response to

22   that.  And I assume, when you say Clear Channel, you

23   also mean Reed Smith.

24     Q      Yes.  I mean anyone acting on Clear Channel's

25   behalf.  So you don't remember --

Linda Kaley Erkelens                                                July 14, 2008

Page 111

```
1        A    No.

2        Q    -- a letter specifically in response?

3             (Exhibit 9 marked)

4             THE WITNESS:  Well, I guess it was after, huh?

5    BY MR. DAIRE:

6        Q    So this is a letter on Reed Smith letterhead

7    from Scott Baker dated July 20th, 2007, and you were

8    listed as a recipient of this letter.  Do you recognize

9    this letter?

10       A    I do.

11       Q    Can you describe the document?

12       A    July 20th from Reed Smith on Scott D. Baker

13   letterhead to Linda K. Erkelens on the Clear Channel

14   billboard at 1801 Turk, acknowledging my May 31st

15   letter.

16       Q    Okay.  Do you recall receiving this letter on

17   or about July 20th?

18       A    I do.

19       Q    And there's an enclosure with the letter.  Can

20   you describe what that is, if you know?

21       A    An unreadable copy of a permit application.

22   It was even worse by fax.

23       Q    Is it an application or also an approved

24   permit?

25       A    It's an approved permit, so I guess it's a
```

Page 112

1    permit.

2         Q    And you just called it unreadable, but were

3    you able to recognize it as a permit --

4         A    I recognize it as a permit, but I had no idea

5    that I was giving away my rights based on what I

6    couldn't read on here.  And I found the letter rather

7    threatening.  In other words, if you don't sign with

8    Clear Channel, you're not going to get another

9    billboard.

10             Where does the Reed come in Reed Smith?  Is

11   that a last name or a first name?

12        Q    I can tell you after we're done.

13        A    I'm just wondering.  Because it's my middle

14   name.  I just made the connection.

15        Q    Spelled the same way and everything, huh?

16                    (Exhibit 10 marked)

17   BY MR. DAIRE:

18        Q    So you've just been and handed what is a

19   letter on McIntosh Property Services letterhead dated

20   July 23rd, 2007.  Indicates you are the signatory to the

21   letter and that the recipient is Scott Baker.  Doesn't

22   say at Reed Smith, but I'll represent that he's an

23   attorney here.

24             Do you recognize this letter?

25        A    I do.

Page 113

1        Q     And do you have any reason to doubt that it

2   was sent on or about July 23rd, 2007?

3        A     I do not.  I didn't want them to destroy my

4   roof.

5        Q     What do you mean by that?

6        A     Anything they did on the removal of the

7   billboard -- I mean, it's -- it's a lousy job of

8   affixing the billboard to the roof, in my estimation,

9   and I didn't -- I had already repaired leaks to one

10  apartment that was very difficult with an occupied

11  apartment.  I didn't want anything that would damage the

12  roof.

13       Q     And first sentence of this letter says, "Thank

14  you for your letter and copy of the permit."  Did you

15  type that sentence or have it -- or did you dictate that

16  sentence?

17       A     I typed it.  Or dictated it.  I didn't

18  recognize -- am I allowed to talk?

19       Q     You're allowed to give a complete answer.

20       A     I didn't recognize the impact.  I couldn't

21  read all of the permit.

22       Q     Did you tell anyone at Clear Channel that you

23  couldn't read the permit?

24       A     No.

25       Q     Did you tell Mr. Baker that you couldn't read

July 14, 2008

Linda Kaley Erkelens

Page 114

1    the permit?

2       A    No.

3       Q    Did you request that Clear Channel send

4    another permit?

5       A    No.  I got a copy of the permit that was

6    readable and realized, with some explanation from

7    counsel, that the word "voluntarily," I was giving away

8    all my rights to the billboard, and it was time to bring

9    a halt until we got this straightened out.

10      Q    So you didn't ask Clear Channel for another

11   copy of the permit?

12      A    No, I did not.

13      Q    Did you ask Mr. Baker for another copy of the

14   permit?

15      A    No, I did not.

16      Q    At the time of this letter, did you still

17   expect Clear Channel to remove the sign structure?

18      A    Yes.

19      Q    Why?

20      A    I guess because it was their sign structure,

21   which is what you're waiting to hear.

22      Q    You also indicate your expectation that Clear

23   Channel will repair any and all damage to the

24   installation and removal the sign has created to the

25   roof.  Do you see the passage I'm indicating there?

Linda Kaley Erkelens                                                July 14, 2008

```
 1        A    Yes.
 2        Q    Why did you expect Clear Channel to repair any
 3   and all damage from installation and removal?
 4        A    Because it was put up under the lease that
 5   they assumed, that they bought, that they were covered
 6   under, the fostering whatever.
 7        Q    So the lease was your basis for that
 8   expectation?  Is that correct?
 9        A    It was my hope that I wasn't going to have to
10   deal with a destroyed roof.
11        Q    And you put Clear Channel on notice that you
12   expected them to repair any and all damage to the
13   installation --
14        A    I did.
15        Q    -- and removal of the sign.
16             I just want to make sure -- the question I
17   asked was somewhat compound, so I want to break it down.
18             You expected Clear Channel to repair any and
19   all damage caused by the installation of the sign
20   structure; is that right?
21        A    Yes.
22        Q    And you also expected Clear Channel to repair
23   any and all damage caused by the removal of the sign
24   structure.  Is that also correct?
25        A    Yes.
```

Linda Kaley Erkelens                                July 14, 2008

142

REPORTER'S CERTIFICATION

    I, Quyen N. Do, Certified Shorthand Reporter, in and for the State of California, do hereby certify:

    That the foregoing witness was by me duly sworn; that the deposition was then taken before me at the time and place herein set forth; that the testimony and proceedings were reported stenographically by me and later transcribed into typewriting under my direction; that the foregoing is a true record of the testimony and proceedings taken at that time.

