Gerald M. Murphy, State Bar No. 99994
Andrew S. Azarmi, State Bar No. 241407
LUCE, FORWARD, HAMILTON & SCRIPPS LLP
Rincon Center II, 121 Spear Street, Suite 200
San Francisco, California 94105-1582
Tel:    415.356.4600
Fax:    415.356.4610
E-mail:  gmurphy@luce.com
E-mail:  aazarmi@luce.com

Attorneys for Defendant
LINDA ERKELENS

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

| | |
|---|---|
| CLEAR CHANNEL OUTDOOR, INC., a Delaware Corporation,<br><br>        Plaintiff,<br><br>    v.<br><br>LINDA ERKELENS, an individual,<br><br>        Defendant. | Case No. C 07-06138 SBA<br><br>**DECLARATION OF ANDREW S. AZARMI IN SUPPORT OF DEFENDANT'S OPPOSITION TO PLAINTIFF CLEAR CHANNEL OUTDOOR, INC.'S MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>Date:    September 23, 2008<br>Time:    9:00 a.m.<br>Place:   Courtroom 3, 3rd Floor - Oakland<br><br>Complaint Filed:  December 4, 2007<br>Trial Date:      November 10, 2008<br><br>Hon. Saundra Brown Armstrong |

1.    I am an attorney at the law firm of Luce, Forward, Hamilton & Scripps LLP, attorneys of record for Defendant Linda Erkelens ("Defendant" or "Erkelens"). I am licensed to practice law before the Courts for the State of California and the U.S. District Court for the Northern District of California. I have direct and personal knowledge of the facts set forth in my Declaration and, if called and sworn as a witness, I would competently testify to these facts under penalty of perjury. I am submitting this Declaration in support of Defendant's opposition to Plaintiff's motion for summary judgment.

2.    Attached hereto as **Exhibit 1** is a true and correct copy of the original "Application for Permit Signs-Bill Boards building permit for construction of the Billboard located at 1801 Turk Street, issued by the City and County of San Francisco Department of Public Works, dated August 28, 1958.

3.    Attached hereto as **Exhibit 2** is a true and correct copy of the Lease #07-20264 for the property between Foster & Kleiser and Los Dos Investment Co., dated January 1, 1984, as well as the subsequent letters renewing the Lease dated July 2, 1990 and August 21, 2002, respectively, and which was also an exhibit to the Deposition of Linda Erkelens.

4.    Attached hereto as **Exhibit 3** are true and correct certified excerpts from the Deposition of Linda Erkelens, Vol. 1, dated July 14, 2008.

5.    Attached hereto as **Exhibit 4** is a true and correct copy of the Contract for the Sale and Purchase of Real Property located at 1801 Turk Street, San Francisco, California, dated May 19, 2004, and signed by Linda K. Erkelens and Ronald Dion and/or Assignees, and which was also an exhibit to the Deposition of Linda Erkelens.

6.    Attached hereto as **Exhibit 5** is a true and correct copy of a letter dated February 14, 2007, from Linda Erkelens to Clear Channel Outdoors regarding her decision not to renew the lease on 1801 Turk Street, and which was also an exhibit to the Deposition of Linda Erkelens.

7.    Attached hereto as **Exhibit 6** is a true and correct copy of a letter dated May 31, 2007, from Linda Erkelens to Clear Channel Outdoors regarding making arrangements for removal of the billboard and lock box after expiration of the July 31, 2007 Lease and her retention of permit #144724477, and which was also an exhibit to the Deposition of Linda Erkelens.

8.      Attached hereto as **Exhibit 7** is a true and correct copy of the Application for Building of Additions, Alterations or Repairs, approved by the San Francisco Department of Building Inspections dated June 26, 2007 and approved July 18, 2007, and which was also an exhibit to the Deposition of Linda Erkelens.

9.      Attached hereto as **Exhibit 8** is a true and correct copy of a letter from Reed Smith, attorneys for Clear Channel Outdoors, dated July 20, 2007, regarding the Lease termination notice, informing Erkelens that subject property owners may not use the property for any purpose, and further advising that if such property is removed pursuant to the San Francisco Planning Code 604(h), it cannot be rebuilt and doing so would be a violation, and which was also an exhibit to the Deposition of Linda Erkelens.

10.     Attached hereto as **Exhibit 9** is a true and correct copy of the October 17, 2007 transcript of hearing regarding protesting the issuance of Clear Channel Outdoor's Permit to Alter a Building, approved July 18, 2007, Appeal No. 07-128, Item 11.

11.     Attached hereto as **Exhibit 10** is a true and correct copy of the December 12, 2007 transcript of hearing regarding protesting the issuance of Clear Channel Outdoor's Permit to Alter a Building, approved July 18, 2007, Appeal No. 07-128.

12.     Attached hereto as **Exhibit 11** is a true and correct copy of a photograph of the Billboard produced by Clear Channel Outdoor, bates numbered CCO0107.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed this 26th day of August, 2008 at San Francisco, California.

                         /s/ Andrew S. Azarmi
                         Andrew S. Azarmi

# EXHIBIT 1

Central Form . F. No. 432

Write in Ink — File Two Copies    RECEIVED

## CITY AND COUNTY OF SAN FRANCISCO

DEPARTMENT OF PUBLIC WORKS    1950 GENERAL PERMIT BUREAU
BLDG. FORM    SEP 2 11 2:08

# 4

BUILDING INSPECTION

APPLICATION FOR PERMIT
SIGNS—BILL BOARDS

August 28, 1958    195....

Application is hereby made to the Department of Public Works of the City and County of San Francisco for permission to build in accordance with the plans and specifications submitted herewith and according to the description and for the purpose hereinafter set forth:

ELECTRIC SIGN ☐    NON-ELECTRIC SIGN ☐    BILL BOARD ☒

(1) Location  Turk and Divisadero SW - Upper West Wall - 125 x 50

(2) Total Cost $ 300.00 .......................... (3) Number of stories in building  4

(4) Present use of building  16  ............ (5) Type of building  5 .....

(6) If Sign give: Style  25' Unilluminated Posting

Thickness  8"  Size 12.25 x 24.5 Ft. Weight  2500  Lbs.

(7)

### PLOT PLAN AND ELEVATION

Indicate exactly the location of sign or billboard horizontally and vertically

TO BUILD 25 FEET OF BILLBOARD ON WALL IN ACCORDANCE WITH BLUEPRINT #P-48 DATED 9/27/48, FILED WITH APPLICATION #110514 DATED 8/17/48 AND BUILDING PERMIT #4208 DATED 1/11/48. TO INCLUDE PLATFORM, LADDER AND OTHER APPURTENANCES NECESSARY FOR SERVICING OF STRUCTURE. BILLBOARD TO BE BRACED AS SHOWN ON POSTER AND KLEISER DWG FO-265.



(8) Drawings in duplicate showing methods of attachments must be submitted with this application.

(9) No portion of building or structure, or scaffolding used during construction, to be closer than 6'0" to any wire containing more than 750 volts. See Sec. 385, Calif. Penal Code.

(10) Contractor  Foster and Kleiser Co. (Div. of W.R. Grace & Co.)

License No.  2918    License No. ..........
State of California    City and County of San Francisco
Address  1675 Eddy Street, San Francisco 19, California

(11) I hereby certify and agree that if a permit is issued for the construction described in this application, all the provisions of the permit, and all the laws and ordinances applicable thereto will be complied with. I further agree to save San Francisco and its officials and employees harmless from all costs and damages which may accrue from use or occupancy of the sidewalk, street or sidewalk space or from anything else in connection with the work included in the permit. The foregoing covenant shall be binding upon the owner of said property, the applicant, their heirs, successors and assignees.

(12) Owner  Foster and Kleiser Co. (Div. of W.R. Grace & Co.)

Address  1675 Eddy Street, San Francisco 19, Calif. Phone No.  WE 1-6600
(For contact by Bureau)

By ....................    Address ....................
Owner's Authorized Agent to be Owner's Authorized Architect, Engineer or General Contractor

326

1/20264
BLDG. FORM

**4**

APPLICATION OF

No. 214477

FOR PERMIT TO
ERECT SIGN OR BILL BOARD

Location  Turk and Divisadero St —
Upper West WALL — 125' x 50'

Foster and Kaiser Company
(Div. of W.R. Grace & Co.)

Cost $300.00

Filed  August 28 _____ 1958

Approved:

_____
Superintendent, Bureau of Building Inspection

Permit No._____

Issued _____ 195.

REFER TO:

Bureau of Engineering ...........
BBI Street Inspector ...........
Boiler Inspector ...........
Art Commission ...........
Dept. of Public Health ...........

Approved: _____ 9/5 1958

_____
Building Inspector, Bureau of Building Inspection

I agree to comply with all conditions or stipulations of the various Bureaus or Departments noted hereon.

_____
Owner's Authorized Agent

Approved: _____

_____
Department of Public Health

Approved: _____

_____
Department of Electricity

Approved: _____

_____
Art Commission

Approved: _____

_____
Boiler Inspector

Approved: _____

_____
Department of City Planning

PC Setback _____

Approved: _____

_____
Bureau of Fire Prevention & Public Safety

Approved: _____

_____
Structural Engineer,
Bureau of Building Inspection

_____
Bureau of Engineering

ERK 00040

# EXHIBIT 2



EXHIBIT 6
Wit. LINDA K. ERKELENS
Date 7/14/08
Owen N. Dv. CSR No. 12447

**Foster & Kleiser**
A METROMEDIA COMPANY

#07-20264

Date _____

LCF-1 (5-77)

1. The undersigned, as Lessor, hereby leases and grants exclusively to Foster and Kleiser, Division of Metromedia, Inc., as Lessee, the property (with free access to and upon same) located in the City of __San Francisco__
County of __San Francisco__ , State of __California__ , described as:

__1801 Turk Street SL 100' W/o Divisadero__

__Assessor's Block 1153, Lot 1 (125' x 150')__

as per map thereof recorded in the Office of the County Recorder of __San Francisco__ County, State of __California__ , for a term of three (3) years from __January 1__ , 19 __84__ , for the purpose of erecting and maintaining advertising signs thereon, including necessary supporting structures, devices, illumination facilities and connections, service ladders, and other appurtenances thereon.

2. Lessee shall pay to the Lessor rental in the amount of __Eight hundred forty and no/100 _____ __($ 840.00 _____ )__ Dollars per year, payable on a monthly basis. Prior to construction and for the entire period during which no advertising copy is being displayed on the property by Lessee, the rental shall be Ten ($10.00) Dollars.

3. Lessee shall save the Lessor harmless from all damage to persons or property by reason of accidents resulting from the negligent acts of its agents, employees or others employed in the construction, maintenance, repair or removal of its signs on the property.

4. Lessor agrees that he, his tenants, agents, employees, or other persons acting in his or their behalf shall not place or maintain any object on the property or on any neighboring property which would in any way obstruct or impair the view of Lessee's sign structures. If such an obstruction or impairment occurs, the Lessee, without limiting such other remedies as may be available, has the option of requiring the Lessor to remove said obstruction or impairment, or the Lessee may itself remove the obstruction or impairment charging the cost of said removal to the Lessor, or the Lessee may reduce the rental herein paid to the sum of Five ($5.00) Dollars per year so long as such obstruction or impairment continues.

5. If the view of Lessee's signs is obstructed or impaired in any way, or if the value of such signs is diminished by reason of diversion or reduction of vehicular traffic, or if the use of any such signs is prevented or restricted by law, or if for any reason a building permit for erection or modification of any such signs is refused, the Lessee may immediately, at its option, adjust the rental in direct proportion to the decreased value of the leased premises for advertising purposes resulting from any of the foregoing circumstances, or may terminate the lease and receive adjustment for all rent paid for the unexpired term.

6. If Lessee is prevented by law, or government or military order, or other causes beyond Lessee's control from illuminating its signs, the Lessee may reduce the rental provided by paragraph 2 by one-half (½), with such reduced rental to remain in effect so long as such condition continues to exist.

7. This Lease shall continue in full force and effect for its term and thereafter for subsequent successive like terms unless terminated at the end of such term or any successive like term upon written notice by the Lessor or Lessee served sixty (60) days before the end of such term or subsequent like term, provided that Lessee shall have the right to terminate the Lease at the end of any sixty day period upon written notice to Lessor served not less than sixty (60) days prior to the end of such sixty day period. Lessor shall have the right to terminate the Lease at any time during the period of this Lease if the Lessor is to improve the unimproved property by erecting thereon a permanent private commercial or residential building. Lessee shall remove its signs within sixty (60) days after receipt of a copy of the applicable building permit. The Lessor will, upon giving such notice of building, return to the Lessee all rent paid for the unexpired term plus the total cost of the construction and the removal of Lessee's signs, less 1/180th of such cost for each full month of this Lease prior to the notice of termination. If Lessor fails to commence the erection of the private commercial or residential building within sixty (60) days after Lessee removes its signs, Lessee shall again have the right to occupy the premises and maintain advertising signs subject to the provisions of this Lease. If any portions of the property are not to be utilized for such building, the Lessee has the option to use the remaining portion on the same terms, except that the rent shall be proportionately reduced.

8. It is agreed between the parties that Lessee shall remain the owner of all advertising signs, structures, and improvements erected or made by Lessee, and that, notwithstanding the fact that the same constitute real estate fixtures, the Lessee shall have the right to remove said signs, structures, and improvements at any time during the term of the Lease, or after the expiration of this Lease.

9. This Lease shall constitute the sole agreement of the parties relating to the lease of the above described premises. Neither party will be bound by any statements, warranties, or premises, oral or written, unless such statements, warranties or premises are set forth specifically in the Lease.

10. The word "Lessor" as used herein shall include Lessors. This lease is binding upon and inures to the benefit of the heirs, executors, successors, and assigns of Lessee and Lessor.

11. Lessor represents that he is the owner(s) ☒ tenant(s) ☐ other(s) ☐ _____ of the property covered by this Lease and has the authority to execute this Lease. All rents to be paid pursuant to this Lease, and all notices are to be forwarded to the undersigned Lessor at the address noted below the Lessor's signature.
EXECUTED by the Lessor in the presence of _____
who is hereby requested to sign as witness.

WITNESS: _____

ACCEPTED: FOSTER AND KLEISER
Division of Metromedia, Inc.

By: _____
Title: _____
JAMES G. HUGHES
_____

LESSOR(S)
X __Sue Moxon__

__Los Dos Investment Co.__
Address: __440 West Live Oak__
__Mill Valley, CA  94941__

BY: Sue Moxon



**PATRICK MEDIA GROUP, INC.**

1601 MARITIME ST., OAKLAND, CA 94607 (415) 835-5900

July 2, 1990

Los Dos
Attn: Susan Moxon
208 Benson Circle
Mill Valley, CA 94941

     RE:  Lease #15-20264, San Francisco
           1801 Turk Street (SL 100' W/o Divisadero)

Dear Ms. Moxon:

    This letter is in reference to your recent conversation with our Real Estate Representative, Gregg Machon, regarding the advertising structure at the subject location.

    It is agreeable to Patrick Media Group Inc. to increase the annual rental to $1,320.00, payable monthly effective July 1, 1990. Effective July 1, 1994 the annual rental will be increased to $1,500.00, payable monthly. The term of this agreement will be for seven years. All other terms and conditions of the existing lease shall remain the same.

    If this meets with your approval, please have the original of this letter signed and returned to this office for processing. An envelope has been provided for your convenience. The copy is to be retained for your records.

    Should you have any questions concerning this agreement, please contact me. Your cooperation in this matter is certainly appreciated.

Yours truly,

James G. Hughes
Manager
Real Estate Department

ACCEPTED AND APPROVED:

_____
Susan Moxon
for Los Dos

JGH/GM/sb



August 21, 2002

Mr. Craig Lipton
Maven Investments
1138 Taylor St.
San Francisco, CA 94133

RE:  Lease #20264, San Francisco
     Turk St. SL 100' w/o Divisadero

Dear Mr. Lipton:

This letter is in reference to the advertising structure located
on the above described property.