    IN WITNESS WHEREOF, I have subscribed my name this 16th day of July 2008.

Quyen N. Do, RPR, CSR No. 12447

1              UNITED STATES DISTRICT COURT

2             NORTHERN DISTRICT OF CALIFORNIA

3                SAN FRANCISCO DIVISION

4

5   CLEAR CHANNEL OUTDOOR, INC., a
    Delaware corporation,
6
                    Plaintiff,
7
          vs.                    CASE NO. C 07-06138 JCS
8
    LINDA ERKELENS, an individual,
9
                    Defendant.
10  ~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

11

12

13                 DEPOSITION OF

14             LINDA KALEY ERKELENS

15                  VOLUME II

16

17                JULY 17, 2008

18                 11:16 a.m.

19

20       Two Embarcadero Center, Suite 2000

21             San Francisco, California

22

23     Reported by Quyen N. Do, RPR, CSR No. 12447

24

25

```
 1                  APPEARANCES OF COUNSEL

 2

          For Plaintiff:
 3
              REED SMITH LLP
 4            JAMES A. DAIRE, ESQ.
              Two Embarcadero Center, Suite 2000
 5            San Francisco, California 94111
              415.659.5922
 6            415.391.8269 Fax
              jdaire@reedsmith.com
 7

 8        For Defendant:

 9            LUCE, FORWARD, HAMILTON & SCRIPPS LLP
              GERALD M. MURPHY, ESQ.
10            Rincon Center II
              121 Spear Street, Suite 200
11            San Francisco, California 94105-1582
              415.356.4600
12            415.356.4610 Fax
              gmurphy@luce.com
13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    SAN FRANCISCO, CALIFORNIA

 2              THURSDAY, JULY 17, 2008; 11:16 A.M.

 3                    LINDA KALEY ERKELENS,

 4     having been first duly sworn, testifies as follows:

 5

 6                         EXAMINATION

 7     BY MR. DAIRE:

 8          Q    Good morning, Miss Erkelens.

 9          A    Good morning.

10          Q    This is a resumption of a deposition that was

11     previously started on Monday, and the same admonitions

12     and instructions apply to this proceeding.  I just want

13     to make sure you didn't have any other questions about

14     the deposition this morning.

15          A    No.

16          Q    Okay.  The court reporter has handed you

17     Exhibit 13, which is where we left off on Monday.  This

18     is a letter from you and your husband to Kevin Hicks

19     dated March 31st, 2007.  Do you recall writing this

20     letter?

21          A    Yes, I do.

22          Q    In the third full paragraph, you ask Mr. Hicks

23     some questions about whether Clear Channel owns the sign

24     and whether Clear Channel has the right to remove the

25     sign.  Do you see that passage?
```

Page 157

1       Q     And have you ever considered hiring a lawyer

2    to look over the terms of those leases?

3       A     Not that I can remember.

4       Q     You've always considered yourself capable of

5    handling the leases yourself?

6       A     Yes, I have.

7       Q     When you received Exhibit 14 from Mr. Hicks,

8    did you share the offer with Clear Channel or anyone at

9    Clear Channel?

10      A     No, I did not.

11      Q     Did you tell anyone at Clear Channel that you

12   were considering other lessees for the real estate?

13      A     No, I did not.

14      Q     And, to the best of your recollection, you

15   received this letter sometime in spring of 2007, right?

16      A     Yes.

17                    (Exhibit 15 marked)

18   BY MR. DAIRE:

19      Q     The court reporter has handed you an e-mail

20   dated May 7th, 2007.  The author is again Kevin, and it

21   looks like, from the e-mail address, that you are the

22   recipient.  Do you recall receiving this e-mail?

23      A     Yes, I do.

24      Q     If you look at the last sentence before, Kevin

25   says, "Thanks."  He says, "Let me know if there is

1      Q     So you understood that, in order to keep a

2   billboard at 1801 Turk, there had to be a permit in

3   place?

4      A     Correct.  I was not going to have a illegal

5   billboard.

6      Q     Did anyone instruct you or advise you to put

7   that sentence into the letter?

8      A     No.

9      Q     Did anyone instruct you or advise you to

10  retain that permit number?

11     A     No.

12     Q     So this letter was sent one day before you

13  sent a letter to Clear Channel reminding it of the

14  termination and asking it to remove its sign; is that

15  right?

16     A     That's what the dates on the letter would say.

17     Q     Do you have any --

18     A     But I have no reason to assume otherwise.

19     Q     Prior to this May 30th, 2007, letter, had you

20  ever told Clear Channel that they could not remove the

21  sign?

22     A     Have I ever told Clear Channel that they could

23  not remove the sign?

24     Q     Prior to the May 30th, 2007, letter, had you

25  told Clear Channel that they could not remove the sign?