Clear Channel Outdoor, Inc. is agreeable to increasing the
annual rental to $1,950.00, payable monthly, effective August 1,
2002.  Effective August 1, 2003 and for each year thereafter the
annual rental shall be increased by three percent (3%).  The
term of this agreement shall be for five (5) years.  All other
terms and conditions of the existing Lease Agreement dated
January 1, 1984 shall remain the same.

If this meets with your approval, please sign the original of
this letter and return it to this office for processing.  The
copy is to be retained for your records.

Should you have any questions concerning this arrangement,
please contact Patrick Powers at (510) 835-5900 x219.  Thank you
for your consideration in this matter.

Sincerely,                           ACCEPTED AND AGREED:


David C. Sweeney                     Craig Lipton
Vice President / Real Estate         Maven Investments
Northern California Division

# EXHIBIT 3

**CERTIFIED COPY**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

CLEAR CHANNEL OUTDOOR, INC., a
Delaware corporation,

        Plaintiff,

vs.                            CASE NO. C 07-06138 JCS

LINDA ERKELENS, an individual,

        Defendant.

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

DEPOSITION OF

LINDA KALEY ERKELENS

July 14, 2008
1:21 p.m.

Two Embarcadero Center, Suite 2000
San Francisco, California

QUYEN N. DO, RPR, CSR No. 12447



PAULSON

2

1                    APPEARANCES OF COUNSEL

2

3        For Plaintiff:

4            REED SMITH LLP

5            JAMES A. DAIRE, ESQ.

6            Two Embarcadero Center, Suite 2000

7            San Francisco, California 94111

8            415.659.5922

9            415.391.8269 Fax

10           jdaire@reedsmith.com

11

12       For Defendant:

13           LUCE, FORWARD, HAMILTON & SCRIPPS LLP

14           GERALD M. MURPHY, ESQ.

15           Rincon Center II

16           121 Spear Street, Suite 200

17           San Francisco, California 94105-1582

18           415.356.4600

19           415.356.4610 Fax

20           gmurphy@luce.com

21

22

23

24

25

Linda Kaley Erkelens                                    July 14, 2008

3

1                          INDEX OF EXAMINATION

2

3    WITNESS:  Linda Kaley Erkelens

4

5    EXAMINATION                                         PAGE

6    By Mr. Daire  ...................................   6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

1                    INDEX TO EXHIBITS

2    EXHIBITS                                        MARKED

3    1    One-page document entitled "1801 Turk Street"    32

4    2    11-page document entitled "Contract for the

5         Sale and Purchase of Real Property" at 1801

6         Turk Street ................................. 43

7    3    One-page document entitled "1801 Turk 2003 &

8         2004 Income and Expenses" ................... 54

9    4    One-page letter to Clear Channel from Linda K.

10        Erkelens and Ron W. Dion dated November 2,

11        2005 ....................................... 71

12   5    E-mail thread, the top e-mail of which is from

13        Kevin Hicks to Linda K Erkelens dated Tuesday,

14        July 24, 2007 .............................. 82

15   6    Three-page document; lease between the lessor

16        and lessee of 1801 Turk Street and two

17        amendments to the lease .................... 88

18   7    One-page letter to David Sweeney at Clear

19        Channel Outdoors from Linda Erkelens and

20        Ronald Dion dated February 14, 2007 ........ 90

21   8    One-page letter on McIntosh Property Services

22        letterhead dated May 31, 2007, from Linda K.

23        Erkelens to Patrick Powers at Clear Channel

24        Outdoors ................................... 97

25

5

INDEX TO EXHIBITS (Cont.)

EXHIBITS                                              MARKED

9    Eight-page document; letter on Reed Smith

     letterhead from Scott Baker to Linda K.

     Erkelens dated July 20, 2007, with enclosures  111

10   One-page letter on McIntosh Property Services

     letterhead to Scott D. Baker from Linda K.

     Erkelens dated July 23, 2007 ................ 112

11   One-page document on Reed Smith letterhead

     from Christine Morgan to Linda K. Erkelens

     dated July 25, 2007 ...................... 122

12   One-page letter addressed to Sherm from Kevin,

     dated February 27, 2007 .................... 131

13   One-page e-mail dated March 31, 2007, from

     Linda Erkelens to

     ads@advertisingdisplaysystems.com .......... 135

INSTRUCTION(S) NOT TO ANSWER

Page      Line

14  ...   18

Linda Kaley Erkelens                              July 14, 2008

43

1          A    I believe the inspections were done, and then

2     they were all waived, and the price was lowered.

3          Q    I see.  You said a review of financial

4     documents.  Was one of the conditions to the sale -- do

5     you remember what documents you looked at?

6          A    All the tenants' files, the leases, the

7     rent-raise letters.  Tenant applications, if they

8     existed.

9          Q    Did you also review the lease in place between

10    Clear Channel and Maven Investments?

11         A    Yes, I did.

12         Q    And this was prior to the close of escrow,

13    correct?

14         A    Yes.

15         Q    Was this prior to signing the contract for

16    sale?

17         A    I don't know.  Or I don't remember.

18              MR. DAIRE:  Let's take a look at that now.

19                   (Exhibit 2 marked)

20    BY MR. DAIRE:

21         Q    Take a quick look through, Miss Erkelens, and

22    let me know when you're finished.

23         A    What -- is there a question on the table?

24         Q    Just waiting for you to finish reviewing.

25    Just let me know when you're done.

Linda Kaley Erkelens                                        July 14, 2008

44

1       A     Okay.

2       Q     I just want to make sure that we have the

3   timeline right.

4             What is this document that I've just handed

5   you?  Can you describe it?

6       A     It's a contract for sale and purchase of real

7   property at 1801 Turk Street.

8       Q     Who are the parties to the agreement?

9       A     Linda Erkelens and Ron Dion as buyers and

10  Craig Lipton, representing the sellers.

11      Q     Okay.  Did you fill out this contract?

12      A     No.  He rewrote my initial offer, and this is

13  his contract.

14      Q     Okay.  So the handwriting at the top of the

15  page is his?

16      A     Yes.  He is actually my agent in this.  I am

17  not operating as a real estate broker in this deal.

18      Q     Okay, I just want to make sure that we have

19  the timeline right here.  So the inspections and

20  conditions that you mentioned just prior to this, to the

21  best of your recollection, were those done just prior to

22  or after May 19th, 2004?

23      A     I don't remember.

24      Q     With respect to the financial document review,

25  did you undertake that yourself, or did someone else

Linda Kaley Erkelens                                    July 14, 2008

88

1    and you want the Schoepp Construction bill, which has

2    the 6.5 [sic] hours.

3         Q    So those are all notes that you've written

4    during the deposition this afternoon?

5         A    Well, not the top page.

6         Q    Those are unrelated?

7         A    They're totally unrelated, and then this one

8    got too cluttered, so I recopied it.

9                   (Exhibit 6 marked)

10   BY MR. DAIRE:

11        Q    Let me know when you've had a chance to take a

12   look at this, Miss Erkelens.

13        A    Okay.

14        Q    This is an untitled document that looks, in

15   substance, to be a lease between the lessor and lessee

16   of 1801 Turk Street and two subsequent amendments to the

17   lease.  Have you seen these documents before?

18        A    Yes, I have.

19        Q    When is the first time that you saw these

20   documents?

21        A    When I was purchasing the property.

22        Q    Prior to entering the agreement to purchase

23   the property?

24        A    Prior to closing escrow.

25        Q    So, before August 2004?

Linda Kaley Erkelens                                    July 14, 2008

90

1        A    No.

2        Q    And did you talk to any other third parties

3    about the terms of the deal before the close of escrow?

4        A    No.

5             MR. DAIRE:    Exhibit 7.

6                      (Exhibit 7 marked)

7    BY MR. DAIRE:

8        Q    This is a letter dated February 14th, and it

9    says that it's from you and your husband to David

10   Sweeney at Clear Channel Outdoors dated February 14th,

11   2007.  Do you recognize this document?

12       A    Yes.

13       Q    Tell me what it is.

14       A    We were notifying Clear Channel that we would

15   not be renewing the lease on the billboard at 1801 Turk.

16   If they wanted to present us with a new lease, we'd

17   consider it, but we do not intend to roll the lease

18   over.  I did not want to be in the same situation that

19   Sue Moxon was in.

20       Q    Did you get a response from Clear Channel?

21       A    Eventually, I got a phone call that said,

22   "Call and talk to us."  I didn't get any proposal.

23       Q    Who called you?

24       A    I could have told you this morning.  Don't

25   remember his name.  It was not David Sweeney.  It was

97

1    renewing lease.

2        Q      Gotcha.

3                    (Exhibit 8 marked)

4    BY MR. DAIRE:

5        Q      So this looks to be a letter on McIntosh

6    Property Services letterhead dated May 31st, 2007, from

7    you to Patrick Powers at Clear Channel Outdoors.  Do you

8    recognize this document?

9        A      I do.

10       Q      And that's your signature at the bottom there?

11       A      Yes, it is.

12       Q      And do you have any reason to doubt that it

13   was written on or around May 31st, 2007?

14       A      No.

15       Q      Okay, if I call this the second termination

16   letter as opposed to the first in February, you'll

17   understand what I'm referring to?

18       A      Okay.

19       Q      So, in the second termination letter, did

20   you -- well, let me ask it this way:  In the second

21   termination letter, did you state that you were willing

22   to renegotiate the lease?

23       A      No, I did not.

24       Q      Why not?

25       A      Because I no longer was willing to negotiate

Linda Kaley Erkelens                                        July 14, 2008

102

1       Q      And you didn't discuss it with anybody else

2   associated with ADS?

3       A      No.

4       Q      Okay.  The second sentence in the first full

5   paragraph of that letter says, "Please make arrangements

6   to remove the billboard and your lock box from our gate

7   by that time."  "That time" referring to July 31, 2007?

8       A      Correct.

9       Q      And those were your words?

10      A      Yes.

11      Q      Why did you ask Clear Channel to make

12  arrangements to remove the billboard and lockbox?

13      A      Because ... because I didn't understand the

14  new law, and I assumed we will be putting up our own

15  billboard.

16      Q      When you say new law --

17      A      Or the Peskin ordinance.

18      Q      So, when you say new law, you're referring to

19  the Peskin ordinance?

20      A      Right.

21      Q      To your knowledge, what is the Peskin

22  ordinance?

23      A      A restriction on billboards, supposed -- it

24  was supposed to be all -- there couldn't be any new

25  billboards, but somewhere along the line it got twisted

Linda Kaley Erkelens                                    July 14, 2008

103

1    into replace and -- and voluntary and -- and everything

2    else, and that's why I got lawyers here, because I don't

3    know.

4         Q    At the time you wrote this letter, did you

5    expect Clear Channel to remove the billboard and its

6    lockbox?

7         A    Yes, but I didn't expect them to remove my

8    rights.  I didn't expect them to write the permit in

9    such a way that I lost my right to have a billboard.

10        Q    Okay.  Miss Erkelens, I'm not trying to argue

11   with you today.  I'm just asking you questions.

12        A    Yep.

13        Q    So just so we're clear, if you just want to

14   answer the questions I ask.

15             MR. MURPHY:  I think she did answer your

16   question.

17             THE WITNESS:  I think it's time for another

18   bathroom break.

19             MR. MURPHY:  Okay.

20             MR. DAIRE:  That's fine.

21             MR. MURPHY:  Take a break.

22             (Break taken at 4:17 p.m. to

23             4:23 p.m.)

24   BY MR. DAIRE:

25        Q    Back on?

Linda Kaley Erkelens                                    July 14, 2008

111

1      A      No.

2      Q      -- a letter specifically in response?

3                    (Exhibit 9 marked)

4             THE WITNESS:  Well, I guess it was after, huh?

5      BY MR. DAIRE:

6      Q      So this is a letter on Reed Smith letterhead

7      from Scott Baker dated July 20th, 2007, and you were

8      listed as a recipient of this letter.  Do you recognize

9      this letter?

10     A      I do.

11     Q      Can you describe the document?

12     A      July 20th from Reed Smith on Scott D. Baker

13     letterhead to Linda K. Erkelens on the Clear Channel

14     billboard at 1801 Turk, acknowledging my May 31st

15     letter.

16     Q      Okay.  Do you recall receiving this letter on

17     or about July 20th?

18     A      I do.

19     Q      And there's an enclosure with the letter.  Can

20     you describe what that is, if you know?

21     A      An unreadable copy of a permit application.

22     It was even worse by fax.

23     Q      Is it an application or also an approved

24     permit?

25     A      It's an approved permit, so I guess it's a

Linda Kaley Erkelens                                July 14, 2008

112

1    permit.

2        Q    And you just called it unreadable, but were

3    you able to recognize it as a permit --

4        A    I recognize it as a permit, but I had no idea

5    that I was giving away my rights based on what I

6    couldn't read on here.  And I found the letter rather

7    threatening.  In other words, if you don't sign with

8    Clear Channel, you're not going to get another

9    billboard.

10        Where does the Reed come in Reed Smith?  Is

11    that a last name or a first name?

12        Q    I can tell you after we're done.

13        A    I'm just wondering.  Because it's my middle

14    name.  I just made the connection.

15        Q    Spelled the same way and everything, huh?

16            (Exhibit 10 marked)

17    BY MR. DAIRE:

18        Q    So you've just been and handed what is a

19    letter on McIntosh Property Services letterhead dated

20    July 23rd, 2007.  Indicates you are the signatory to the

21    letter and that the recipient is Scott Baker.  Doesn't

22    say at Reed Smith, but I'll represent that he's an

23    attorney here.

24        Do you recognize this letter?

25        A    I do.

Linda Kaley Erkelens                                    July 14, 2008

113

1       Q    And do you have any reason to doubt that it

2  was sent on or about July 23rd, 2007?

3       A    I do not.  I didn't want them to destroy my

4  roof.

5       Q    What do you mean by that?

6       A    Anything they did on the removal of the

7  billboard -- I mean, it's -- it's a lousy job of

8  affixing the billboard to the roof, in my estimation,

9  and I didn't -- I had already repaired leaks to one

10  apartment that was very difficult with an occupied

11  apartment.  I didn't want anything that would damage the

12  roof.

13       Q    And first sentence of this letter says, "Thank

14  you for your letter and copy of the permit."  Did you

15  type that sentence or have it -- or did you dictate that

16  sentence?

17       A    I typed it.  Or dictated it.  I didn't

18  recognize -- am I allowed to talk?

19       Q    You're allowed to give a complete answer.

20       A    I didn't recognize the impact.  I couldn't

21  read all of the permit.

22       Q    Did you tell anyone at Clear Channel that you

23  couldn't read the permit?

24       A    No.

25       Q    Did you tell Mr. Baker that you couldn't read

Linda Kaley Erkelens                                July 14, 2008

114

1    the permit?

2         A    No.

3         Q    Did you request that Clear Channel send

4    another permit?

5         A    No.  I got a copy of the permit that was

6    readable and realized, with some explanation from

7    counsel, that the word "voluntarily," I was giving away

8    all my rights to the billboard, and it was time to bring

9    a halt until we got this straightened out.

10        Q    So you didn't ask Clear Channel for another

11   copy of the permit?

12        A    No, I did not.

13        Q    Did you ask Mr. Baker for another copy of the

14   permit?

15        A    No, I did not.

16        Q    At the time of this letter, did you still

17   expect Clear Channel to remove the sign structure?

18        A    Yes.

19        Q    Why?

20        A    I guess because it was their sign structure,

21   which is what you're waiting to hear.