Page 163

```
 1       A      No.

 2       Q      Prior to your July 23rd, 2007, letter, had you

 3   ever told Clear Channel that they could not remove the

 4   sign?

 5       A      And where are the other -- are those the

 6   exhibits?

 7       Q      The court reporter has handed you Exhibit 10,

 8   which is your July 23rd, 2007, letter.

 9       A      Would you repeat your question, then.

10       Q      Okay.  I'll have the court reporter repeat it.

11              (Record read as follows:

12              "QUESTION:  Prior to your July

13              23rd, 2007, letter, had you ever

14              told Clear Channel that they could

15              not remove the sign?")

16          THE WITNESS:  No.

17                  (Exhibit 17 marked)

18   BY MR. DAIRE:

19       Q      And the court reporter has handed you a

20   document titled "Lease Agreement," dated May 29th, 2007,

21   between Linda Kaley Erkelens as lessor and Advertising

22   Display Systems 1 as lessee.  Do you recognize this

23   document?

24       A      Yes, I do.

25       Q      Can you tell me what it is?
```

1      A     It's a lease.

2      Q     What's the lease for?

3      A     Sign lease -- general advertising signage

4  rights on the exterior of 1801 Turk.

5      Q     If you look at paragraph 8 on the second page

6  of the lease, the third sentence in that paragraph says

7  "lessor," which would be you, right?

8      A     Right.

9      Q     "Lessor agrees to deliver possession to

10  Lessee," which would be ADS, right?

11      A     Right.

12      Q          "Lessor agrees to deliver possession to

13               Lessee as soon as after said CCO expiration;

14               to that end, Lessor further agrees to use her

15               'best efforts' in delivering said possession."

16               What is your understanding of that sentence?

17      A     That I didn't want to have two leases in

18  effect at the same time and that their lease couldn't

19  start until Clear Channel had relinquished all rights.

20      Q     Can you describe what your best efforts were

21  in delivering possession to ADS?

22      A     I guess this is part of it here.  Going

23  through this whole mess.

24      Q     You mean the deposition?

25      A     The deposition, the lawsuits, the Board of

1    Appeals.  The minutia.

2        Q    Did you take any actions, after signing this

3    lease, to deliver possession to ADS?

4        A    I'm sure you have a letter there that I did

5    between the July 23rd one.

6        Q    Let's forget the documents for now.  I'm just

7    asking, did you do anything in order to deliver

8    possession from Clear Channel to ADS?

9        A    I don't remember anything.

10       Q    After you signed the lease agreement that is

11   Exhibit 17 here, did you prohibit Clear Channel from

12   coming onto your property to remove the sign?

13       A    At the point I filed my appeal, yes.

14       Q    Why did you prohibit Clear Channel from coming

15   on your property to take down the sign?

16            MR. MURPHY:  Calls for a legal conclusion.

17            You may answer.

18            Also invades attorney-client privilege, but to

19   the extent you can answer the question without revealing

20   anything that you discussed with your attorneys, you

21   must.

22            THE WITNESS:  Once I could read the permit, I

23   felt very scared that all my rights were being taken

24   away and I was going to lose the billboard, and until

25   there was some resolution -- I wanted some resolution.

189

1          REPORTER'S CERTIFICATION

2

3      I, Quyen N. Do, Certified Shorthand Reporter, in

4  and for the State of California, do hereby certify:

5

6      That the foregoing witness was by me duly sworn;

7  that the deposition was then taken before me at the time

8  and place herein set forth; that the testimony and

9  proceedings were reported stenographically by me and

10 later transcribed into typewriting under my direction;

11 that the foregoing is a true record of the testimony and

12 proceedings taken at that time.

13      IN WITNESS WHEREOF, I have subscribed my name

14 this 29th day of July 2008.

15

16

17  _____

    Quyen N. Do, RPR, CSR No. 12447

18

19

20

21

22

23

24

25



EXHIBIT 6
Wit LINDA KERKELENS
Date 7/14/08
Quyen N. Do, CSR No. 12447

#07-20264

**Foster & Kleiser**
A METROMEDIA COMPANY

LCF-1 (5-77)

Date_____

1. The undersigned, as Lessor, hereby leases and grants exclusively to Foster and Kleiser, Division of Metromedia, Inc., as Lessee, the property (with free access to and upon same) located in the City of __San Francisco__
County of __San Francisco__, State of __California__, described as:

__1801 Turk Street SL 100' W/o Divisadero__

__Assessor's Block 1153, Lot 1 (125' x 150')__

as per map thereof recorded in the Office of the County Recorder of __San Francisco__ County, State of __California__, for a term of __five (5)__ years from __January 1__ 19 __84__, for the purpose of erecting and maintaining advertising signs thereon, including necessary supporting structures, devices, illumination facilities and connections, service ladders, and other appurtenances thereon.

2. Lessee shall pay to the Lessor rental in the amount of __Eight hundred forty and no/100 --------------__
_____ ($ __840.00__ ) Dollars per year, payable on a monthly basis. Prior to construction and for the entire period during which no advertising copy is being displayed on the property by Lessee, the rental shall be Ten ($10.00) Dollars.

3. Lessee shall save the Lessor harmless from all damage to persons or property by reason of accidents resulting from the negligent acts of its agents, employees or others employed in the construction, maintenance, repair or removal of its signs on the property.

4. Lessor agrees that he, his tenants, agents, employees, or other persons acting in his or their behalf shall not place or maintain any object on the property or on any neighboring property which would in any way obstruct or impair the view of Lessee's sign structures. If such an obstruction or impairment occurs, the Lessee, without limiting such other remedies as may be available, has the option of requiring the Lessor to remove said obstruction or impairment, or the Lessee may itself remove the obstruction or impairment charging the cost of said removal to the Lessor, or the Lessee may reduce the rental herein paid to the sum of Five ($5.00) Dollars per year so long as such obstruction or impairment continues.