22        Q    You also indicate your expectation that Clear

23   Channel will repair any and all damage to the

24   installation and removal the sign has created to the

25   roof.  Do you see the passage I'm indicating there?

Linda Kaley Erkelens                                July 14, 2008

131

1        A    I don't think so.

2        Q    Do you know if he has any sort of an

3    independent contractor relationship?

4        A    With ADS?

5        Q    With ADS or Mr. Hicks.

6        A    I don't think so.  If so, he hasn't disclosed

7    it to me.

8        Q    Do you know how Mr. Hicks and Sherman met?

9        A    No.  I can only speculate.

10       Q    You've never had a conversation with them

11    about it?

12       A    [Witness shaking her head.]  Sherman's done

13    commercial real estate for years, and his dad did

14    commercial real estate before him.  You know, he did a

15    lot with a guy name Ben Kalman.  I don't know.

16       Q    Should we take another five-minute break?  Now

17    would be a good time.

18       A    All right.

19       MR. DAIRE:  Let's go off the record five

20    minutes.

21            (Break taken at 5:15 p.m. to

22            5:20 p.m.)

23       MR. DAIRE:  Mark this guy as 12.

24            (Exhibit 12 marked)

25    BY MR. DAIRE:

Linda Kaley Erkelens                                    July 14, 2008

132

1       Q       This is a letter dated February 27, 2007.  The

2  recipient is listed as Sherm, and the author is listed

3  as Kevin.  Do you recognize this document?

4       A       Yes, I do.

5       Q       Can you tell me what it is?

6       A       It was attached to an e-mail that Kevin Hicks

7  sent to Sherman Little and then Sherman forwarded to me.

8       Q       Was it forwarded around February 27th, 2007?

9       A       No.  It was a little later than that.  I think

10  it was into March because there was some sort of --

11  either Sherman's e-mail changed or Kevin's e-mail

12  changed or something.  But I think I got it in March.

13  When it says "Dion's sign," it means my husband, Ron

14  Dion.  They refer to him last -- by last name sometimes.

15       Q       So was there a cover e-mail that accompanied

16  this letter?

17       A       Yes.  And I turned it in.

18       Q       When you say you turned it in, you mean you

19  provided it to your counsel?

20       A       That's correct.  No, I put it through the mail

21  slot down front on Embarcadero 2.

22       Q       Makes it sound like homework.

23       A       That's what it is.  It's brutal and

24  ridiculous.  I'm going back to residential real estate.

25       Q       Do you recall if the cover e-mail had any

Linda Kaley Erkelens                          July 14, 2008

134

1    another lease.

2         Q    So you never told anyone at Clear Channel,

3    "I've got another offer in the hopper"?

4         A    No.  I was done with it.  I wasn't going to

5    spend anymore time, I thought.

6         Q    So you were done with it as of

7    February 27th --

8         A    No.  I was done with it when we came up with a

9    lease that I signed, but --

10        Q    Okay.

11        A    -- I wasn't going to play one against another

12   or try and get too involved.  I was still in New Zealand

13   at this point.

14        Q    You have a home there?

15        A    Yes.

16        Q    So you split your time between New Zealand and

17   San Francisco?

18        A    Yep.

19        Q    Who's in charge of the property management

20   when you're in New Zealand?

21        A    I am and Mindy.  You can do a lot with e-mail

22   and fax -- e-fax and phones and ...

23        Q    So you still oversee the property management?

24        A    I do.  But I don't deal with running bathtubs.

25        Q    Is Mindy a full-time employee?

Linda Kaley Erkelens                                July 14, 2008

142

REPORTER'S CERTIFICATION

I, Quyen N. Do, Certified Shorthand Reporter, in
and for the State of California, do hereby certify:

That the foregoing witness was by me duly sworn;
that the deposition was then taken before me at the time
and place herein set forth; that the testimony and
proceedings were reported stenographically by me and
later transcribed into typewriting under my direction;
that the foregoing is a true record of the testimony and
proceedings taken at that time.

        IN WITNESS WHEREOF, I have subscribed my name
this 16th day of July 2008.


                    _____

                    Quyen N. Do, RPR, CSR No. 12447

# EXHIBIT 4

JUL-01-2004 09:44 AM                                                          P.02



**REALTOR®**

## CONTRACT FOR THE SALE AND PURCHASE OF REAL PROPERTY
### THIS IS INTENDED TO BE A LEGALLY BINDING CONTRACT. READ IT CAREFULLY.
#### SAN FRANCISCO ASSOCIATION OF REALTORS® STANDARD FORM

_SAN FRANCISCO_, California _May 19, 2004_ (Date).

_LINDA K. ERKELENS AND RONALD DION and/or Assignees_, hereinafter referred to as Buyer, offers to purchase the real property situated at _1801 TURK ST._ in the City of _SAN FRANCISCO_, County of _SAN FRANCISCO_ State of California (the "Property"), for the purchase price of _THREE MILLION NINE HUNDRED SEVENTY THOUSAND_ Dollars, ($ _3,970,000_) upon the following TERMS and CONDITIONS.

1. **FINANCIAL TERMS AND CONDITIONS.**

   A. $ _10,000_ **INITIAL DEPOSIT** evidenced by ☒ personal check or ☐ _____ payable to _FIRST AMERICAN TITLE Co._ (Payee), which shall not be cashed or otherwise negotiated until mutual execution of this contract, whereupon it shall promptly be delivered to Payee.

   B. $ _65,000_ **ADDITIONAL DEPOSIT** to be placed in escrow ☐ within _____ days after the mutual execution of this contract or ☐ on or before _____.

   C. $ _2,400,000_ **NEW FIRST LOAN.** This contract is conditioned upon Buyer obtaining a new first loan for a term of thirty (30) or _____ years at an initial annual rate of interest not to exceed _5_ % for a loan which is ☒ adjustable according to the lender's predetermined schedule or ☐ fixed for an initial period of _____ year(s) or ☐ fixed for the entire term, secured by a first deed of trust on the Property, with a loan fee of not more than _1_ loan points and on other terms and conditions satisfactory to Buyer.

   D. $ _____ **NEW SECOND LOAN.** This contract is conditioned upon Buyer obtaining a new second loan for a term of fifteen (15) or _____ years at an initial annual rate of interest not to exceed _____% for a loan which is ☐ adjustable according to the lender's predetermined schedule or ☐ fixed for an initial period of _____ year(s) or ☐ fixed for the entire term, secured by a second deed of trust on the Property, with a loan fee of not more than _____ loan points and on other terms and conditions satisfactory to Buyer.

   E. $ _____ **NON-CONTINGENT FINANCING.** Buyer intends to obtain new financing in the principal amount specified. Seller agrees to provide access to the Property for appraisal purposes. Buyer acknowledges that the full amount stated may not be obtainable and that the terms and availability of loans are subject to constant change. Buyer further acknowledges that neither obtaining financing nor satisfactory appraisal is a condition of Buyer's performance, unless the appraisal condition in paragraph 3 is checked.

   F. $ _____ **OTHER FINANCING** (see SFAR Addendum - Assumption of Existing Loan / Seller Financing).

   G. $ _1,495,000_ **CASH BALANCE** payable by Buyer through escrow prior to Close of Escrow.

   H. $ _3,970,000_ **TOTAL PURCHASE PRICE, EXCLUDING CLOSING COSTS AND ADJUSTMENTS, IF ANY.** (Total of A through G.)

2. **SOURCE OF FUNDS.** Buyer represents that the funds required for the Initial Deposit, Additional Deposit, Cash Balance, and closing costs are available at Buyer's disposal, and that obtaining these funds is **not** a condition of this contract unless paragraph 1G (Sale of Buyer's Property) is initialed, or an additional condition relating to these funds has been agreed to in writing.

3. **APPRAISAL.** This contract is ☐ (if checked) subject to the Property appraising at no less than the purchase price.

4. **FINANCING PROVISIONS.** Buyer shall act diligently and in good faith to obtain all necessary financing and insurance for the purchase of the Property. For loans referred to above requiring an application, Buyer shall submit to lender(s) a completed written application with all supporting financial information and authorizations required by lender(s) within three (3) days after the mutual execution of this contract. In the event that Buyer is unable to obtain the loan commitment(s) indicated in paragraph 1 or does not otherwise waive those conditions in writing and/or remove any appraisal condition established by paragraph 3 within thirty (30) or _____ days after the mutual execution of this contract, either party may then terminate this contract.

5. **ESCROW.** Escrow shall close ☒ on _August 17, 2004_ (date) or ☐ _____ days after the mutual execution of this contract ("Close of Escrow"). This contract, including any addenda and counteroffers, shall constitute escrow instructions to Buyer and Seller. The parties shall execute additional instructions consistent with this contract and deliver them to _FIRST AMERICAN TITLE Co._ ("Escrow Agent"). Release of funds from escrow will require mutually consistent signed instructions from both Buyer and Seller, or the rendering of a judicial decision or arbitration award authorizing the release.

6. **OCCUPANCY.** Buyer ☐ intends or ☒ does not intend to occupy the Property as Buyer's principal residence.

7. **PHYSICAL POSSESSION.** Physical possession of the Property shall be delivered to Buyer upon recordation of the deed or ☐ (if checked) after recordation of the deed but not later than midnight on _____ (date). The agreement setting forth the terms upon which Seller shall occupy the Property after Close of Escrow is attached hereto and made a part of this contract. ☒ (if checked) Physical possession of the Property shall be delivered subject to tenants' rights.

Buyer's Initials _____ Seller's Initials _____

### SELLING BROKER'S COPY

Copyright © 2003 San Francisco Association of REALTORS®

Page 1 of 7 (Rev. 10/03)

EXHIBIT 2

JUL-01-2004 09:45 AM                                                      P.03

Property Address: __1801 Turk St. San Francisco, CA__          Date: __5.17.04__

8. **PRELIMINARY TITLE REPORT.** Within three (3) or _____ days after the mutual execution of this contract, Buyer, at Buyer's expense, shall order a Preliminary Title Report from Escrow Agent. Seller's proceeds from the sale of the Property shall be applied to pay off all monetary liens at Close of Escrow, except that Seller shall have no obligation to pay off bonds and/or assessments unless agreed to in writing by Buyer and Seller. Buyer's objections to any encumbrances of record ("Exceptions") shall be delivered in writing to Seller within seven (7) or _____ days after Buyer's receipt of the Preliminary Title Report. Buyer shall not be required to object to monetary liens, other than bonds and/or assessments which Buyer does not intend to assume. Seller shall, within three (3) or _____ days after receipt of Buyer's objections, deliver to Buyer written notice that either (1) the Exceptions objected to by Buyer will be eliminated by Close of Escrow, or (2) Seller is unwilling or unable to eliminate the Exceptions. If Seller notifies Buyer that the Exceptions will not be eliminated by Close of Escrow, Buyer shall have three (3) or _____ days from receipt of Seller's notification to notify Seller in writing that Buyer will purchase the Property with the Exceptions to the policy of title insurance remaining in effect. If Buyer does not so notify Seller within the specified time period, either party may then terminate this contract.

9. **FIXTURES.** All fixtures and fittings that are attached to the Property or for which special openings have been made are included, free of liens, in the purchase price, including electrical, lighting, plumbing and heating fixtures, hardware, solar systems, built-in appliances, screens, awnings, shutters, window coverings, attached floor coverings, television antennas/satellite dishes and related equipment, water softening systems, air coolers or conditioners, pool and spa equipment, mailbox, garage door openers and transmitters, trees, shrubs and outdoor plants planted in the ground, and items permanently attached to the Property, except for:_____
_____

10. **PERSONAL PROPERTY.**
    ☐ **(For Residential Property)** The following personal property on the Property at the date of the mutual execution of this contract is included in the sale, free of liens and without warranty of condition: _____ ' _____
_____
_____

    ☒ **(For Rental Property)** All personal property on the Property at the date of the mutual execution of this contract owned by Seller and used in the operation of the Property is included in the sale. ☒ (If checked) Seller shall provide, within seven (7) or __30__ days after the mutual execution of this contract, an inventory of the personal property.

11. **PRORATIONS AND EXPENSES.** The following shall be paid current and then prorated between Buyer and Seller as of Close of Escrow: real property taxes (based upon the latest information available regarding the assessed value of the Property and the applicable tax rate); bonds and assessments; Homeowners' Association dues and assessments; interest on any loan(s) secured by the Property assumed by Buyer; premiums for any insurance on the Property assumed by Buyer; rents; and operating expenses. Security deposits and accrued interest thereon, where the law requires interest to be paid on security deposits, shall be credited to Buyer's account at Close of Escrow. Buyer shall pay the escrow fee and title insurance premiums. Seller shall pay any real property transfer taxes. Buyer shall pay any Homeowners' Association transfer fees and move-in fees. Seller shall pay any Homeowners' Association move-out fees. Seller shall pay any prepayment penalty or other fees or charges imposed by lenders for loans being paid off through escrow. Unless specified in this contract, all other prorations and expenses shall be paid by either Buyer or Seller in accordance with local custom. Buyer and Seller understand that the Property will be reassessed upon change of ownership. A supplemental tax bill will be sent to Buyer which may reflect an increase or decrease in property taxes based on the purchase price. Tax bills issued after Close of Escrow for periods of time before Close of Escrow shall be paid by Seller.

12. **ADDITIONAL TERMS AND CONDITIONS.** A through L below are made a part of this contract only when initialed by Buyer. Choose only one of A or B and only one of C or D.
    **Buyer's Initials**
    _____/_____  A. **STRUCTURAL PEST CONTROL INSPECTION—SUBJECT TO BUYER'S APPROVAL.** Buyer, at Buyer's expense, shall obtain a written structural pest control inspection report with respect to the Property and all improvements thereon. If Buyer does not remove this condition in writing within fifteen (15) or _____ days after the mutual execution of this contract, either party may then terminate this contract. During this time, Buyer may request Seller to make repairs or to credit Buyer for the costs of recommended repair work, but Seller shall not be obligated to agree to any such request.
    **Buyer's Initials**
    _____/_____  B. **WAIVER OF STRUCTURAL PEST CONTROL INSPECTION.** Although Buyer has been advised that Buyer may order a new written structural pest control inspection report with respect to the Property and all improvements thereon, Buyer elects to purchase the Property in its present condition without obtaining such a report. Buyer acknowledges that any reports Buyer may have received do not constitute representations by either Seller or Broker(s) as to the current condition of the Property and Buyer hereby releases Seller and Broker(s) from all claims, demands and liabilities with respect to the existence of conditions and defects which would be likely to be disclosed by an inspection report ordered by Buyer.

Buyer's Initials _____    Seller's Initials _____    **SELLING BROKER'S COPY**          
                                                 Copyright © 2003 San Francisco Association of REALTORS®                    Page 2 of 7
                                                                                                                          (Rev. 10/03)

JUL-01-2004 09:46 AM                                                      P.04

Property Address: __1801 Turk St. San Francisco, CA__          Date: __5·19·04__

Buyer's Initials

_____/_____ **C. INSPECTIONS BY CONTRACTORS, ENGINEERS AND ARCHITECTS.** Buyer's obligations under this contract are conditioned upon Buyer's written approval, at Buyer's sole discretion, of inspection reports on the Property by contractors, engineers, architects, and/or other experts retained by Buyer, which inspections may include but are not limited to structural, plumbing, sewer/septic, well, heating, air conditioning, electrical and mechanical systems, built-in appliances, roof, soil, foundation, retaining walls, geologic conditions, pool/spa and related equipment, possible environmental hazards (such as asbestos, mold, electromagnetic fields, formaldehyde, radon gas, lead-based paint or lead hazards, fuel or chemical storage tanks, hazardous waste, and other materials or products), water/utility use restrictions, and location of property lines. Brokers do not certify lot size or interior square footage, information contained in inspection reports, or representations of others. Seller shall permit the inspections upon receiving reasonable advance notice from Buyer, and Buyer agrees to provide Seller with a copy of all inspection reports at no cost to Seller. If Buyer does not remove this condition in writing within fifteen (15) or _____ days after the mutual execution of this contract, either party may then terminate this contract. During this time, Buyer may request Seller to make repairs or to credit Buyer for the estimated costs of identified repair work, but Seller shall not be obligated to agree to any such request.