5. If the view of Lessee's signs is obstructed or impaired in any way, or if the value of such signs is diminished by reason of diversion or reduction of vehicular traffic, or if the use of any such signs is prevented or restricted by law, or if for any reason a building permit for erection or modification of any such signs is refused, the Lessee may immediately, at its option, adjust the rental in direct proportion to the decreased value of the leased premises for advertising purposes resulting from any of the foregoing circumstances, or may terminate the lease and receive adjustment for all rent paid for the unexpired term.

6. If Lessee is prevented by law, or government or military order, or other causes beyond Lessee's control from illuminating its signs, the Lessee may reduce the rental provided by paragraph 2 by one-half (½), with such reduced rental to remain in effect so long as such condition continues to exist.

7. This Lease shall continue in full force and effect for its term and thereafter for subsequent successive like terms unless terminated at the end of such term or any successive like term upon written notice by the Lessor or Lessee served sixty (60) days before the end of such term or subsequent like term, provided that Lessee shall have the right to terminate the Lease at the end of any sixty day period upon written notice to Lessor served not less than sixty (60) days prior to the end of such sixty day period. Lessor shall have the right to terminate the Lease at any time during the period of this Lease if the Lessor is to improve the unimproved property by erecting thereon a permanent private commercial or residential building. Lessee shall remove its signs within sixty (60) days after receipt of a copy of the applicable building permit. The Lessor will, upon giving such notice of building, return to the Lessee all rent paid for the unexpired term plus the total cost of the construction and the removal of Lessee's signs, less 1/180th of such cost for each full month of this Lease prior to the notice of termination. If Lessor fails to commence the erection of the private commercial or residential building within sixty (60) days after Lessee removes its signs, Lessee shall again have the right to occupy the premises and maintain advertising signs subject to the provisions of this Lease. If any portions of the property are not to be utilized for such building, the Lessee has the option to use the remaining portion on the same terms, except that the rent shall be proportionately reduced.

8. It is agreed between the parties that Lessee shall remain the owner of all advertising signs, structures, and improvements erected or made by Lessee, and that, notwithstanding the fact that the same constitute real estate fixtures, the Lessee shall have the right to remove said signs, structures, and improvements at any time during the term of the Lease, or after the expiration of this Lease.

9. This lease shall constitute the sole agreement of the parties relating to the lease of the above described premises. Neither party will be bound by any statements, warranties, or promises, oral or written, unless such statements, warranties or promises are set forth specifically in this Lease.

10. The word "Lessor" as used herein shall include Lessors. This lease is binding upon and inures to the benefit of the heirs, executors, successors, and assigns of Lessee and Lessor.

11. Lessor represents that he is the owner(s) ☒ tenant(s) ☐ other(s) ☐ _____
of the property covered by this Lease and has the authority to execute this Lease. All rents to be paid pursuant to this Lease, and all notices are to be forwarded to the undersigned Lessor at the address noted below the Lessor's signature.

EXECUTED by the Lessor in the presence of _____
who is hereby requested to sign as witness.

WITNESS: _____

ACCEPTED: FOSTER AND KLEISER
Division of Metromedia, Inc.

By: _____
JAMES G. HUGHES

Title: _____

LESSOR(S)
X _____ Sue Moxon

Los Dos Investment Co.

Address: __440 West Live Oak__
__Mill Valley, CA  94941__

BY: Sue Moxon

**patrick**

PATRICK MEDIA GROUP, INC.

1601 MARITIME ST., OAKLAND, CA 94607 (415) 835-5900

July 2, 1990

Los Dos
Attn: Susan Moxon
208 Benson Circle
Mill Valley, CA  94941

    RE:  Lease #15-20264, San Francisco
       1801 Turk Street (SL 100' W/o Divisadero)

Dear Ms. Moxon:

This letter is in reference to your recent conversation with our Real Estate Representative, Gregg Machon, regarding the advertising structure at the subject location.

It is agreeable to Patrick Media Group Inc. to increase the annual rental to $1,320.00, payable monthly effective July 1, 1990. Effective July 1, 1994 the annual rental will be increased to $1,500.00, payable monthly.  The term of this agreement will be for seven years.  All other terms and conditions of the existing lease shall remain the same.

If this meets with your approval, please have the original of this letter signed and returned to this office for processing.  An envelope has been provided for your convenience.  The copy is to be retained for your records.

Should you have any questions concerning this agreement, please contact me.  Your cooperation in this matter is certainly appreciated.

                Yours truly,

                James G. Hughes
                Manager
                Real Estate Department

ACCEPTED AND APPROVED:

_____
Susan Moxon
for Los Dos

JGH/GM/sb



August 21, 2002

Mr. Craig Lipton
Maven Investments
1138 Taylor St.
San Francisco, CA 94133

RE:   Lease #20264, San Francisco
      Turk St. SL 100' w/o Divisadero

Dear Mr. Lipton:

This letter is in reference to the advertising structure located
on the above described property.

Clear Channel Outdoor, Inc. is agreeable to increasing the
annual rental to $1,950.00, payable monthly, effective August 1,
2002.  Effective August 1, 2003 and for each year thereafter the
annual rental shall be increased by three percent (3%).  The
term of this agreement shall be for five (5) years.  All other
terms and conditions of the existing Lease Agreement dated
January 1, 1984 shall remain the same.

If this meets with your approval, please sign the original of
this letter and return it to this office for processing.  The
copy is to be retained for your records.

Should you have any questions concerning this arrangement,
please contact Patrick Powers at (510) 835-5900 x219.  Thank you
for your consideration in this matter.