Buyer's Initials

_____/_____ **D. WAIVER OF INSPECTIONS BY CONTRACTORS, ENGINEERS AND ARCHITECTS.** Buyer hereby waives Buyer's right to perform inspections as provided in paragraph 12C above. Buyer is aware that all real property and improvements contain defects and conditions which are not readily apparent and which may affect the value and/or desirability of the Property. Buyer and Seller acknowledge that Broker(s) do not guarantee and in no way assume responsibility for the condition of the Property. Buyer also is aware of Buyer's own affirmative duty to exercise due diligence in observing the condition of and inspecting the Property to protect Buyer's interests. Buyer acknowledges that any reports Buyer may have received do not constitute representations by either Seller or Broker(s) as to the current condition of the Property. Buyer has been strongly advised to retain Buyer's own contractors and other experts to investigate the condition and suitability of all aspects of the Property and all matters affecting the value and desirability of the Property. If Buyer has elected not to perform inspections as specified in paragraph 12C above, then Buyer, by initialing this paragraph, releases Seller and Broker(s) from all claims, demands, and liabilities which in any manner pertain to matters which could have been disclosed by such inspections.

Buyer's Initials

_____/_____ **E. UNDERGROUND STORAGE TANKS ("USTs").** The parties acknowledge that Article 21 of the San Francisco Health Code requires owners of real property in San Francisco with USTs located on or immediately adjacent to the real property to file a plan for closure of the USTs within thirty (30) days of their discovery. If Seller does not provide Buyer with a written report by a licensed contractor specializing in USTs stating that no such tanks can be located, then Buyer is advised to conduct Buyer's own professional inspection, which Seller shall permit. If the inspection reveals the existence of one or more USTs, then Seller shall, at Seller's expense, remove the USTs and complete any necessary remedial work to the Property prior to Close of Escrow. This paragraph, if initialed, shall be effective notwithstanding the inclusion of paragraph 12D above.

Buyer's Initials

_____/_____ **F. CONDOMINIUM DISCLOSURE.** Within ten (10) or _____ days after the mutual execution of this contract, Seller, at Seller's expense, shall furnish Buyer with copies of the Property's legal description (including parking and storage spaces, if any), covenants, conditions and restrictions, articles of incorporation, bylaws, rules and regulations currently in force, the most recent financial statements of the Homeowners' Association, a current operating budget, one year's minutes of the Homeowners' Association meetings and any other documents required by law. Seller shall also advise Buyer within this time of any delinquent or special but uncollected assessments, any anticipated extraordinary maintenance or repair expenses and any pending or anticipated litigation affecting the Property. Buyer's obligations under this contract are conditioned upon Buyer's delivery to Seller of written approval of the documents within five (5) or _____ days after Buyer's receipt thereof. Approval of the documents shall be at Buyer's sole discretion. If Buyer does not approve the documents within the specified time period, either party may then terminate this contract. Buyer is hereby advised that any structural pest control or other inspections of common areas may be subject to the approval of, and limited in scope by, the Homeowners' Association and/or its Board of Directors.

Buyer's Initials

_____/_____ **G. SALE OF BUYER'S PROPERTY.** Buyer's obligations under this contract are conditioned upon the sale and close of escrow of Buyer's real property, commonly known as _____, within the time specified in this contract for Close of Escrow of the Property. Seller shall have the right to continue to offer the Property for sale and conditionally accept another offer subject to the provisions of this contract. Following such conditional acceptance, Seller shall give Buyer written notice of Seller's acceptance of any such offer. If Buyer does not waive this condition in writing within seventy-two (72) hours after receipt of the notice, this contract shall terminate. If Buyer elects to waive this condition, Buyer also agrees to waive any loan condition insofar as it depends on the sale of Buyer's property and within three (3) or _____ days from Buyer's waiver of this condition, Buyer shall submit documentation to Seller demonstrating Buyer's financial ability to close escrow on the Property without closing escrow on Buyer's property. If Seller does not approve this documentation in writing within five (5) or _____ days of receipt, either party may then terminate this contract. Seller's approval shall not be unreasonably withheld. Paragraph 28 does not apply to this paragraph.

Buyer's Initials    Seller's Initials        **SELLING BROKER'S COPY**

_____/_____    _____/_____    Copyright © 2003  San Francisco Association of REALTORS®        Page 3 of 7
                                                                         (Rev. 10/03)

JUL-01-2004 09:47 AM                                                      P.05

Property Address: 1801 Turk St. San Francisco, CA                Date: 5.19.04

Buyer's Initials

_____/_____ H. **RENTAL PROPERTY.** Buyer agrees to purchase the Property subject to existing leases and the rights of parties in possession. Within seven (7) or _____ days after the mutual execution of this contract, Seller shall deliver to Buyer copies of all leases, rental agreements and Section 6.14 notices as well as copies of all outstanding notices sent to tenants and a written statement of (1) any and all oral agreements with tenants, (2) uncured defaults by Seller or tenants, (3) claims made by Seller against tenants or by tenants against Seller in any court of law or to the San Francisco Rent Board, or other governmental agencies, (4) all tenants' deposits held by Seller, including any claimed offsets against those deposits, (5) any pass-throughs which constitute part of the existing rent, including the nature of the pass-through, the amount, and the period of time for which the pass-through is in effect, (6) which units include parking as part of the rent, whether any garages or parking spaces are rented to non-tenants, the amount received for each parking space, and the terms of any rental agreement or lease for the parking space, (7) notices of rent increases and the rental history of each unit from the date of each tenant's occupancy to the present, and (8) any Notices to Quit served on tenants and, if the notices have been filed with the San Francisco Rent Board, proof of such filing. If Buyer does not deliver to Seller, within seven (7) or _____ days after receipt of the documents, written notice approving the documents, either party may then terminate this contract. Approval of the documents shall be at Buyer's sole discretion. Prior to Close of Escrow, Seller agrees that no changes in the leases and/or tenancies shall be made and no new leases or rental agreements shall be entered into without Buyer's prior written consent, which consent shall not be unreasonably withheld. Seller shall deliver to Escrow Agent prior to Close of Escrow: (1) any and all tenants' deposits, including security deposits, last month's rent deposits, cleaning deposits, key or other deposits, and any required interest accrued thereon through Close of Escrow, which deposits and interest shall be disbursed to Buyer at Close of Escrow; and (2) copies of any notice(s) of the transfer of deposits given by Seller to tenants.

Buyer's Initials

_____/_____ I. **RENTAL INFORMATION QUESTIONNAIRES ('ESTOPPELS').** Within three (3) or _30_ days after the mutual execution of this contract, Seller shall deliver to all tenants written Rental Information Questionnaires, requesting from each tenant acknowledgment of the terms and conditions of the tenant's rental. No later than fifteen (15) or _30_ days after the mutual execution of this contract, Seller shall deliver to Buyer all completed Questionnaires returned by tenants to Seller. If any Rental Information Questionnaires are returned after that day, Seller agrees to provide them to Buyer within two (2) days of receipt.

Buyer's Initials

_____/_____ J. **TENANT STATUS.** Owner Move-In / Tenant Status Addendum (Form SF-OMIA) is included in this contract.

Buyer's Initials

_____/_____ K. **ILLEGAL UNIT(S).** Buyer understands that unit(s) _____ is/are not legally permitted. It/they may violate zoning ordinances, may have been built without a building permit, and a certificate of final completion and occupancy may not have been issued. Buyer may be required to bring the unit(s) into compliance or to remove kitchen, bathroom or other facilities at Buyer's expense. A substantial fine may be imposed and Buyer may be prevented from renting the illegal unit(s). Buyer is advised to obtain legal advice from a qualified real estate attorney with respect to potential claims tenants renting such units may have, if any.

Buyer's Initials

_____/_____ L. **INCOME AND EXPENSE STATEMENT.** Within seven (7) or _____ days after the mutual execution of this contract. Seller shall deliver to Buyer a true and complete statement of the income and expenses of the Property for calendar years _2003_ and the current year to date. Buyer's obligations under this contract are conditioned upon Buyer's delivery to Seller of written approval of the statement within seven (7) or _____ days after Buyer's receipt thereof. Approval of the statement shall be at Buyer's sole discretion. If Buyer does not approve the statement within the specified time period either party may then terminate this contract.

13. **COMPLIANCE WITH LOCAL, STATE AND FEDERAL LEGISLATION.** Buyer is advised to consult with appropriate authorities to determine the extent to which local, State and federal laws may affect the ownership and use of the Property.

A. **BUILDING PERMIT HISTORY.** (Applies if the Property contains one or more residential units). Seller, at Seller's expense, shall promptly obtain from the appropriate local governmental agency a Report of Residential Building Record ("3R") or similar report and provide same to Buyer. Buyer's obligations under this contract are conditioned upon Buyer's written approval of the report within five (5) or _____ days after Buyer's receipt thereof. If Buyer does not approve the report within this time period, either party may then terminate this contract. Brokers do not investigate or guarantee the accuracy of the information contained in such report. Buyer is strongly advised to investigate the status of zoning, permits or code compliance with the local planning department and not rely solely on the 3R report.

B. **ENERGY AND WATER CONSERVATION.** Unless an exemption applies or there has been previous compliance, Seller, at Seller's expense, shall order an energy and/or water conservation inspection report. If the inspection report(s) indicates the need for conservation work, then Seller shall pay the cost of the work, not to exceed the maximum expenditure amount, if any, required by local law. Seller shall complete the work by Close of Escrow and shall file a certificate of compliance with the appropriate agencies.

C. **WATER HEATERS.** California law requires that water heaters be strapped, braced or anchored to resist falling or displacement. The State Uniform Plumbing Code also requires that new or replacement water heaters located in a garage area be installed in such a manner that their ignition point is at least 18 inches above the floor. Buyer is hereby notified that different local authorities may have more stringent requirements, such as in Daly City which requires existing water heaters to be elevated. Seller shall, at Seller's expense, bring any water heater installations into compliance with these requirements prior to Close of Escrow.

Buyer's Initials    Seller's Initials        **SELLING BROKER'S COPY**                          Page 4 of 7
                                      Copyright © 2003 San Francisco Association of REALTORS®         (Rev. 10/03)

JUL-01-2004 09:48 AM                                                    P.06

Property Address: 1801 Turk St. San Francisco, CA          Date: 5.19.04

D. **SMOKE DETECTORS.** Applicable State and local law requires that every residential property be properly equipped with approved, operating and functioning smoke and/or heat detectors. If such detectors are not already installed on the Property, Seller shall install and pay for the detectors prior to Close of Escrow. **If the Property is a single-family dwelling, Seller shall deliver to Buyer a written statement of compliance in accordance with applicable law before Close of Escrow.**

E. **LEAD-BASED PAINT HAZARDS DISCLOSURE.** Seller shall complete and deliver to Buyer within three (3) days after the mutual execution of this contract, a Lead-Based Paint Hazards Disclosure and Addendum in compliance with 42 U.S.C. 4852d.

F. **NATURAL HAZARDS ZONE DISCLOSURE.** Seller shall disclose to Buyer within seven (7) days after the mutual execution of this contract, if the Property is located in a Special Flood Hazard Area, an Area of Potential Flooding as shown on a dam failure inundation map, a Very High Fire Hazard Severity Zone, a Wildland Area that may contain substantial forest fire risks and hazards, an Earthquake Fault Zone, a Seismic Hazard Zone, or any other zone for which disclosure is required by law.

14. **RESIDENTIAL RENT CONTROL ORDINANCE.** If the Property is located in San Francisco, Buyer is advised that there is in effect a Residential Rent Stabilization and Arbitration Ordinance, amended from time to time, which may severely affect Buyer's rights of ownership and right to move into the Property. Buyer is advised to research documents filed with the San Francisco Rent Board pertaining to the Property and to obtain legal advice from a real estate attorney knowledgeable and experienced in San Francisco rent control law to determine the effect of this Ordinance.

15. **MEGAN'S LAW.** Notice: The California Department of Justice, sheriff's departments, police departments serving jurisdictions of 200,000 or more and many other local law enforcement authorities maintain for public access a data base of the locations of persons required to register pursuant to paragraph 1 of subdivision (a) of Section 290.4 of the Penal Code. The data base is updated on a quarterly basis and a source of information about the presence of these individuals in any neighborhood. The Department of Justice also maintains a Sex Offender Identification Line through which inquiries about individuals may be made. This is a "900" telephone service. Callers must have specific information about individuals they are checking. Information regarding neighborhoods is not available through the "900" telephone service.

16. **REAL ESTATE TRANSFER DISCLOSURE STATEMENT.**

A. **ONE TO FOUR DWELLING UNITS.** If the Property contains one (1) to four (4) dwelling units, Seller shall complete and deliver to Buyer within three (3) or _____ days after the mutual execution of this contract, a Real Estate Transfer Disclosure Statement ("TDS") in compliance with the provisions of California Civil Code §1102 et seq. unless Seller has already done so. **Buyer's Initials**

B. _____/_____ **SUPPLEMENT TO TRANSFER DISCLOSURE STATEMENT.** If a TDS is required by law or this paragraph 16, and this paragraph 16B is initialed by Buyer, Seller shall complete and deliver to Buyer the local supplement to the TDS (including questions for Condominiums/Cooperatives/Other Associations, and for Income Property if paragraph 16C is initialed by Buyer) within three (3) or _____ days after the mutual execution of this contract. **Buyer's Initials**

C. _____/_____ **FIVE OR MORE DWELLING UNITS AND/OR COMMERCIAL SPACE.** If the Property contains five (5) or more dwelling units and/or commercial space and this paragraph 16C is initialed by Buyer, although California Civil Code §1102 et seq. does not apply, Seller shall complete and deliver to Buyer a TDS not later than three (3) or _____ days after the mutual execution of this contract. Buyer's obligations under this contract are conditioned upon Buyer's written approval of the TDS within seven (7) or _____ days of Buyer's receipt thereof, which approval shall be at Buyer's sole discretion. If Buyer does not approve the TDS within this time period, either party may then terminate this contract.

17. **CONDITION OF PROPERTY.** Seller represents to Buyer and Broker(s) that Seller has no knowledge or notice that the Property has any material defects other than as disclosed in writing by Seller before mutual execution of this contract or as soon as practicable thereafter in the TDS or other writing. Seller shall maintain the Property in the same general condition as when this contract was signed by Buyer and Seller until possession is delivered to Buyer. Seller shall deliver the Property free of debris and in broom-clean condition and provide Buyer, at possession, with existing keys to all property locks, mail boxes, gates, alarms and garage doors, and garage door remote controls, if any. Buyer and Seller agree that Broker(s) shall not be responsible for Seller's performance under this paragraph.

18. **RISK OF LOSS.** All risk of loss to the Property shall be borne by Seller until title has been conveyed to Buyer. If improvements on the Property are destroyed or materially damaged in an amount exceeding five percent (5%) of the purchase price prior to transfer of title, Buyer shall have the right to terminate this contract. All damages totaling less than five percent (5%) of the purchase price shall be paid by Seller.

19. **WALK-THROUGH INSPECTION.** Buyer shall have the right to make a final inspection of the Property no later than five (5) or _____ days prior to Close of Escrow, not as a contingency of the sale but solely to confirm that: (a) the Property is in substantially the same condition as on the date of mutual execution of this contract, unless otherwise agreed to in writing; and (b) Seller has complied with any additional written obligations regarding the condition of the Property.