Sincerely,                              ACCEPTED AND AGREED:

David G. Sweeney                        Craig Lipton
Vice President / Real Estate            Maven Investments
Northern California Division



# McIntosh PROPERTY SERVICES

RECEIVED
JUN 14 2007
REED SMITH LLP

May 31, 2007

Patrick Powers
Clear Channel Outdoors
555 12ᵗʰ Street Suite 950
Oakland, CA 94607

Dear Mr. Powers,

This is to remind you that as of July 31ˢᵗ 2007, the lease of Clear Channel Outdoors of the billboard at 1801 Turk is terminated. Please make arrangements to remove the billboard and your lock box from our gate by that time.

We are retaining the permit #144724477.

Thank you very much.

Sincerely yours,

Linda K. Erkelens

19 th

APARTMENT RENTALS
REAL ESTATE BROKER

390 ARKANSAS STREET
SAN FRANCISCO
CALIFORNIA 94107-2846
415-826-4011
FAX 415-826-4087



π Δ EXHIBIT 8
Wit: LINDA K. ERKELENS
Date: 7/14/08
Quyen N. Do, CSR No. 12447

ERK 00016

# ReedSmith

Reed Smith LLP
Two Embarcadero Center
Suite 2000
San Francisco, CA 94111-3922
415.543.8700
Fax 415.391.8269

Scott D. Baker
Direct Phone: 415.659.5901
Email: sbaker@reedsmith.com

July 20, 2007

**VIA FACSIMILE**
**CERTIFIED MAIL/RETURN RECEIPT REQUESTED**
**REGULAR MAIL**

Linda K. Erkelens
McIntosh Property Services
390 Arkansas Street
San Francisco, California 94107-2846



Re:    CCO Billboard at 1801 Turk

Dear Ms. Erkelens:

You previously wrote Clear Channel Outdoor ("CCO") on May 31, 2007 purporting to terminate as of July 31, 2007 "the lease of Clear Channel Outdoors of the billboard at 1801 Turk," and asking that CCO "make arrangements to remove the billboard and [] lock box from our gate by that time." As you know, the Lease Agreement dated January 1, 1984 ("Lease") provides that:

> 8.    It is agreed between the parties that Lessee shall remain the owner of all advertising signs, structures, and improvements erected or made by Lessee, and that, notwithstanding the fact that the same constitute real estate fixtures, the Lessee shall have the right to remove said signs, structures, and improvements at any time during the term of the Lease, or after the expiration of this Lease."

In light of your termination notice, the Lease provisions, and your specific request, please be advised that CCO intends to exercise its rights and will remove all of its signs, structures and improvements from the premises commencing on July 30, 2007 pursuant to the enclosed permit. Please make all necessary arrangements to allow for CCO's crew to undertake this work. Any interference with CCO's exercise of its rights will subject the property owners, and anyone who may assist them, to liability.

Please be further advised that the property owners may not use CCO's property for any purpose. Any use of CCO's property by the property owners or any agent of theirs shall be the basis for additional claims by CCO.

Finally, you erroneously assert that "[w]e" – presumably a reference to the owners of 1801 Turk -- "are retaining the permit #144724477." As you mentioned during our prior phone call, your reference to permit #144724477 is a typographical error, as you had intended to reference CCO's original permit for the erection of CCO's billboard at 1801 Turk, permit no. 214477. As you must know, because CCO

NEW YORK ♦ LONDON ♦ LOS ANGELES ♦ PARIS ♦ SAN FRANCISCO ♦ WASHINGTON, D.C. ♦ PHILADELPHIA ♦ PITTSBURGH ♦ OAKLAND
MUNICH ♦ PRINCETON ♦ NORTHERN VIRGINIA ♦ WILMINGTON ♦ NEWARK ♦ MIDLANDS, U.K. ♦ CENTURY CITY ♦ RICHMOND

r e e d s m i t h . c o m

DOCSSFO-12485160.1-CMORGAN 7/20/07 3:35 PM

Linda K. Erkelens
July 20, 2007
Page 2

ReedSmith

is voluntarily removing its general advertising sign at 1801 Turk, the sign cannot be rebuilt. The San Francisco Planning Code, at Section 604(h), explicitly prohibits this:

> A sign which is voluntarily destroyed or removed by its owner or which is required by law to be removed may be restored only in full conformity with the provisions of this Code....A general advertising sign that has been removed shall not be reinstalled, replaced, or reconstructed at the same location, and the erection, construction, and/or installation of a general advertising sign at that location to replace the previously existing sign shall be deemed to be a new sign in violation of Section 611(a) of this Code....[S.F. Plan. Code §604(h), ¶2]

If you intend any response, please provide it to us in writing by no later than July 24, 2007 as CCO is in the process of scheduling equipment and personnel. We will deem your silence to be acquiescence to CCO's removal of its property.

Very truly yours,

Scott D. Baker/cmm

Scott D. Baker

Enclosures

cc:    Laura Toncheff, Esq.





CONDITIONS AND STIPULATIONS

CENTRAL PERMIT BUREAU
1660 Mission Street
San Francisco, California 94103

CITY AND COUNTY OF SAN FRANCISCO
DEPARTMENT OF BUILDING INSPECTION
(415) 558-6088

Receipt No: 112.685
Application/Permit No: M78125

PERMIT IS GRANTED TO

ERECT    ALTER BUILDING
DEMOLISH BUILDING    GRADE
LOWER CURB  X  OCCUPY STREET SPACE
EXCAVATE STREET OR SIDEWALK

ERECT SIGN   DATE OF ISSUE  19-JUL-07
    FILING FEE RECEIPT #
POST NOTICE
REPAIR OR CONSTRUCT SIDEWALK

THIS PERMIT IS GRANTED IN ACCORDANCE WITH
PROVISIONS OF THE CHARTER AND ORDINANCES OF
THE CITY AND COUNTY OF SAN FRANCISCO AND/OR
THE CURRENT STANDARD SPECIFICATIONS OF THE
DEPARTMENT OF BUILDING INSPECTION

• ADDITIONAL INFORMATION REGARDING SPECIFIC
PERMITS IS GIVEN ON THE BACK OF THIS FORM.