20. **AGENCY RELATIONSHIPS CONFIRMATION.** The following agency relationships are hereby confirmed for this transaction:
Listing Agent ( Maven Brokerage, Inc. )          Selling Agent (_____)
is the agent of                                    (if not the same as Listing Agent) is the agent of
☐ the Seller exclusively; or                       ☐ the Buyer exclusively; or
☒ both the Buyer and Seller.                       ☐ the Seller exclusively; or
                                                    ☐ both the Buyer and Seller.

**Buyer's Initials**    **Seller's Initials**    **SELLING BROKER'S COPY**              Page 5 of 7
                                          Copyright © 2003 San Francisco Association of REALTORS®          (Rev. 10/03)

JUL-01-2004 09:49 AM                                                              P.07

Property Address: 1901 Turk St. San Francisco, CA                    Date: 5.19.04

21. **LIQUIDATED DAMAGES.** By initialing this paragraph, Buyer and Seller agree that if Buyer fails to complete this purchase by reason of any default by Buyer, Seller shall retain as liquidated damages for breach of contract the deposit(s) actually paid. However, if the Property is a dwelling with no more than four (4) units, one of which Buyer intends to occupy, then the amount retained shall be no more than three percent (3%) of the purchase price. Any excess shall be returned to Buyer. Buyer and Seller shall also execute a separate liquidated damages document for any additional deposit. (Execution of California Association of REALTORS® Form RID shall fulfill this requirement.) Note: In the event of a dispute, funds deposited in trust accounts or escrow are not released automatically and require mutually consistent signed instructions from both Buyer and Seller, or the rendering of a judicial decision or arbitration award authorizing such release. Buyer's Initials Seller's Initials (BOTH Buyer's and Seller's initials are required for Liquidated Damages to be in effect.)

22. **MEDIATION OF DISPUTES.** If a dispute arises out of this contract or a breach hereof Buyer and Seller agree to first attempt in good faith to settle the dispute by non-binding mediation under the rules of the AAA (American Arbitration Association) or JAMS (Judicial Arbitration and Mediation Services) before resorting to court action or binding arbitration. In mediation a mutually acceptable resolution is sought and a settlement is not imposed on the parties. Mediation fees shall be paid equally by Buyer and Seller. This paragraph shall not apply to any disputes within the jurisdictional limits of Small Claims Court. Any party who refuses to mediate as required by this paragraph shall not be entitled to any attorney's fees award under this contract. A court action to obtain a provisional remedy shall not be a violation of this paragraph provided the party commencing the action agrees, pending mediation, to an immediate stay of the court action after obtaining the provisional remedy. This paragraph is effective regardless of whether the parties also agree to arbitration.

23. **ARBITRATION OF DISPUTES.** Any dispute or claim in law or equity arising out of this contract or any resulting transaction shall be decided by neutral binding arbitration in accordance with the rules of the AAA or JAMS (determined by the first filing party) and not by court action except as provided by California law for judicial review of arbitration proceedings. The parties shall have the right to discovery in accordance with Code of Civil Procedure §1283.05. Arbitrators can award compensatory damages, punitive damages, and/or order specific performance, injunctive relief and declaratory relief. Judgment upon the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof. The following matters are excluded from arbitration hereunder: (a) a judicial or non-judicial foreclosure or other action or proceeding to enforce a deed of trust, mortgage, or real property sales contract as defined in Civil Code §2985; (b) an unlawful detainer action; (c) the filing or enforcement of a mechanic's lien; (d) any matter which is within the jurisdiction of a probate court or a small claims court; or (e) an action for bodily injury or wrongful death, or for latent or patent defects to which Code of Civil Procedure §337.1 or §337.15 applies. The filing of a judicial action to enable the recording of a notice of pending action, for order of attachment, receivership, injunction, or other provisional remedies, shall not constitute a waiver of the right to arbitrate under this provision. "NOTICE: BY INITIALING IN THE SPACE BELOW YOU ARE AGREEING TO HAVE ANY DISPUTE ARISING OUT OF THE MATTERS INCLUDED IN THE 'ARBITRATION OF DISPUTES' PROVISION DECIDED BY NEUTRAL ARBITRATION AS PROVIDED BY CALIFORNIA LAW AND YOU ARE GIVING UP ANY RIGHTS YOU MIGHT POSSESS TO HAVE THE DISPUTE LITIGATED IN A COURT OR JURY TRIAL. BY INITIALING IN THE SPACE BELOW YOU ARE GIVING UP YOUR JUDICIAL RIGHTS TO DISCOVERY AND APPEAL, UNLESS THOSE RIGHTS ARE SPECIFICALLY INCLUDED IN THE 'ARBITRATION OF DISPUTES' PROVISION. IF YOU REFUSE TO SUBMIT TO ARBITRATION AFTER AGREEING TO THIS PROVISION, YOU MAY BE COMPELLED TO ARBITRATE UNDER THE AUTHORITY OF THE CALIFORNIA CODE OF CIVIL PROCEDURE. YOUR AGREEMENT TO THIS ARBITRATION PROVISION IS VOLUNTARY."
"WE HAVE READ AND UNDERSTAND THE FOREGOING AND AGREE TO SUBMIT DISPUTES ARISING OUT OF THE MATTERS INCLUDED IN THE 'ARBITRATION OF DISPUTES' PROVISION TO NEUTRAL ARBITRATION."
Buyer's Initials Seller's Initials (BOTH Buyer's and Seller's initials are required for Arbitration of Disputes to be in effect.)

Buyer and Seller acknowledge that they have not received or relied upon any representation by Broker(s) regarding this paragraph and that they have been advised by Broker(s) to seek legal advice regarding arbitration.

24. **HOME WARRANTY PLANS.** Buyer and Seller acknowledge that they are aware of the availability of home warranty plans which provide limited coverage against system and appliance failures, but have not relied upon any representation by Broker(s) regarding the extent of coverage of any such plan. ☐ (If checked) A one-year home warranty plan will be purchased at a cost not to exceed $_____, to be paid by _____. Any additional costs are to be borne by Buyer.

25. **TAX WITHHOLDING.** If Seller is a foreign person, as defined in the Foreign Investment in Real Property Tax Act (FIRPTA), Buyer must, unless an exemption applies, withhold from Seller's proceeds ten percent (10%) of the gross sale price of the Property. Also, the California Revenue and Taxation Code requires Buyer to withhold from Seller's proceeds three and one-third percent (3 1/3%) of the gross sale price, unless Seller signs an affidavit stating that the Property has been Seller's principal residence or another exemption applies. Prior to Close of Escrow, Seller and Buyer shall deliver to Escrow Agent all documentation reasonably necessary to carry out the provisions of these laws. Buyer is authorized to deduct from Seller's proceeds any amounts required thereunder.

Buyer's Initials    Seller's Initials         **SELLING BROKER'S COPY**                Page 6 of 7
                                    Copyright © 2003 San Francisco Association of REALTORS®      (REV. 10/03)

JUL-01-2004 09:50 AM                                                    P.06

Property Address: 1801 Turk St. San Francisco, CA                Date: 5.19.04

26. **ATTORNEYS' FEES.** In any action, proceeding or arbitration between Buyer and Seller arising out of this contract, the prevailing party shall be entitled to reasonable attorney fees and costs from the non-prevailing party.

27. **TIME.** Time is of the essence. All references in this contract to "days" refer to calendar days.

28. **SELLER TERMINATION.** Termination by Seller as provided for herein shall be effected only by delivery of a written notice of termination to Buyer, which provides a 24-hour period to perform contractual term(s) or remove contingency(ies). In the event that Buyer does not perform as noticed, this contract shall be of no further force or effect, and all funds, documents and instructions held by Seller, Buyer, Broker(s) or Escrow Agent shall be promptly returned to the person who delivered the same to the holder, unless otherwise expressly provided for herein. Any escrow or title company charges and fees shall be borne by Buyer.

29. **BROKERS.** Nothing in this contract shall be deemed or construed to make Broker(s) or Real Estate Agent(s) a party to the agreement between Buyer and Seller. The term Real Estate Agent as used in this contract shall mean the licensed individual(s) who have personally served as agent(s) for either the Buyer or the Seller in the preparation, negotiation and review of this contract.

30. **NOTICE AND DELIVERY.** All notices by a party under this contract, including but not limited to any termination notice by Buyer or Seller, shall be in writing and effective only upon actual receipt by the other party or that party's Real Estate Agent. Delivery by any method (personal, mail, fax, etc.) other than e-mail is effective.

31. **GENERAL PROVISIONS.** This contract contains the entire agreement of the parties and any agreement or representation respecting the Property or the duties of Buyer and Seller in relation thereto which is not expressly set forth herein is null and void. No amendment to or modification of this contract shall be valid or enforceable unless in writing and signed by Buyer and Seller. This contract shall be binding upon and inure to the benefit of the parties' respective heirs, successors and assigns.

32. **ACKNOWLEDGMENT OF RECEIPT.** The parties hereby acknowledge receipt of a copy of this contract and certify that they have read and understand its provisions. The parties hereby consent to disclosure of the sales price and terms of this contract after Close of Escrow.

33. **ADDITIONAL TERMS AND CONDITIONS** including all attached Addenda signed by Buyer and Seller shall be deemed a part of this contract. ☐ (If checked) Buyer's Inspection Advisory (CAR Form BIA) is an Addendum to this contract.

*See Attached*

34. **EXPIRATION.** This offer shall be deemed revoked unless a copy of this contract with Seller's signature accepting it is delivered in person, or by mail or fax and personally received by Buyer or Buyer's Real Estate Agent within twenty-four (24) or _____ hours of presentation to Seller, or ☒ (if checked) not later than __5__ a.m./p.m. on __5.19.04__ (date).
A REAL ESTATE BROKER OR AGENT CAN ADVISE ON REAL ESTATE MATTERS ONLY. FOR LEGAL ADVICE, CONSULT AN ATTORNEY. NO REPRESENTATION IS MADE BY BROKER(S) AS TO THE LEGAL SUFFICIENCY, LEGAL EFFECT OR TAX CONSEQUENCES OF THIS CONTRACT. THESE ARE QUESTIONS FOR AN ATTORNEY AND/OR AN ACCOUNTANT.

Buyer _____ Date 5-19-04  Buyer _____ Date 5-19-04

## ACCEPTANCE

The undersigned Seller hereby accepts the foregoing offer and agrees to sell the Property on the terms and conditions set forth herein, or ☒ (if checked) accepts on the above terms and conditions as amended by the counteroffer dated __5.25.04__

Seller agrees to pay to Listing Broker: the amount specified in a separate written agreement, or ☐ (if checked) _____
Listing Broker agrees to assign to Selling Broker: the amount specified in the MLS, or ☐ (if checked) _____
Compensation to Brokers is payable (a) upon recordation of the deed or other evidence of title transfer, or (b) if completion of the sale is prevented by default of Seller, upon Seller's default, or (c) if completion of the sale is prevented by default of Buyer, only if and when Seller collects damages from Buyer, by suit or otherwise, and then in an amount equal to one-half of the damages recovered, not to exceed the above compensation after deducting title and escrow expenses and any expenses of collection. Seller hereby irrevocably assigns to Brokers the compensation from Seller's proceeds and irrevocably instructs escrow holder to disburse those funds to Brokers at Close of Escrow. Commission instructions can be amended or revoked only with the consent of the Brokers. In any action, proceeding, or arbitration relating to the payment of compensation, the prevailing party shall be entitled to reasonable attorney's fees and costs. The undersigned Seller has read and acknowledges receipt of a copy of this contract, and authorizes Brokers to deliver a signed copy to Buyer.

Seller _____ Date 5.25.04  Seller _____ Date _____
**AGREED AS TO COMMISSIONS.** Broker(s) hereby accept the agreement for compensation stated above.

Listing Broker __Maxin Brokerage, Inc.__       Selling Broker __Maxin Brokerage, Inc.__

Real Estate Agent for Seller _____ Date 5/25/04  Real Estate Agent for Buyer _____ Date 5/25/04

Approved by Managing Broker _____ Date 5/25/04  Approved by Managing Broker _____ Date 5/25/04

### SELLING BROKER'S COPY

Copyright © 2003 San Francisco Association of REALTORS®

Page 7 of 7
(Rev. 10/03)

JUL-01-2004 09:51 AM                                          P.09

# ADDENDUM 1

RE:     Purchase Agreement with Counter Offer executed May 20, 2004, between Linda Erkelens and Ronald Dion as Buyer and Craig Lipton on behalf of the co-tenancy that owns 1801 Turk Street as Seller for the property located at 1801 Turk Street, San Francisco, CA.

Pertaining to item 33, Additioonal Terms and Conditions:

1.      Linda K. Erkelens is a licensed Real Estate Broker.

2.      Seller to cooperate with Buyer's 1031 exchange at no cost or liability to seller.

3.      Seller to complete Rent Board petitions for O&M and Capital Improvements.

4.      Buyer and Seller agree that the energy conservation work has been completed.

5.      The washers and dryers are included in the purchase.

Buyer: _____     Date:
        Linda Erkelens

Buyer: _____     Date: 5-19-04
        Ronald Dions

Seller: _____    Date: 5/25/04
        Craig Lipton
        For all Co-tenants

## Counter Offer

**THIS IS INTENDED TO BE A LEGALLY BINDING AGREEMENT WITH SIGNIFICANT IMPACT ON YOUR RIGHTS AND OBLIGATIONS. YOU ARE ENCOURAGED TO READ IT CAREFULLY.**

Craig Lipton on behalf of the co-tenancy that owns 1801 Turk Pine Street ("Seller") makes the following Counter Offer to the Offer contained in the Purchase Agreement executed by Linda Erkelens and Ronald Dions ("Buyer") on May 19, 2004, relating to that certain real property and improvements thereon (the "Property") located at 1801 Turk Street in the City of San Francisco, County of San Francisco, State of California.

The terms and provisions of the aforementioned Purchase Agreement are hereby accepted as to all terms and provisions except as follows:

1. <u>Contingency Period and Increased Deposit:</u>  If Buyer does not remove ALL OF THE CONTINGENCIES IN THE CONTRACT (including the financing contingency) and increase Buyer's deposit to $100,000 and re-execute the liquidated damages provision of the contract within 21 calendar days from acceptance, Seller may, at Seller's sole discretion, cancel this agreement and Buyer's entire deposit shall be returned.

2. <u>Additional Items:</u>  (a). One of the Sellers is a licensed California real estate agent, (b).  Seller shall complete the renovation of unit #9 at Seller's expense.

The foregoing terms and conditions supersede and replace any inconsistent provisions in the Purchase Agreement.  All other terms and conditions of the Purchase Agreement shall remain in full force and effect.  The Purchase Agreement and this Counter Offer taken together shall constitute the entire agreement of the parties.

This Counter Offer shall expire and shall be deemed null and void unless Buyer accepts the same in writing and advises Seller, by fax or by hand delivery with an executed copy of this Counter Offer not later than 11:00 a.m. on or before May 20, 2004; in such event neither Seller nor Buyer shall have any further rights or obligations hereunder.  Until notification of

acceptance, Seller shall remain free to review and accept other offers, to revoke this Counter Offer and/or make other Counter Offers.

The date on which Buyer accepts this Counter Offer in writing shall be "Effective Date" of the Purchase Agreement between Seller and Buyer. Seller hereby acknowledges receipt of an executed copy of this Counter Offer.

Seller: Craig Lipton
For all Co-tenants                            Date: 5/25/04

Buyer accepts and agrees to the terms and conditions set forth in this Counter Offer and agrees to purchase the Property on the terms and conditions in the aforementioned Real Estate Purchase Contract as modified by the provisions of the Counter Offer.

Buyer hereby acknowledges receipt of an executed copy of this Counter Offer.