HOUSE NUMBER CERTIFICATE

SUPPLEMENTAL FEE PAID:

FINAL PLAN CHECK    EXPEDITER FEE    PENALTY
STRUCTURAL LTR      DCP FEE
ORDER 1

DBI PUC PAID AT FILING

ST. SPACE                         164.16
CPB PROCESSING FEE                 20.00

LOCATION OF JOB
STREET ADDRESS
1601  TURK  ST         1163001

NOTES AND BOUNDS

FRONTAGE  FT  DEPTH  FT        TYPE        ESTIMATED COST $
BUILDING USE

SIDEWALKS FT6      FT. BY ALL LINEAL FT        90 days

WORK MUST COMMENCE ON BUILDING WITHIN       90 days        OF DATE OF ISSUANCE OF THIS PERMIT
UNLESS EXTENSION AUTHORIZED, IF UNDER ENFORCEMENT ORDERS, SPECIAL TIME PERIODS WHERE
DEEMED WILL APPLY.

TIME FOR COMPLETION OF WORK UNDER THIS BUILDING PERMIT EXPIRES         3 months        AFTER DATE OF
ISSUANCE. IF UNDER ENFORCEMENT ORDERS, SPECIAL TIME PERIODS WILL APPLY.
(NOTE: STREET SPACE PERMIT EXPIRES ON COMPLETION OF WORK OR WHEN REVOKED BY DIRECTOR OF
PUBLIC WORKS, SEE BACK OF FORM FOR OTHER TIME LIMITS.)

SANTOS & URRUTIA ASSOCIATES 415-
642-7222
FEE PAID BY
2451 HARRISON STREET
ADDRESS
SAN FRANCISCO CA 94110
CITY

PERMIT   1126685
APPR #
CENTRAL
PERMIT
BUREAU 01 BY  YANBRENDA

SUBTOTAL OF FEES WITH APPLICABLE SURCHARGES

SURCHARGE                          9.00
BOA SURCHARGE                      1.02

SUBTOTAL OTHER FEES    $         $185.18
TOTAL                            $185.18

*SEPARATE PERMITS MUST BE OBTAINED FOR ELECTRICAL, PLUMBING OR OTHER RELATED WORK*
2003.1 (nRev 10/95)

City and County of San Francisco

DEPARTMENT OF BUILDING INSPECTION

# JOB CARD



OFFICE HOURS: THE BUILDING INSPECTION IS OPEN DAILY, MONDAY THRU FRIDAY,
FROM 7:30 a.m. TO 5:00 p.m. DISTRICT BUILDING INSPECTORS KEEP OFFICE HOURS DAILY,
MONDAY THRU FRIDAY, FROM 7:30 a.m. TO 8:30 a.m. AND FROM 3:00 p.m. TO 4:00 p.m.

REQUESTS FOR INSPECTIONS ARE TAKEN ONLY DURING THE HOURS OF
8:30 A.M. TO 3:00 P.M. BY CALLING (415) 558-6096

APPLICATION NO. 200708Z8.5893    PERMIT NO. 120565    ISSUED

JOB ADDRESS: 1801 Turk St    BLOCK:    LOT:

NATURE OF WORK:

WORK PERMITTED UNDER AUTHORITY OF THIS BUILDING PERMIT NUMBER MUST START BY 90 DAYS
AND BE COMPLETED BY

WORK UNDERWAY MUST BE INSPECTED AT LEAST EVERY NINETY (90) DAYS IN ORDER TO PREVENT EXPIRATION
DUE TO ABANDONMENT OF WORK.

EXTENSIONS OF THE "START" & "COMPLETE WORK" DATES OF THIS BUILDING PERMIT NUMBER MAY BE GRANTED
UPON WRITTEN REQUEST PRIOR TO THE DATES NOTED ABOVE.

For information on the Permit Process, Building Plans Review, Access Issues, etc., please see page 4 of this
JOB CARD for useful and appropriate telephone numbers.

ELECTRICAL & PLUMBING WORK MUST HAVE PERMITS SEPARATE FROM A BUILDING PERMIT.

KEEP THIS CARD POSTED IN A CONSPICUOUS PLACE ON THE JOB SITE AT ALL TIMES.
PLANS AND PERMIT DOCUMENTS SHALL BE ON THE JOB SITE
AT ALL TIMES WHEN WORK IS IN PROGRESS.
AFTER COMPLETION OF WORK, RETAIN THIS CARD FOR YOUR RECORDS.

CENTRAL PERMIT BUREAU
1660 Mission Street
San Francisco, California 94103

CITY AND COUNTY OF SAN FRANCISCO
DEPARTMENT OF BUILDING INSPECTION
(415)558-6088

Receipt No: 1126563
Application/Permit No: 200706238549.3

PERMIT IS GRANTED TO

ERECT  X  ALTER BUILDING
DEMOLISH BUILDING    GRADE
LOWER CURB    OCCUPY STREET SPACE
EXCAVATE STREET OR SIDEWALK
HOUSE NUMBER CERTIFICATE

ERECT SIGN    DATE OF ISSUE  18-JUL-07
FILING FEE RECEIPT #  366865

POST NOTICE
REPAIR OR CONSTRUCT SIDEWALK

THIS PERMIT IS GRANTED IN ACCORDANCE WITH
PROVISIONS OF THE CHARTER AND ORDINANCES OF
THE CITY AND COUNTY OF SAN FRANCISCO AND/OR
THE CURRENT STANDARD SPECIFICATIONS OF THE
DEPARTMENT OF BUILDING INSPECTION

* ADDITIONAL INFORMATION REGARDING SPECIFIC
PERMITS IS GIVEN ON THE BACK OF THIS FORM.