Buyer: Linda Erkelens                         Date: 5/25/04

Buyer: Ronald Dions                           Date: 5-25-04

NO REPRESENTATION IS MADE BY AGENT AS TO THE LEGAL EFFECT OF VALIDITY OF ANY PROVISION OF THE COUNTER OFFER. A REAL ESTATE BROKER IS QUALIFIED TO GIVE ADVICE ON REAL ESTATE MATTERS. IF YOU DESIRE LEGAL OR TAX ADVICE, CONSULT YOUR ATTORNEY OR TAX ADVISOR.

JUL-01-2004 09:53 AM                                                P.12

## CONTINGENCY REMOVAL DOCUMENT

To:        Craig Lipton, for all co-tenants who own 1801 Turk, "Seller"
From:      Linda Erkelens and Ronald W. Dion, "Buyer"
Date:      June 13, 2004
Subject:   Purchase Agreement with Counter Offer executed May 20,
           2004, between Linda Erkelens and Ronald Dion as Buyer
           and Craig Lipton on behalf of the co-tenancy that owns 1801
           Turk Street as Seller for the property located at 1801 Turk
           Street, San Francisco, CA.

1.   Buyer hereby removes the contingencies in Section 8 (Title
     Report), Section 11.A (Pest Control Inspection), Section 12.H,
     (Rental Agreements), Section 11.L (Income and Expense
     Statement), Section 12.C (Inspections by Contractors, etc.), Section
     13.A (RRR Report) and Section 16.C (TDS) of the Contract.

Buyer acknowledges that upon mutual execution of this document, the
contract for the purchase and sale of 1801 Turk Street, San Francisco,
California shall have no remaining contingencies and Buyer shall
increase Buyer's deposit to $100,000. Said deposit shall become non-
refundable and serve as liquidated damages (per the terms of Section 21
of the Purchase Agreement) should the Buyer fail to complete the
purchase of the property per the terms of the Purchase Agreement and
Counter Offer. All other terms and conditions of the sale included in
the Purchase Agreement and Counter Offer shall remain in full force
and effect.


Buyer: _____    Date: 6/13/04
        Linda Erkelens

Buyer: _____    Date: 6-13-04
        Ronald Dions

Seller: _____   Date: 6/13/04
        Craig Lipton
        For all Co-tenants

# EXHIBIT 5

# MCINTOSH PROPERTY SERVICES

David Sweeney
Clear Channel Outdoors
1601 Maritime Street
Oakland, CA 94607

February 14, 2007

Re: 1801 Turk Street, San Francisco, CA. 94115

Dear David:

This is to again notify you that we will not be renewing the lease on 1801 Turk
Street. We are open to negotiating a new lease but do not intend to roll the lease
over into another 5 year period beyond its current expiration of July 31, 2007.

Please call me if you have any further questions.

Linda Erkelens and Ronald Dion
Owners

APARTMENT RENTALS
REAL ESTATE BROKER



ARKANSAS STREET
FRANCISCO
CALIFORNIA 94107-2846
415-826-4011
FAX 415-826-4087



ERK 00019

# EXHIBIT 6



# McIntosh PROPERTY SERVICES

RECEIVED
JUN 1 4 2007
REED SMITH LLP

May 31, 2007

Patrick Powers
Clear Channel Outdoors
555 12th Street Suite 950
Oakland, CA 94607

Dear Mr. Powers,

This is to remind you that as of July 31st 2007, the lease of Clear Channel Outdoors of the billboard at 1801 Turk is terminated. Please make arrangements to remove the billboard and your lock box from our gate by that time.

We are retaining the permit #144724477.

Thank you very much.

Sincerely yours,

Linda K. Erkelens

19 th

APARTMENT RENTALS
REAL ESTATE BROKER

390 ARKANSAS STREET
SAN FRANCISCO
CALIFORNIA 94107-2846
415-826-4011
FAX 415-826-4067



EXHIBIT 8
We Linda K Erkelens
Date 7/14/08
Oyyes N. Do, CSR No. 12447

ERK 00016

# EXHIBIT 7

# APPROVED
### Dept of Building Insp.

JUL 1 8 2007

**APPLICATION FOR BUILDING PERMIT** CITY AND COUNTY OF SAN FRANCISCO
**ADDITIONS, ALTERATIONS OR REPAIRS** DEPARTMENT OF BUILDING INSPECTION

FORM 3 ☐ OTHER AGENCIES REVIEW REQUIRED

FORM 8 ☐ OVER-THE-COUNTER ISSUANCE

APPLICATION IS HEREBY MADE TO THE DEPARTMENT OF BUILDING INSPECTION OF SAN FRANCISCO FOR PERMISSION TO BUILD IN ACCORDANCE WITH THE PLANS AND SPECIFICATIONS SUBMITTED HEREWITH AND ACCORDING TO THE DESCRIPTION AND FOR THE PURPOSE HEREINAFTER SET FORTH.

NUMBER OF PLANS

6/26/07    355865    ☒ 801 Turk    1153-001

126503    071801    $1,500    3000

**INFORMATION TO BE FURNISHED BY ALL APPLICANTS**

**LEGAL DESCRIPTION OF EXISTING BUILDING**

O    Apartment

**DESCRIPTION OF BUILDING AFTER PROPOSED ALTERATION**

O    Apartment — no sign

Clear Channel Outdoor Oakland    555 12th St    H-4    925-5400    921009    6/30/07

Clear Channel Outdoor    510 446 7714

Voluntary commencing and demolition of nonconforming
noncomplying general advertising sign per planning code
secs 101(b) 187(b) and 604(h). Once commenced
demolition should be completed in a reasonable time.

**ADDITIONAL INFORMATION**

N/A

N/A

IMPORTANT NOTICES    NOTICE TO APPLICANT

CHECK ONE PROPERTY BOX
☒ OWNER    ☐ ARCHITECT
☐ LESSEE    ☐ AGENT
☐ OTHER

**APPLICANT'S CERTIFICATION**

DUPLICATE

ERK 00043



CONDITIONS AND STIPULATIONS

Contact the district building inspector at the start of work call 558-6096. For plumbing inspection scheduling call 558-6054, for electrical inspection scheduling call 558-6030. This application is approved without site inspection, detailed plumbing or electrical plan review and does not constitute an approval of the building. Work authorized must be done in strict accordance with all applicable codes. Any electrical or plumbing work shall require appropriate separate permits.

By _____
NEIL FRIEDMAN, DBI

JUL 17 2007

To remove general at S (west-facing wall sign) and restore wall.
Sign Record #288        Jon Purvis 7/3/07

N/A
W. Bug___ 6/26/07

N/A

N/A : Street Space deferred to Contractor

BSM___ EPT 6/26/07

N/A

CENTRAL PERMIT BUREAU
1660 Mission Street
San Francisco, California 94103

**CITY AND COUNTY OF SAN FRANCISCO**
**DEPARTMENT OF BUILDING INSPECTION**
(415)558-6088

**Receipt No:** 1126685

**Application/Permit No:** M781755

PERMIT IS GRANTED TO

| ERECT | ALTER BUILDING |
| DEMOLISH BUILDING | GRADE |
| LOWER CURB X | OCCUPY STREET SPACE |
| EXCAVATE STREET OR SIDEWALK | |
| HOUSE NUMBER CERTIFICATE | |

ERECT SIGN  DATE OF ISSUE  19-JUL-07

FILING FEE RECEIPT #

POST NOTICE

REPAIR OR CONSTRUCT SIDEWALK

THIS PERMIT IS GRANTED IN ACCORDANCE WITH
PROVISIONS OF THE CHARTER AND ORDINANCES OF
THE CITY AND COUNTY OF SAN FRANCISCO AND/OR
THE CURRENT STANDARD SPECIFICATIONS OF THE
DEPARTMENT OF BUILDING INSPECTION

* ADDITIONAL INFORMATION REGARDING SPECIFIC
  PERMITS IS GIVEN ON THE BACK OF THIS FORM.

SUPPLEMENTAL FEE PAID:

| FINAL PLAN CHECK | EXPEDITER FEE | PENALTY |
| STRUCTURAL LTR | DCP FEE | |

OWNER:

DBI P/C PAID AT FILING

AUDITED FOR REFUND

LOCATION OF JOB:
STREET ADDRESS:

1801   TURK   ST

HOUSE NUMBER:  EXISTING

1153/001

ASSESSOR
BLOCK/LOT

ST SPACE                    164.16
CPB PROCESSING FEE           20.00

METES AND BOUNDS

| FRONTAGE FT | # STORIES | TYPE | LEGAL OCCUPANCIES |

BUILDING USE                              ESTIMATED COST $          .00

SIDEWALK SQ FTGE          ST SPACE LINEAR FT   40   S FT CURB SECT TO BE LOWERED

WORK MUST COMMENCE ON BUILDING WITHIN  90 days  OF DATE OF ISSUANCE OF THIS PERMIT,
UNLESS EXTENSION AUTHORIZED IF UNDER ENFORCEMENT ORDERS SPECIAL TIME PERIODS WHERE
SPECIFIED WILL APPLY

TIME FOR COMPLETION OF WORK UNDER THIS BUILDING PERMIT EXPIRES __ Months __ AFTER DATE OF
ISSUANCE IF UNDER ENFORCEMENT ORDERS SPECIAL TIME PERIODS WHERE SPECIFIED WILL APPLY
NOTE STREET SPACE PERMIT EXPIRES ON COMPLETION OF WORK OR WHEN REVOKED BY DIRECTOR OF
PUBLIC WORKS SEE BACK OF FORM FOR OTHER TIME LIMITS )

SANTOS & URRUTIA ASSOCIATES 415-
64)-0122
2451 HARRISON STREET
SAN FRANCISCO CA 94110

PERMIT   1126685

| APPEAL | |
| GENERAL | |
| PERMIT | |
| BUREAU 01 | FANGERENDA |

SUBTOTAL OF FEES WITH APPLICABLE SURCHARGES        $185.18

| SURCHARGE | 0.00 |
| BOA SURCHARGE | 1.02 |

SUBTOTAL OTHER FEES
TOTAL        $        $185.18

*SEPARATE PERMITS MUST BE OBTAINED FOR ELECTRICAL, PLUMBING OR OTHER RELATED WORK*

# City and County of San Francisco

## DEPARTMENT OF BUILDING INSPECTION

# J O B   C A R D



OFFICE HOURS: THE BUILDING INSPECTION IS OPEN DAILY, MONDAY THRU FRIDAY, *FROM 7:30 a.m. TO 5:00 p.m.* DISTRICT BUILDING INSPECTORS KEEP OFFICE HOURS DAILY, MONDAY THRU FRIDAY, *FROM 7:30 a.m. TO 8:30 a.m. AND FROM 3:00 p.m. TO 4:00 p.m.*

**REQUESTS FOR INSPECTIONS ARE TAKEN ONLY DURING THE HOURS OF 8:30 A.M. TO 3:00 P.M. BY CALLING (415) 558-6096**

APPLICATION NO. _200704 25 5493_    PERMIT NO. _110986 5 0118_    ISSUED _____

JOB ADDRESS: _1801 Turk St_    BLOCK: _____    LOT: _____

NATURE OF WORK: _____

_____

_____

_____

WORK PERMITTED UNDER AUTHORITY OF THIS BUILDING PERMIT NUMBER MUST START BY 90 DAYS AND BE COMPLETED BY _____

WORK UNDERWAY MUST BE INSPECTED AT LEAST EVERY NINETY (90) DAYS IN ORDER TO PREVENT EXPIRATION DUE TO ABANDONMENT OF WORK.

EXTENSIONS OF THE "START" & "COMPLETE WORK" DATES OF THIS BUILDING PERMIT NUMBER MAY BE GRANTED UPON WRITTEN REQUEST PRIOR TO THE DATES NOTED ABOVE.

For information on the Permit Process, Building Plans Review, Access Issues, etc., please see page 4 of this JOB CARD for useful and appropriate telephone numbers.

*ELECTRICAL & PLUMBING WORK MUST HAVE PERMITS SEPARATE FROM A BUILDING PERMIT.*

*KEEP THIS CARD POSTED IN A CONSPICUOUS PLACE ON THE JOB SITE AT ALL TIMES. PLANS AND PERMIT DOCUMENTS SHALL BE ON THE JOB SITE AT ALL TIMES WHEN WORK IS IN PROGRESS. AFTER COMPLETION OF WORK, RETAIN THIS CARD FOR YOUR RECORDS.*

ERK 00046

CENTRAL PERMIT BUREAU
1660 Mission Street
San Francisco, California 94103

CITY AND COUNTY OF SAN FRANCISCO
DEPARTMENT OF BUILDING INSPECTION
(415)558-6088

Receipt No: 1126563
Application/Permit No: 200706285493

PERMIT IS GRANTED TO

ERECT  X  ALTER BUILDING          ERECT SIGN   DATE OF ISSUE  18-JUL-07
DEMOLISH BUILDING      GRADE                    FILING FEE RECEIPT # 366865
LOWER CURB      OCCUPY STREET SPACE
EXCAVATE STREET OR SIDEWALK        POST NOTICE
HOUSE NUMBER CERTIFICATE      REPAIR OR CONSTRUCT SIDEWALK

SUPPLEMENTAL FEE PAID:
    FINAL PLAN CHECK       EXPEDITER FEE       PENALTY
    STRUCTURAL LTR  X  DCP FEE

OWNER:
CLEAR CHANNEL OUTDOOR          (415)642-7722
LOCATION OF JOB:          HOUSE NUMBER:  EXISTING      ASSIGNED
STREET ADDRESS          1153/001                      BLOCK/LOT
1801  TURK  ST

THIS PERMIT IS GRANTED IN ACCORDANCE WITH
PROVISIONS OF THE CHARTER AND ORDINANCES OF
THE CITY AND COUNTY OF SAN FRANCISCO AND/OR
THE CURRENT STANDARD SPECIFICATIONS OF THE
DEPARTMENT OF BUILDING INSPECTION

* ADDITIONAL INFORMATION REGARDING SPECIFIC
  PERMITS IS GIVEN ON THE BACK OF THIS FORM

DBI P/C PAID AT FILING          $51.03

AUDITED FOR REFUND

                                        FFE
                          BUILDING                    75.40

METES AND BOUNDS

FRONTAGE FT    5  # STORIES     TYPE    R-1
BUILDING USE  APARTMENTS          LEGAL OCCUPANCIES
                          ESTIMATED COST $        3,000.00
SIDEWALK SQ FT OR          ST SPACE LINEAR FT   9 FT CURB SLOT TO BE LOWERED

WORK MUST COMMENCE ON BUILDING WITHIN    90 days    OF DATE OF ISSUANCE OF THIS PERMIT
UNLESS EXTENSION AUTHORIZED  IF  UNDER ENFORCEMENT ORDERS SPECIAL TIME PERIODS  WHERE
SPECIFIED WILL APPLY

TIME FOR COMPLETION OF WORK UNDER THIS BUILDING PERMIT EXPIRES    4 Months    AFTER DATE OF
ISSUANCE IF UNDER ENFORCEMENT ORDERS SPECIAL TIME PERIODS WHERE SPECIFIED WILL APPLY
(NOTE: THIS PERMIT EXPIRES ON COMPLETION OF WORK OR WHEN REVOKED BY DIRECTOR OF
PUBLIC WORKS. SEE BACK OF FORM FOR OTHER TIME LIMITS.)