SUPPLEMENTAL FEE PAID:

FINAL PLAN CHECK    EXPEDITER FEE    PENALTY
STRUCTURAL LTR.  X  DCP FEE

OWNER:
CLEAR CHANNEL OUTDOOR

DBI/LBC PAID AT FILING    $51.03
AUDITED FOR TB BOND

FEE

BUILDING                75.00

LOCATION OF JOBS
STREET ADDRESS
1001  TURK  ST

HOUSE NUMBER/S    EXISTING
1153001

(415)642-7722
ASSIGNED
BY/CK/LOT

ZONE                R-1

LEGAL OCCUPANCY    ESTIMATED COST/S
3,000.00

BUILDING USE  APARTMENTS

PROPOSED FLOOR AREA
STRUCTURAL NOTES

SIDEWALK FRONTAGE

SURCHARGE                26.00
BOM SURCHARGE

SUBTOTAL OF FEES WITH APPLICABLE SURCHARGES  $103.40

WORK MUST COMMENCE WITHIN  80 days
UNLESS EXTENSION AUTHORIZED UNDER ENFORCEMENT GROUPS SPECIAL TIME PERIODS
SPECIFIED WILL APPLY

THIS PERMIT FOR COMPLETION OF WORK UNDER THIS BUILDING PERMIT EXPIRES...

STRONG MOTION                1.60

SANTOS AND URRUTIA  642-7722

FEE PAYOR
2451  HARRISON  ST
ADDRESS
SF CA
CITY

PERMIT  1126563

APPEAL
CENTRAL
PERMIT
BUREAU 001  BUFKASUSAN

SUBTOTAL OTHER FEES  $        1.60
TOTAL                $  103.00

*SEPARATE PERMITS MUST BE OBTAINED FOR ELECTRICAL, PLUMBING OR OTHER RELATED WORK*
9003-18(Rev.10/05)

CENTRAL PERMIT BUREAU
1660 Mission Street
San Francisco, California 94103

CITY AND COUNTY OF SAN FRANCISCO
DEPARTMENT OF BUILDING INSPECTION
(415) 558-6088

Receipt No: 1126685
Application/Permit No: 9718225

## WARNING

Pursuant to Article 20 of Chapter 10, Part II of the San Francisco Municipal Code (Public Works Code), certain building permits may be issued only after the permittee analyzes the soil for the presence of hazardous wastes and, where applicable, certifies that it has completed site mitigation. No officer, employee, or agency of the City conducted the soil sampling and analysis, recommended site mitigation measures, conducted the site mitigation or checked or verified the reports submitted or work performed for accuracy, reliability or adherence to protocols. In issuing this permit, neither the city nor any of its officers or employees make any representation that the soil on or about the site is free from the presence of hazardous wastes. Nor does the City's implementation of the process relieve any person from their rights and responsibilities relating to hazardous waste contamination under state and federal law. Neither soil analysis pursuant to Article 20 of Public Works Code nor the issuance of this permit is intended to alter, extinguish, or transfer these responsibilities.

ADDITIONAL INFORMATION

1. Building Permit.
All requests for extension of time must be in writing to Director, Dept. of Building Inspection. Permits are issued subject to Appeal within 15 days to Board of Permit Appeals.
Incur no expenses until right of Appeal has lapsed.

2. Demolition Permit.
If Demolition involves Abandonment of Side Sewer Permittee must obtain a Side Sewer Permit. The Side Sewer will then be blocked at the Main Sewer.

3. Permit to Lower Curb/To Excavate in Street or Sidewalk.
Issued to construct Auto Runway as per Article 15, Public Works Code.
Excavation should be carried out in accordance with Article 9 of Public Works Code.
If issued with Building permit time for completion is same as Building; If issued alone, complete work within 6 months from date of Permit. Void if not started within 6 months.

4. Street Space Permit.
No refuse, excavated materials, concrete or mortar is to be disposed of upon Paved Streets, catch basins or into the City sewer system. No material or equipment shall be left on Roadway of Police Tow-Away Zone during hours when Tow-Away Rule is in force. Gutters and Waterways must be kept clear.
All provisions of Section 724.3 of the Public Works Code are incorporated into this permit by reference.
Street and sidewalk space occupied must not exceed a width 1/2 the width of the sidewalk plus 1/3 the width of the Roadway, freeing...

5. Permit to Repair or Construct Sidewalk.

6. Hold Harmless Clause.
The Permittee(s) by acceptance of this permit, agree(s) to indemnify and hold harmless, the City and County of San Francisco from and against any and all claims, demands and actions for damages resulting from operations under this permit, regardless of negligence of the City and County of San Francisco, and to assume the defense of the City and County of San Francisco against such claims, demands and actions.

BOARD OF PERMIT APPEALS STIPULATIONS.



# McIntosh PROPERTY SERVICES

July 23, 2007

Reed Smith
Scott D. Baker
2 Embarcadero Center
Suite 2000
San Francisco, CA 94111-3922

Dear Mr. Baker,

Thank you for your letter and copy of the permit. We expect that as part of the removal, you will repair any and all damage the installation and removal of the sign has created to the roof and side of the building.