SANTOS AND URRUTIA  642-7722          PERMIT  1126563

                                        SUBTOTAL OF FEES WITH APPLICABLE SURCHARGES      $101.40

                                        SURCHARGE                                          0.00
                                        SEOA SURCHARGE                                    26.00

APPEAL

CENTRAL
PERMIT
BUREAU  WM  BUFFASUSAN                  STRONG MOTION                                      1.60

                                        SUBTOTAL OTHER FEES                                1.60
                                        TOTAL                             $                $103.00

*SEPARATE PERMITS MUST BE OBTAINED FOR ELECTRICAL, PLUMBING OR OTHER RELATED WORK*
5603.18(Rev 10/95)

CENTRAL PERMIT BUREAU
1660 Mission Street
San Francisco, California 94103

CITY AND COUNTY OF SAN FRANCISCO
DEPARTMENT OF BUILDING INSPECTION
(415)558-6088

Receipt No: 1126685

Application/Permit No: M781225

## WARNING

Pursuant to Article 20 of Chapter 10, Part II of the San Francisco Municipal Code (Public Works Code), certain building permits may be issued only after the permittee analyzes the soil for the presence of hazardous wastes and, where applicable, certifies that it has completed site mitigation. No officer, employee, or agency of the City conducted the soil sampling and analysis, recommended site mitigation measures, conducted the site mitigation or checked or verified the reports submitted or work performed for accuracy, reliability or adherence to protocols. In issuing this permit, neither the city nor any of its officers or employees make any representation that the soil on or about the site is free from the presence of hazardous wastes. Nor does the City's implementation of this process relieve any person from their duties and responsibilities relating to hazardous waste contamination under state and federal law. Neither soil analysis pursuant to Article 20 of Public Works Code nor the issuance of this permit is intended to alter, extinguish, or transfer these responsibilities.

### ADDITIONAL INFORMATION

1 **Building Permit**
All requests for extension of time must be in writing to Director, Dept. of Building Inspection. Permits are issued subject to Appeal within 15 days to Board of Permit Appeals. Incur no expenses until right of Appeal has lapsed.

2 **Demolition Permit**
If Demolition involves Abandonment of Side Sewer Permittee must obtain a Side Sewer Permit. The Side Sewer will then be blocked at the Main Sewer.

3 **Permit to Lower Curb/To Excavate in Street or Sidewalk.**
Issued to construct Auto Runway as per Article 15, Public Works Code.
Excavation should be carried out in accordance with Article 8 of Public Works Code.
If issued with Building permit time for completion is same as Building. If issued alone, complete work within 6 months from date of Permit. Void if not started within 6 months.

4 **Street Space Permit.**
No refuse, excavated materials, concrete or mortar is to be disposed of upon Paved Streets, catch basins or into the City Sewer system. No material or equipment shall be left on Roadway of Police Tow-Away Zone during hours when Tow-Away Rule is in force. Gutters and Waterways must be kept clear.
All provisions of Section 724.0 of the Public Works Code are incorporated into this permit by reference.
Street and sidewalk areas occupied must not exceed a width 1/2 the width of the sidewalk plus 1/3 the width of the Roadway fronting.

5 **Permit to Repair or Construct Sidewalk.**
Handicap Ramps required in vicinity of Crosswalks per plan No.11-23, 982, Ch. 2. Before beginning any work under this permit contact your Area Inspector Tel. 554-5837. Permit valid for 3 months from date issued, unless extension authorized.
Some sidewalks have been constructed over a subsidewalk basement or other below ground structure. Issuance of this permit does not limit, modify, or alter in any way the responsibility of the property owner to ensure that such subsidewalk space complies with the San Francisco Building Code, Electrical Code, Fire Code, Mechanical Code, Plumbing Code, Public Works Code, and other Municipal Codes. In addition, issuance of this permit does not limit the liability of the property owner or his or her agent if work pursuant to this permit or the actions of a third party result in damage to the sidewalk or subsidewalk structure, consequently, permittees proceed at their own risk. The City and County of San Francisco makes no representations that issuance of a sidewalk permit will or will not directly or indirectly affect a subsidewalk structure. The Department of Building Inspection, in conjunction with the Department of Public Works, issues permits to construct or alter subsidewalk spaces separately from a sidewalk permit. Property owners are encouraged to seek the advice of qualified professionals to independently analyze the structural integrity of subsidewalk space and determine whether such spaces should be improved or modified.

6 **Hold Harmless Clause.**
The Permittee(s) by acceptance of this permit, agree(s) to indemnify and hold harmless the City and County of San Francisco from and against any and all claims, demands and actions for damages resulting from operations under this permit, regardless of negligence of the City and County of San Francisco, and to assume the defense of the City and County of San Francisco against all such claims, demands and actions.

BOARD OF PERMIT APPEALS STIPULATIONS

ERK 00048

# EXHIBIT 8

# ReedSmith

Scott D. Baker
Direct Phone: 415.659.5901
Email: sbaker@reedsmith.com

Reed Smith LLP
Two Embarcadero Center
Suite 2000
San Francisco, CA 94111-3922
415.543.8700
Fax 415.391.8269

July 20, 2007

**VIA FACSIMILE**
**CERTIFIED MAIL/RETURN RECEIPT REQUESTED**
**REGULAR MAIL**

Linda K. Erkelens
McIntosh Property Services       —
390 Arkansas Street
San Francisco, California 94107-2846



Re:    CCO Billboard at 1801 Turk

Dear Ms. Erkelens:

You previously wrote Clear Channel Outdoor ("CCO") on May 31, 2007 purporting to terminate as of July 31, 2007 "the lease of Clear Channel Outdoors of the billboard at 1801 Turk," and asking that CCO "make arrangements to remove the billboard and [] lock box from our gate by that time." As you know, the Lease Agreement dated January 1, 1984 ("Lease") provides that:

> 8.    It is agreed between the parties that Lessee shall remain the owner of all advertising signs, structures, and improvements erected or made by Lessee, and that, notwithstanding the fact that the same constitute real estate fixtures, the Lessee shall have the right to remove said signs, structures, and improvements at any time during the term of the Lease, or after the expiration of this Lease."

In light of your termination notice, the Lease provisions, and your specific request, please be advised that CCO intends to exercise its rights and will remove all of its signs, structures and improvements from the premises commencing on July 30, 2007 pursuant to the enclosed permit. Please make all necessary arrangements to allow for CCO's crew to undertake this work. Any interference with CCO's exercise of its rights will subject the property owners, and anyone who may assist them, to liability.

Please be further advised that the property owners may not use CCO's property for any purpose. Any use of CCO's property by the property owners or any agent of theirs shall be the basis for additional claims by CCO.

Finally, you erroneously assert that "[w]e" – presumably a reference to the owners of 1801 Turk -- "are retaining the permit #144724477." As you mentioned during our prior phone call, your reference to permit #144724477 is a typographical error, as you had intended to reference CCO's original permit for the erection of CCO's billboard at 1801 Turk, permit no. 214477. As you must know, because CCO

NEW YORK ♦ LONDON ♦ LOS ANGELES ♦ PARIS ♦ SAN FRANCISCO ♦ WASHINGTON, D.C. ♦ PHILADELPHIA ♦ PITTSBURGH ♦ OAKLAND
MUNICH ♦ PRINCETON ♦ NORTHERN VIRGINIA ♦ WILMINGTON ♦ NEWARK ♦ MIDLANDS, U.K. ♦ CENTURY CITY ♦ RICHMOND

r e e d s m i t h . c o m

DOCSSFO-12465160.1-CMORGAN 7/20/07 3:35 PM

Linda K. Erkelens
July 20, 2007
Page 2

**ReedSmith**

is voluntarily removing its general advertising sign at 1801 Turk, the sign cannot be rebuilt.  The San
Francisco Planning Code, at Section 604(h), explicitly prohibits this:

> A sign which is voluntarily destroyed or removed by its owner or which is required by
> law to be removed may be restored only in full conformity with the provisions of this
> Code....A general advertising sign that has been removed shall not be reinstalled,
> replaced, or reconstructed at the same location, and the erection, construction, and/or
> installation of a general advertising sign at that location to replace the previously existing
> sign shall be deemed to be a new sign in violation of Section 611(a) of this Code....[S.F.
> Plan. Code §604(h), ¶2]

  If you intend any response, please provide it to us in writing by no later than July 24, 2007 as
CCO is in the process of scheduling equipment and personnel.  We will deem your silence to be
acquiescence to CCO's removal of its property.

Very truly yours,

*Scott D. Baker/cmw*

Scott D. Baker

Enclosures

cc:    Laura Toncheff, Esq.





## CONDITIONS AND STIPULATIONS

CENTRAL PERMIT BUREAU
1660 Mission Street
San Francisco, California 94103

CITY AND COUNTY OF SAN FRANCISCO
DEPARTMENT OF BUILDING INSPECTION
(415)558-6088

Receipt No: 112668?
Application/Permit No: M781275

PERMIT IS GRANTED TO

ERECT    ALTER BUILDING    ERECT SIGN    DATE OF ISSUE    19-JUL-0?
DEMOLISH BUILDING    GRADE    · FILING FEE RECEIPT #
LOWER CURB   X   OCCUPY STREET SPACE
EXCAVATE STREET OR SIDEWALK    POST NOTICE
HOUSE NUMBER CERTIFICATE

THIS PERMIT IS GRANTED IN ACCORDANCE WITH
PROVISIONS OF THE CHARTER AND ORDINANCES OF
THE CITY AND COUNTY OF SAN FRANCISCO AND/OR
THE CURRENT STANDARD SPECIFICATIONS OF THE
DEPARTMENT OF BUILDING INSPECTION .

· ADDITIONAL INFORMATION REGARDING SPECIFIC
PERMITS IS GIVEN ON THE BACK OF THIS FORM.

SUPPLEMENTAL FEE PAID:

FINAL PLAN CHECK    EXPEDITER FEE    PENALTY
STRUCTURAL LTR    DCP FEE
OTHER :

DBI P/C PAID AT FILING

AUDITED FOR REFUND

ST. SPACE    164.16
CPB PROCESSING FEE    20.00

LOCATION OF JOB :    HOUSE NUMBER:  EXISTING    ASSUMED
STREET ADDRESS :    BLOCK/LOT

1801  TURK  ST    1153/001

METES AND BOUNDS

FRONTAGE FT    TYPE    ST SPACE COVERED    SFT OVER EXIST TO BE LOWERED
BUILDING USE    ESTIMATED COST $    .00
SIDEWALK SQ. FT OR    ST. SPACE LIN SHAFT    40    Months    AFTER DATE OF

TIME FOR COMPLETION OF WORK UNDER THIS BUILDING PERMIT EXPIRES
ISSUANCE, & UNDER ENFORCEMENT ORDERS (SPECIAL TIME PERIODS WHERE SPECIFIED) WILL APPLY
(NOTE: STREET SPACE PERMIT EXPIRES ON COMPLETION OF WORK OR WHEN REVOKED BY DIRECTOR OF
PUBLIC WORKS. SEE BACK OF FORM FOR OTHER TIME LIMITS.)

PERMIT    1126685

CENTRAL
PERMIT
BUREAU # :  YANBRENDA

SANTOS & URRUTIA ASSOCIATES 415-
642-7722

ADDRESS
2451  HARRISON STREET
SAN FRANCISCO CA  94110

SURCHARGE    0.00
BOA SURCHARGE    1.02

SUBTOTAL OF FEES WITH APPLICABLE SURCHARGES    $185.18

SUBTOTAL OTHER FEES
TOTAL    $    $185.18

*SEPARATE PERMITS MUST BE OBTAINED FOR ELECTRICAL, PLUMBING OR OTHER RELATED WORK*
9003-1 (Rev 10/95)

City and County of San Francisco

DEPARTMENT OF BUILDING INSPECTION

# JOB CARD



**OFFICE HOURS: THE BUILDING INSPECTION IS OPEN DAILY, MONDAY THRU FRIDAY,**
*FROM 7:30 a.m. TO 5:00 p.m. DISTRICT BUILDING INSPECTORS KEEP OFFICE HOURS DAILY,*
*MONDAY THRU FRIDAY, FROM 7:30 a.m. TO 8:30 a.m. AND FROM 3:00 p.m. TO 4:00 p.m.*

**REQUESTS FOR INSPECTIONS ARE TAKEN ONLY DURING THE HOURS OF**
**8:30 A.M. TO 3:00 P.M. BY CALLING (415) 558-6096**

APPLICATION NO. 200706 28 5893    PERMIT NO. 1124565 0117    ISSUED

JOB ADDRESS: 1801 Turk St    BLOCK: _____  LOT: _____

NATURE OF WORK: _____

_____

_____

_____

WORK PERMITTED UNDER AUTHORITY OF THIS BUILDING PERMIT NUMBER MUST START BY 90 DAYS
AND BE COMPLETED BY _____

WORK UNDERWAY MUST BE INSPECTED AT LEAST EVERY NINETY (90) DAYS IN ORDER TO PREVENT EXPIRATION
DUE TO ABANDONMENT OF WORK.

EXTENSIONS OF THE "START" & "COMPLETE WORK" DATES OF THIS BUILDING PERMIT NUMBER MAY BE GRANTED
UPON WRITTEN REQUEST PRIOR TO THE DATES NOTED ABOVE.

For information on the Permit Process, Building Plans Review, Access Issues, etc., please see page 4 of this
JOB CARD for useful and appropriate telephone numbers.

*ELECTRICAL & PLUMBING WORK MUST HAVE PERMITS SEPARATE FROM A BUILDING PERMIT.*

*KEEP THIS CARD POSTED IN A CONSPICUOUS PLACE ON THE JOB SITE AT ALL TIMES.*
*PLANS AND PERMIT DOCUMENTS SHALL BE ON THE JOB SITE*
*AT ALL TIMES WHEN WORK IS IN PROGRESS.*
*AFTER COMPLETION OF WORK, RETAIN THIS CARD FOR YOUR RECORDS.*

CENTRAL PERMIT BUREAU
1660 Mission Street
San Francisco, California 94103

CITY AND COUNTY OF SAN FRANCISCO
DEPARTMENT OF BUILDING INSPECTION
(415)558-6088

Receipt No: 11065v3
Application/Permit No: 200706285493

PERMIT IS GRANTED TO

ERECT  X  ALTER BUILDING        ERECT SIGN   DATE OF ISSUE   18-JUL-07
DEMOLISH BUILDING     GRADE                   FILING FEE RECEIPT #  3668865
LOWER CURB     OCCUPY STREET SPACE
EXCAVATE STREET OR SIDEWALK      POST NOTICE
HOUSE NUMBER CERTIFICATE          REPAIR OR CONSTRUCT SIDEWALK
SUPPLEMENTAL FEE PAID:

STRUCTURAL LTR  X    DCP FEE             PENALTY

OWNER:
CLEAR CHANNEL OUTDOOR                    (415)642-7722

LOCATION OF JOB:                HOUSE NUMBER:  EXISTING    ASSIGNED
STREET ADDRESS                                    BLOCK/LOT
1801  TURK  ST                                    1153/001

THIS PERMIT IS GRANTED IN ACCORDANCE WITH
PROVISIONS OF THE CHARTER AND ORDINANCES OF
THE CITY AND COUNTY OF SAN FRANCISCO AND/OR
THE CURRENT STANDARD SPECIFICATIONS OF THE
DEPARTMENT OF BUILDING INSPECTION

* ADDITIONAL INFORMATION REGARDING SPECIFIC
PERMITS IS GIVEN ON THE BACK OF THIS FORM.

DBI PVC PAID AT FILING                 $51.03
AUDITED FOR REFUND

FEE
BUILDING                               75.40

FIRST OF:              CONSTRUCTION TYPE    OCCUPANCY CODE
                       5              R-1

BUILDING USE APARTMENTS

SIDEWALK SQ. FT/SB     182. SPACE LINEAR FT.    3 FT. CURB SET TO BE LOWERED

ESTIMATED COST $        3,000.00

METERS AND BOARDS

LEGAL ORDINANCES

WORK MUST COMMENCE FOLLOWING WITHIN   90 days   OF DATE OF ISSUANCE OF THIS PERMIT
UNLESS EXTENSION AUTHORIZED BY LABOR ENFORCEMENT OFFICER.  SPECIAL TIME PERIOD OF-
SPECIFIED TIME APPLY.