Thank you very much.

Sincerely yours,

Linda K. Erkeleus, Owner

APARTMENT RENTALS
REAL ESTATE BROKER

390 ARKANSAS STREET
SAN FRANCISCO
CALIFORNIA 94107-2846
415-826-4011
FX 415-826-4087
RENTALS@RENTINSF.NET
WWW.RENTINSF.NET



ERK 00013

 

**A.D.S.**

Advertising Display Systems 1, LLC

## LEASE AGREEMENT

This agreement is made and entered into this _29th_ day of MAY 2007, between LINDA KALEY ERKELENS, as Lessor and ADVERTISING DISPLAY SYSTEMS 1, LLC (ADS) Lessee. For and in consideration of the mutual promises and covenants contained herein, the parties hereby agree as follows:

1. LINDA KALEY ERKELENS, Hereinafter Lessor, represents that she has the lease rights to the property known as **1801 TURK STREET**, San Francisco, CA. Effective on signature date below, Lessor agrees to lease to Lessee, all general advertising signage rights to the exterior of said property. More specifically, Lessor grants to lessee the exclusive use of said property for the purpose of installing and maintaining a sign, to be used for general advertising purposes, for a period of five (5) years, with an option to renew for a like period. The rent for the option period will begin at the "then" fair market rent for comparable San Francisco wall signs. This lease includes access and the ground-space thereto, along with the air space necessary to install, maintain, service and change copy on said wall. Lessee will physically post its sign in a manner acceptable to Lessor, so that it does not interfere with the quiet enjoyment of Lessors other tenants at this property. At Lessors discretion, Lessee shall post in a like manner to the present Clear Channel posting at this property. This lease shall commence upon signature date below.

2. In consideration thereof, Lessee agrees to pay Lessor $7,200.00 (SEVENTY-TWO HUNDRED DOLLARS) per year, payable on a monthly basis at $600.00 per month. Monthly rent shall begin upon delivery of possession by Lessor per Clause No. 8 herein and shall thereafter be due monthly "in advance" throughout the term of this lease and any option or extension hereto. This agreement to contain three percent (3%) annual rental increases on the yearly possession commencement date. If rent is not paid within 10 days of the due date, a late fee of 5% of the payment due shall be imposed. If Lessee's rent check is returned to the bank for any reason, a returned check fee of $25.00 shall be imposed.

3. Lessee shall be permitted to install lighting fixtures, at Lessee's sole cost, for purposes of night lighting of the advertisement. All electrical installations and fixtures shall be in compliance with applicable codes and be performed with applicable permits. All electrical bills for said lighting shall be paid by Lessee. The installation and parts costs shall be paid by Lessee. Lessee shall install said lighting in a manner which is the most "unintrusive possible" to the other tenants at this property. Lessee shall retain ownership of any electrical fixtures and/or advertising structure placed or used by Lessee upon Lessor's property. At the expiration of this lease, Lessee, at their sole cost and at Lessor's discretion, shall restore the "wall sign area" to a painted condition which matches its surrounding wall area.

4. Lessee shall hold Lessor harmless from any loss, damage, injury and costs of suit or other expenses incurred in connection with Lessee or Lessee's independent contractor's work upon subject property. Lessee accepts the subject location in "as is" condition. If the existing sign structure is left behind by existing tenant, Lessee may use it or remove it at their sole cost.

5. All insurance to be carried by Lessee shall be issued by State of California admitted carriers and shall be for no less than $2,000,000.00 in liability coverage, naming Lessor as an additional insured.

_RR_ (Initial Lessee)                    (Page 1 of 2)                    _lke_ (Initial Lessor)

1815 El Camino Real, Suite 1 • Burlingame, CA 94010 • 650.697.1060 • Fax 650.697.6612
www.advertisingdisplaysystems.com

6. If the view of the property or Lessee's sign is obstructed or impaired, or the use of such sign is prevented by law, Lessee has the option to terminate this lease upon thirty (30) days written notice to Lessor. Lessor agrees that neither he nor any employee, agent or representative of Lessor will install or permit any obstructions to the visibility of Lessee's sign.

7. All work to be performed by persons acting for or on behalf of Lessee shall always be done in a workmanlike manner, by properly licensed and insured professionals. During installation and copy changes, Lessee agrees to keep the premises free of debris relative to their business activity on said premises.

8. Lessor has made Lessee aware of an existing agreement with Clear Channel Outdoor, hereafter "CCO", at this location. This Lease is meant for the time-period after the expiration of the existing "CCO" agreement. Lessor agrees to deliver possession to Lessee as soon as possible after said CCO expiration; to that end, Lessor further agrees to use her "best efforts" in delivering said possession. The Ten-year term of this Lease is to be calculated from the date of Lessor's delivery of possession to Lessee.

9. In the event of breach of this Agreement necessitating legal expenses, the prevailing party shall be entitled to reasonable attorney's fees, expenses and costs of suit occasioned hereby. This lease is binding upon heirs, assigns and successors of the parties hereto.

10. Both parties agree to execute and deliver to the other party any requested "estoppel letter" within ten-calendar days of request for same.

11. This is the entire agreement between the parties and can only be modified with a written agreement between the parties.

_Linda Kaley Erkelens_                        Date: 5-29-07
Lessor: Linda Kaley Erkelens

_Advertising Display Systems 1, LLC_           Date: 5-29-07
Advertising Display Systems 1, LLC, Lessee

_Raymond Ready_          Title: _Managing Partner_
By:

_Raymond Ready_          Title: _Managing Partner_
Signature

(Page 2 of 2)