TIME FOR COMPLETION OF WORK UNDER THIS BUILDING PERMIT EXPIRES   4 Months   AFTER DATE OF
ISSUANCE. FURTHER EXTENSION ORDERS SPECIAL TIME PERIODS IF SPECIFIED VALID APPLY.
(NOTE: SEE FRONT OR BACK OF WORK OR WORK OR WORK OR WORK REVOKED BY DIRECTOR OF
PUBLIC WORKS. SEE BACK OF FORM FOR OTHER TIME LIMITS.)

SANTOS AND URRUTIA 642-7722              PERMIT  1126563

APPRVAL
                                         CENTRAL
                                         PERMIT
                                         BUREAU/991  BUFKASUSAN

SUBTOTAL OF FEES WITH APPLICABLE SURCHARGES     $101.90

SURCHARGE                               0.00
BOA SURCHARGE                          26.00

STRONG MOTION                           1.60

SUBTOTAL OTHER FEES  $                   1.60
TOTAL                                 $103.00

FEE PAYOR
2451 HARRISON ST
ADDRESS
SF CA
CITY

*SEPARATE PERMITS MUST BE OBTAINED FOR ELECTRICAL, PLUMBING OR OTHER RELATED WORK*
5003-18(Rev.10/95)

February 27, 2007

Hi Sherm,

I apologize for the delay in getting back to you on Dion's sign and I'm also sorry we couldn't get together before I left; I'll be back from Spain March 13th and we'll see if we can catch-up then.

Regarding Dion's sign at Turk & Divisadero, we're very interested in taking it over when the present lease expires. It would be a very good fit for our plant, as we're lacking coverage in that part of the City so we're willing to pay more than usual.

We would normally offer $4,800 per year ($400/mo.) for a "street surface" 30-sheet (300 sq ft), but as I said, we like this sign due to its location relative to our City coverage, so we're willing to pay a premium for it - $7,200 per year ($600/mo.). Our normal offer of $4,800 per year is usually double what Clear Channel and CBS are paying, so we are proposing a very good offer for Ron.

What we propose would also be good for the building as well, as we propose completely removing the antiquated 30-sheet sign structure from the building; patching, painting and prepping the newly exposed area to receive adhesive vinyl. In this manner the advertisement would be attached directly to the prepared wall in the form of an adhesive vinyl, just like peel-off cabinet liner. The wall is prepped with an undercoat, similar to prepping a wall for wall-papering. There is no penetration of the wall or wear and tear on the property in any manner. This also provides a neat and clean advertisement.

The above proposal is based on a ten-year lease with a ten year option, along with annual 3% rental increases.

Let me know what you think and we'll go from there.

I'll give you a call after I get back and we'll get caught-up. Call Ray if you need anything in the meantime (Ray 650 759 2987 cell).


Thanks for thinking of us!


Kevin



# EXHIBIT 9

--oOo--

BOARD OF APPEALS

CITY AND COUNTY OF SAN FRANCISCO

STATE OF CALIFORNIA

LINDA ERKELENS,

          Appellants(s)

      vs.                  APPEAL NO. 07-128

DEPARTMENT OF BUILDING,        ITEM (11)

INSPECTION,

         Respondent

                  /

--oOo--

WEDNESDAY, OCTOBER 17, 2007

1801 Turk Street.  Protesting the issuance on July 18, 2007, to Clear Channel Outdoor, Permit to Alter a Building (on 21-unit razing and demolition of non-conforming, non -- complying general advertising sign per plans).

APPLICATION NO. 2007/06/28/5493

--oOo--

1    they were removed before but --
2        MR. FINNEY:    I can tell you.
3        COMMISSIONER GARCIA:    Well, wait. I'm
4    going to offer you a suggestion as to why they might
5    have been removed and it might have been because a cost
6    benefit curve.
7        There are lots of reasons why it could be
8    and a cost benefit curve -- let me finish, please.
9        It might have been that the income wasn't
10    worth some liability. So, I don't know why they were
11    removed but I would suggest to you that right now you
12    could probably get out from under any liabilities you
13    have and you could probably sell your structure to
14    another general advertising sign that would buy it and
15    assume all liabilities.
16        So, I don't think -- I don't buy into the
17    fact that your reason for not wanting -- for wanting to
18    remove the sign has to do with something -- had to do
19    with your liabilities.
20        I think it has to do with predatory pricing.
21    I think you feel that the fewer signs there are, the
22    more you're going to get to the signs you do have and
23    it's like I've been led to understand by people who are
24    into animal behavior that the reason dogs bury bones is
25    not because they want it, they don't want anybody else

1    to have it and I think you're burying this bone not
2    because you want it but because you want to make sure
3    that nobody else can have it and you are depriving these
4    people of a source of income they had and was a function
5    of the house that they bought.
6        The property they bought had that right
7    attached to it and when Prop G and later 604(h) came
8    along, it took that income away from them.
9        I'm not going to argue vested or anything
10    else. That's not where I'm trying to go with that but
11    I'm just trying to tell you that for this particular
12    Commission, the behavior manifested by Clear Channel is
13    not very attractive.
14        Thank you.
15        MR. FELDMAN:    Now we turn to the
16    audience for public comments.
17        Is there any member of the public who wishes
18    to address the Board? Oh, we have the City standing up
19    there? I didn't see you, sir.
20        MR. SANCHEZ:    Good evening, President
21    Knox, Members of the Board. Scott Sanchez, Planning
22    Department staff.
23        I'll be brief. I just wanted to clarify a
24    few issues. Seems in regards to the ownership question
25    we really have two issues here.

1        In regards to the ownership issue, we really
2    have two separate issues here. The first is the owner
3    authorization on the building permit application.
4        The second is in Section 604(h) which says
5    that the sign may be voluntarily removed by its owner
6    and if it is removed by its owner, what the consequences
7    are.
8        I just want to make it clear that there are
9    two separate and distinct issues there. I think the
10    Deputy City Attorney would like to follow up on that
11    perhaps a bit more.
12        The two other issues, in brief, I want to
13    say it -- restate, again, that Section 180(g) takes
14    general advertising signs, takes signs, non-conforming
15    and non-complying signs out of Sections 181 through 188
16    which deal with non-conforming and non-complying uses
17    and it places them in Section 604.
18        So, all -- the referral on the cite -- the
19    citings 183, 181 fully should be focusing on 604 and,
20    finally, I just wanted to clarify again this sign has
21    not yet been removed.
22        If it were to be removed, it could not be
23    replaced. I wanted to state that for the record again.
24        Thank you.
25        MS. VANIG:    I just want to make one

1    suggestion to this Board which is that I think the Board
2    need not reach the question both in this appeal and in
3    the previous one what the meaning of 604(h) is and,
4    specifically, what the meaning of the term "its owner"
5    means in 604(h).
6        If this Board is not satisfied that agency
7    form was filled out correctly or that there is adequate
8    assurance of owner consent in both of these appeals,
9    then the Board I think can overturn the Department's
10    action and uphold the appeal on that ground without
11    reaching the issue of what 604(h) and I would suggest
12    that course to this Board simply because I want to
13    reiterate my view that there's nothing ambiguous about
14    that provision.
15        Whatever the Department might be required to
16    do to satisfy itself that agreement between an owner
17    and a lessee is a separate issue and I think that that
18    is adequate to dispose of both appeals.
19        COMMISSIONER ALBRIGHT:    Ms. Vanig,
20    can I ask you about that? Because I think Mr. Finney
21    just argued that those provisions are -- actually would
22    be harmless or harmless error on the part of the -- of
23    Clear Channel in this case; but if I understood you
24    correctly, those errors in the permit and errors in the
25    agency document aren't actually harmless error.

1    I do think there are significant impediments
2 to an agreement but I would certainly pursue it and it's
3 possible that such a thing could be arrived at.
4    There are two parties to that discussion.
5 They've expressed a rather definite view of, you know,
6 the appeal of that option but if you're asking us if we
7 would proceed in good faith to explore that, we would.
8    COMMISSIONER GARCIA:    Yeah, because I
9 guess, obviously, you know where we're going with this.
10    This individual, this appellant, is going to
11 lose a stream of income and there are plenty of people
12 here tonight -- who are here tonight who face the same
13 thing and one gentleman got up here and spoke and he's
14 on social security and that's his source of income.
15    And I'm going to go ahead and suggest the
16 continuance and I'm going to hope that both side
17 negotiate in good faith and maybe something good will
18 come of it because, otherwise, I don't see any other
19 solution out of this and maybe in the mean time we will
20 have been able to craft some other solution to this.
21    So, I would move, Mr. President, with your
22 permission --
23    COMMISSIONER ALBRIGHT:    I'm sorry.
24 Can I just make one comment before you move?
25    COMMISSIONER GARCIA:    Yeah, please do.

Page 58

1    COMMISSIONER ALBRIGHT:    I just wanted
2 to say to Mr. Finney thank you for razing that Mr.
3 Boskovich was not necessarily an independent party.
4    I certainly didn't mean to call him up if
5 there was any issue that he was representing a party.
6 Thank you.
7    COMMISSIONER GARCIA:    With the
8 permission of the President who says he will withdraw
9 his motion, I will move that we continue this for one
10 month.
11    Is that enough time for you, Mr. Finney?
12 You can nod "yes" or would you prefer -- is that enough
13 time for you, Mr. Gladstone?
14    MR. GLADSTONE:    (Off-mike response).
15    COMMISSIONER GARCIA:    Would you allow
16 Mr. Gladstone to negotiate in your behalf -- on your
17 behalf?
18    VOICE IN AUDIENCE:    (Off-mike
19 response).
20    COMMISSIONER GARCIA:    Well, then why
21 don't we make it six weeks which would bring us to what?
22    PRESIDENT KNOX:    December 12th.
23    COMMISSIONER GARCIA:    Right.
24    We're up to nine cases.  This would make
25 ten.  We are going to continue this until December 10th

Page 59

1    -- 12th, I'm sorry, and we would pray that both sides
2 would try to seek a solution and would not deprive the
3 appellant of a source of income.
4    MR. FELDMAN:    Okay.
5    We have a motion then from Vice President
6 Garcia to continue the matter to December 12th.
7    On that motion, President Knox?
8    PRESIDENT KNOX:    Aye.
9    MR. FELDMAN:    Commissioner Haaland?
10    COMMISSIONER HAALAND:    Aye.
11    MR. FELDMAN:    And Commissioner Albright?
12    COMMISSIONER ALBRIGHT:    Aye.
13    MR. FELDMAN:    Thank you.
14    It's 4-to-0, then, to continue the matter to
15 December 12th.
16    COMMISSIONER GARCIA:    Thank you, Mr.
17 Finney.
18    MR. FELDMAN:    Any additional briefs to
19 be accepted?
20    PRESIDENT KNOX:    No.
21    MR. FELDMAN:    No additional briefs.
22    PRESIDENT KNOX:    No additional briefs,
23 no additional testimony, no additional public comment.
24    COMMISSIONER ALBRIGHT:    And only
25 other thing I'd like said is the case is settled.

Page 60

1    PRESIDENT KNOX:    Unless I'm mistaken,
2 it's going to be -- unless things change and
3 Commissioner Fong will be back then.
4    He may have some insights he would like to
5 share but the way I see this case, you can do one of two
6 things.
7    You can either just deny the permit, revoke
8 it and, boom!  Back to square one and it may deny the
9 appellants some income stream but it then is consistent
10 with our past -- with that earlier case or we could
11 grant the permit on the condition that it is not deemed
12 a voluntary removal of the sign by the owner and,
13 despite what Mr. Sanchez says for whom I have nothing
14 but the greatest respect, he could bring Mr. Badiner in
15 to tell us why we're wrong and not that he couldn't have
16 said we were wrong.
17    So, it's going to be one of those things, I
18 would think, but that case is over now.
19    MR. FELDMAN:    All right.
20    Ms. Erkelens is satisfied with whatever
21 result if she could withdraw her appeal, also.
22    PRESIDENT KNOX:    Right.
23    MR. FELDMAN:    Yes.
24    Okay.  So that matter is continued then to
25 December 12th.

Page 61

16  (Pages 58 to 61)



1    PRESIDENT KNOX:    Yes.
2    MR. FELDMAN:    Okay.
3        (CONCLUDED)
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
                                    Page 62

1            --oOo--
2        REPORTER'S CERTIFICATE
3
4        I, EASTELLER BRUIHL, CSR No. 3077, a California
5    Certified Shorthand Court Reporter for Star Reporting
6    Service, Inc., 703 Market Street, Suites 1003-1013, San
7    Francisco, California 94013, do hereby certify:
8        That the foregoing proceedings, Pages 1 through
9    to 63, were taken before me at the time and place
10   therein set forth; that all comments, objections and
11   statements made at the time of the proceedings were
12   recorded stenographically by me and were thereafter
13   transcribed;
14       That the foregoing is a true and correct
15   transcript of my shorthand notes so taken.
16       I further certify that I am not a relative or
17   employee of any attorney of the parties nor financially
18   interested in the action.
19       I declare under penalty of perjury by the laws of
20   the State of California that the foregoing is true and
21   correct.
22       Dated:
23
24       Easteller Bruihl, RPR, CSR No. 3077
25
                                    Page 63

# EXHIBIT 10

--o0o--

STATE OF CALIFORNIA

CITY AND COUNTY OF SAN FRANCISCO

BOARD OF APPEALS


LINDA ERKELENS,

        Petitioner,

    vs.                        APPEAL NO. 07-128

DEPARTMENT OF BUILDING

INSPECTION, PLANNING

DEPARTMENT APPROVAL,

        Respondents.

           —      —


APPLICATION NO. 2007/06/28/5493

WEDNESDAY, DECEMBER 12, 2007

Appealing the issuance on July 8, 2007, to Clear

Channel outdoor permit to alter a building on

21-unit apartment building; voluntary removal,

razing and demolition of non-conforming,

non-complying general advertising sign per plans



Page 30

1    Mr. Gladstone can prepare them.

2            COMMISSIONER FUNG:      This will be an

3    intent, then.

4            MR. PACHECO:     Very well.

5            We have a motion from Commissioner Fung to

6    revoke the subject permit with the finding as stated but

7    there will be a future adoption of findings with Mr.

8    Gladstone to prepare them and send them to the Office of

9    the City Attorney.

10           On that motion, President Knox?

11           PRESIDENT KNOX:  Pardon?

12           MR. PACHECO:     On that motion --

13           PRESIDENT KNOX:  Oh, aye.

14           MR. PACHECO:     Vice President Garcia?

15           VICE PRESIDENT GARCIA:     Aye.

16           MR. PACHECO:     Commissioner Albright?

17           COMMISSIONER ALBRIGHT:     Aye.

18           MR. PACHECO:     And Commissioner Haaland?

19           COMMISSIONER HAALAND:     Aye.

20           MR. PACHECO:     Thank you.  The vote is

21   5-to-0 and this permit is revoked with that finding and

22   to a future adoption of findings possibly in January or

23   February.

Page 32

1                            --o0o--

2                      REPORTER'S CERTIFICATE

3          I, EASTELLER BRUIHL, CSR No. 3077, a California

4    Certified Shorthand Court Reporter for Star Reporting

5    Service, Inc., 703 Market Street, Suites 1003-1013, San

6    Francisco, California 94013, do hereby certify:

7          That the foregoing proceedings were taken

8    before me at the time and place therein set forth; that

9    all comments, objections and statements made at the time

10   of the proceedings were recorded stenographically and

11   were thereafter transcribed;

12         That the foregoing is a true and correct

13   transcript of my shorthand notes so taken.

14         I further certify that I am not a relative or

15   employee of any attorney of the parties nor financially

16   interested in the action.

17         I declare under penalty of perjury by the laws

18   of the State of California that the foregoing is true and

19   correct.

20         Dated:    FEBRUARY 22, 2008.

21

22

23              Easteller Bruihl, RPR, CSR No. 3077

**EXHIBIT 11**



CCO0107